IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **BRANDON MONTGOMERY** ) | |
| AS PERSONAL REPRESENSATATIVE ) | |
| FOR THE ESTATE OF GARY MONTGOMERY ) | **COMPLAINT** |
| ) | |
| PLAINTIFF, ) | **AND** |
| vs. ) | |
| ) | **JURY DEMAND** |
| **THE DISTRICT OF COLUMBIA** ) | |
| Office of the Attorney General ) | |
| 441 4th Street, NW ) | |
| Washington, DC 20001 ) | |
| ) | |
| Serve on:      Muriel Bowser ) | |
| Mayor of the District of Columbia ) | |
| John A. Wilson Building ) | |
| 1350 Pennsylvania Avenue, NW ) | |
| Washington, DC 20004 ) | |
| ) | |
| Karl A. Racine ) | |
| Attorney General for the District of Columbia | |
| 441 4th Street, NW, Suite 1100 South ) | |
| Washington, DC 20001 ) | |
| ) | |
| **BRIAN WISE** ) | |
| Individually and in his official capacity ) | |
|   as a Metropolitan Police Officer ) | |
| 300 Indiana Avenue, NW ) | |
| Washington, DC 20001 ) | |
| ) | |
| **HOSAM NASR** ) | |
| Individually and in his official capacity ) | |
|   as a Metropolitan Police Officer ) | |
| 300 Indiana Avenue, NW ) | |
| Washington, DC 20001 ) | |
| ) | |
| **OFFICERS JOHN DOE** ) | |
| Individually and in his official capacity ) | |
|   as a Metropolitan Police Officer ) | |
| 300 Indiana Avenue, NW ) | |
| Washington, DC 20001 ) | |
| ) | |
| DEFENDANTS. ) | |
| ) | |

## COMPLAINT AND JURY DEMAND

### INTRODUCTION

1.      This civil rights lawsuit is brought by the personal representative of the estate of Gary Montgomery, who was a 55-year old mentally disabled man who in February of 2012 was arrested and incarcerated for five and a half years for a murder he did not commit and of which he was completely innocent.  After five and a half years of being incarcerated at the District of Columbia Jail and St. Elizabeths Hospital, respectively, a District of Columbia jury found Mr. Montgomery not guilty of the murder of Ms. Deoni JaParker Jones.

2.      Mr. Montgomery's loss of liberty for over half a decade was caused by the violation of his rights under the Fourth and Fifth Amendments to the United States Constitution, and the unlawful discrimination against him as a person with a mental illness by the District of Columbia Metropolitan Police Department (MPD) during its February 4, 2012 and February 10, 2012 interrogations of him and its odious violation of Mr. Montgomery's rights under *Brady v. Maryland*, 373 U.S. 83 (1967).

3.      Within hours of the murder, the Defendants were in possession of evidence that demonstrated Mr. Montgomery was not the person who had murdered Ms. Jones. However, the Defendants failed to pursue the actual killer of Ms. Jones, and instead unconstitutionally fabricated and otherwise coerced Mr. Montgomery to make statements (that the MPD and the government would later claim were inculpatory), and intentionally withheld exculpatory evidence MPD obtained hours after the murder from Mr. Montgomery's defense lawyers until 48 and 72 hours before the start of his trial on July 31, 2017.

4.      This exculpatory evidence was intentionally suppressed and not disclosed to Mr. Montgomery's defense counsel at the time of his February 23, 2012 Preliminary and Detention Hearings.

5.      The exculpatory statement of an eyewitness to the murder who physically fought with the killer in an attempt to subdue him and hold him for police was given to Mr. Montgomery's defense counsel only 72 hours before the start of his July 31, 2017 trial.

6.      During the investigation of this case, neither Defendant Brian Wise nor any other MPD officer— in five and a half years—ever asked the eyewitness who pursued and briefly subdued the murderer to participate in an identification procedure.

7.      A critical (and exculpatory) five minute piece of video footage showing the actual killer fleeing from the scene, dressed consistently with what the eyewitness to the murder told police minutes after the murder, was not provided to Mr. Montgomery's defense counsel until 48 hours before his trial, depriving them of the opportunity to locate other video footage of the killer fleeing the murder scene early in the case, otherwise investigate important leads, and make use of these materials at the preliminary/detention hearing and other crucial stages in the criminal case.

8.      Five and a half years of suppression meant that other potential video footage of the killer that might have been available earlier would have been recorded over and was therefore forever lost to the defense.

9.      Because so much time elapsed, this unlawful suppression also meant witnesses' memories faded and crucial leads had gone cold and unexplored.

10.     DNA testing was conducted on clothes MPD recovered from the crime scene—clothes MPD believed were left by the murderer—and Defendants obtained a full male DNA profile. This full male DNA profile did not match the decedent or Mr. Montgomery and the results excluded Mr. Montgomery as the murderer.

11.     The Defendants, in 2012 and at no time thereafter made any attempts to compare the DNA profile obtained from the clothing to the DNA profile of another suspect who two callers/tipsters

identified and which suspect Defendant Wise interviewed five days after the murder, who placed himself on the scene of the murder during that interview.

12.     Defendants also failed to enter the DNA profile from the clothing found at the murder scene into CODIS. The Defendants never looked beyond the "ready-made" suspect, despite compelling evidence that Mr. Montgomery was not the person responsible for Ms. Jones' murder.

13.     During Mr. Montgomery's February 4, 2012 and February 10, 2012 interrogations, he exhibited obvious signs of active psychosis.

14.     In gross violation of the United States Constitution, Defendant Brian Wise fed Mr. Montgomery non-publically disclosed details about the murder known only to the killer and the police and then used Mr. Montgomery's fractured thoughts and sentences—the result of over eight hours of interrogation—to paste together what Defendants would declare were incriminating and inculpatory statements.

15.     Defendants Wise and Nasr manufactured a false "confession" and perjured themselves at trial about Mr. Montgomery's statements and the circumstances surrounding these statements.

16.     The fact that Mr. Montgomery had a mental illness was plainly apparent to Defendant Brian Wise who conducted the nearly six-hour interrogation of Mr. Montgomery on February 4, 2012.

17.     Mr. Montgomery's psychosis, marked by fractured thoughts and disconnected sentences, prompted Defendant Brian Wise to ask Mr. Montgomery if he had a mental illness. In response to another inquiry by Detective Wise about whether Mr. Montgomery had a mental health issue, Mr. Montgomery told Detective Wise, "if I'm talkin to myself I'll- you know, I'll go to a psychiatrist."

18.     The video footage of Mr. Montgomery's February 10, 2012 interrogation shows him in an even more agitated psychotic state, hearing voices and speaking to those voices.

19.     Defendant Brian Wise employed coercive interrogation techniques that were unconstitutional and discriminatory because he knew or should have known Mr. Montgomery had a mental illness and

needed an accommodation to ensure Mr. Montgomery understood the questions asked and the purpose of the interrogation and was able to communicate and respond to the questions directed at him during the interrogation.

20.    Defendant Wise intentionally fed Mr. Montgomery facts about the murder in an effort to exploit Mr. Montgomery's mental illness and fabricate a confession.

21.    A person experiencing psychosis is unable to accurately understand reality and their ability to receive and accurately understand information and to communicate is impaired.

22.    Because Mr. Montgomery was experiencing psychosis during both his February 4, 2012 and February 10, 2012 interrogations, he exhibited a clear and unequivocal contextual processing deficit, as evidenced by his disorganized, disjointed, and fractured sentences and responses.

23.    The Defendants failed to make any modification or accommodation to their interrogation of Mr. Montgomery to ensure he was able to communicate and understand the information given to him and instead set about to fabricate a confession from Mr. Montgomery.  Defendants' grossly unconstitutional conduct resulted in MPD obtaining unreliable and bad information that was the result of unconstitutionally coercive interrogation methods that violated Mr. Montgomery's rights under the Fourth and Fifth Amendments and his rights under Title II of the Americans With Disability Act and Section 504 of the Rehabilitation Act, not to be the subject of discrimination.

24.    Some of the fractured and disjointed responses given by Mr. Montgomery during his interrogations were used by the Defendants as incriminating and inculpatory admissions and were used by the Defendants to falsely arrest him.

25.    As a direct and proximate result of the Defendants' unconstitutional and unlawful discriminatory interrogation of Mr. Montgomery and their deliberate and intentional suppression of exculpatory

evidence, Mr. Montgomery lost five and a half (5.5) years of his freedom and suffered for those five and a half (5.5) years.

26.     Further, as a direct and proximate result of the Defendants' unconstitutional and unlawful discriminatory interrogation of Mr. Montgomery and their deliberate and intentional suppression of exculpatory evidence, the true killer of Ms. Deoni JaParker Jones walks free today on the streets of the District of Columbia.

27.     The family of Mr. Montgomery seeks monetary, declaratory and injunctive relief for the suffering of Mr. Montgomery and the loss suffered by his family, as well to reform and remedy the unconstitutional, discriminatory and unlawful policies, practices, and customs of the District of Columbia in interrogating mentally ill suspects.

28.     It is also the hope of Mr. Montgomery's family that this lawsuit will finally cause the MPD to pursue and arrest the actual killer of Ms. Deoni JaParker Jones, thus providing long delayed justice to her family.

## JURISDICTION AND VENUE

29.     Jurisdiction over Plaintiff's federal claims is conferred by 28 U.S.C. §§ 1331 and 1343.[1] Supplemental jurisdiction of Plaintiff's state claims is conferred by 28 U.S.C.§ 1367.

30.     Venue is proper in this court pursuant to 28 U.S.C. § 1391(b) because all of the conduct and legal wrongs alleged occurred in the District of Columbia.

---

[1] 28 U.S.C. § 2201, while not a grant of jurisdiction, authorized this Court to issue declaratory relief and § 2202 any other further relief to which a person is entitled.

## PARTIES

31.     Brandon Montgomery is the personal representative of Plaintiff Estate of Gary Montgomery.
Gary Montgomery, at the time of his death, was a 61-year-old mentally disabled resident of the District
of Columbia.  Mr. Montgomery suffered from Schizophrenia for most of his adult life.

32.     Defendant, District of Columbia, is a municipal corporation organized under the laws of the
United States and is authorized to sue and be sued. The District of Columbia is the local municipal
government for the permanent seat of the federal government of the United States.  Defendant District of
Columbia is responsible for the operation and supervision of the Metropolitan Police Department (MPD)
and the officers working therefor.

33.     Defendant Brian Wise is a homicide detective with MPD and at all times was acting in the scope
of his duties and under color of law pursuant to policies, practices, customs, and usages of the District of
Columbia and MPD. At all times relevant to this Complaint, Defendant Wise acted as an agent, servant,
and/or employee of Defendant District, within the scope of employment, and in the furtherance of the
business of the District of Columbia.  At all times relevant to this Complaint, the conduct described
herein by Defendant Wise was of the same general nature as the conduct the District of Columbia
authorized, or Defendant Wise's conduct was incidental to conduct authorized by the District of
Columbia. Defendant Wise is sued in his individual and official capacities.

34.     Defendant Hosam Nasr is a homicide detective with MPD and at all times was acting in the
scope of his duties and under color of law pursuant to policies, practices, customs and usages of the
District of Columbia and MPD.  At all times relevant to this Complaint, Defendant Nasr acted as an
agent, servant, and/or employee of Defendant District, within the scope of employment, and in the
furtherance of the business of the District of Columbia.  At all times relevant to this Complaint, the
conduct described herein by Defendant Nasr was of the same general nature as the conduct the District

of Columbia authorized, or Defendant Nasr's conduct was incidental to conduct authorized by the District of Columbia. Defendant Nasr is sued in his individual and official capacities.

35.     Defendants John Doe, whose identities are currently unknown, represent those employees of the District of Columbia MPD, who acted under color of law pursuant to statutes, ordinances, policies, practices, customs, and usage of the District of Columbia and who had supervisory authority over Defendants Brian Wise and Hosam Nasr. At all times relevant to this Complaint, Defendants John Doe acted as agents, servants, and/or employees of Defendant District, within the scope of employment, and in the furtherance of the business of the District of Columbia.  At all times relevant to this Complaint, the conduct described herein by Defendants John Doe was of the same general nature as the conduct the District of Columbia authorized, or Defendants John Doe conduct was incidental to conduct authorized by the District of Columbia. Defendants John Doe are sued in their individual and official capacities.

## STATEMENT OF FACTS

36.     On February 2, 2012 at approximately 8:12/8:13 p.m., Ms. Deoni JaParker Jones was stabbed once in the head while sitting at a bus stop at the intersection of East Capitol and Sycamore Street, NE. After stabbing her, the killer grabbed Ms. Jones' purse but dropped it at the scene of the murder as he fled from a Good Samaritan, Jermaine Jackson, who attempted to apprehend him.

37.     Mr. Jermaine Jackson, who was stopped in a vehicle at the traffic light parallel to the bus stop witnessed the murder and attempted to capture and subdue the murderer.

38.     At the time that Ms. Jones was murdered, Jermaine Jackson was approximately 10 feet from the murderer as he stabbed Ms. Jones to death.

39.     Seconds after the murder occurred, Mr. Jackson physically fought with the murderer in a heroic attempt to hold him for police, but the killer eventually escaped running on foot down the southeast side of East Capitol Street toward Benning Road.

40.     A few hours after the murder of Ms. Jones, Mr. Jackson gave a detailed description of the killer and a play-by-play account of a severe beating he inflicted on the person who murdered Ms. Jones in his efforts to capture and subdue him.

41.     Mr. Jackson described the man who killed Ms. Parker as 5'9"-5'11" or 6'0 roughly, 30-40 years old, wearing a gray hoodie under a black puffy jacket with raised quilted squares and he thought the killer had a full beard.

42.     Mr. Jackson told police that "he punched the suspect" really hard, causing him "to fall to the ground."  Once on the ground, Mr. Jackson stomped him in the head at least three to four times, so hard that he knocked the man unconscious.

43.     Mr. Jackson in his February 2, 2012 statement to police also demonstrated how while holding onto a fence for leverage he kicked the killer so hard that he knocked him back to consciousness.

44.     Mr. Jackson also made clear to police in his statement that the man was not blocking his kicks while on the ground.

45.     Based on Mr. Jackson's description of the beating he inflicted on the killer of Ms. Jones, the police knew almost immediately after the murder took place that the person responsible for the murder had been subjected to a physical beating, which would have left significant injuries and bruises on at least his face.

46.     Mr. Montgomery, who did not appear to be 30-40 years old, did not have any head injuries less than 48 hours after the actual killer was stomped in the head three to four times. The photos taken of Mr. Montgomery by MPD crime scene technicians on the morning of February 4, 2012 when the MPD stopped Mr. Montgomery, and video footage of him at his interrogation later that day, show that Mr. Montgomery had no injuries of any kind on his face. His face was unblemished and free of any bruises or injuries.

47.     The image depicted in paragraph forty-seven herein shows Mr. Montgomery's unblemished face February 4, 2012.



48.     On February 3, 2012, the day after Ms. Jones' murder, MPD released video footage on the local news of Mr. Montgomery walking across East Capitol Street, a few minutes before the murder.

49.     Between February 2, 2012, the day of the murder, and the day of Mr. Montgomery's trial more than five years later, Defendants never once asked Jermaine Jackson to participate in an identification procedure, despite Mr. Jackson having been face-to-face with the killer.

50.     Additional video footage collected by the MPD taken from a camera directly across from the bus stop showed Mr. Montgomery leave the bus stop before the murder of Ms. Jones and walk across a nearby street behind the bus stop, leaving the area entirely. This video footage was never released to the public.

51.     Mr. Montgomery did not return to the bus stop after walking away prior to Ms. Jones' murder. Indeed, no video footage showed Mr. Montgomery return to the bus stop prior to the time Ms. Jones was murdered.

52.     Video footage shows another male at the bus stop seated next to Ms. Jones. This is the person who stabbed and killed Ms. Jones.

53.     At the February 23, 2012 preliminary hearing, at which time Mr. Montgomery's defense counsel had not been provided any exculpatory evidence, Assistant United States Attorney David Gorman ("AUSA Gorman"), one of the government lawyers who would also tried the case five and a half years later, asked Defendant Nasr  ". . . is there any other male that came and sat or was near the decedent in the minutes leading up to the murder?" Defendant Nasr answered no. This answer constitutes deliberately false testimony under oath.

54.     Defendant Nasr's answer was untrue based on video footage MPD obtained immediately after the murder that showed the actual killer seated next to Ms. Jones at the bus stop wearing clothing that did not match the clothing Mr. Montgomery was wearing when he walked away from the bus stop.

55.     Defendant Nasr's answer was untrue based on the description of the suspect provided to the police by Jermaine Jackson.

56.     Defendant Nasr's answer was also untrue based on video footage from a Metro Bus and the interior of a business establishment, America's Best Wings, located at 4524 Benning Road, SE. The foregoing footage depicts the actual killer, who was wearing clothing that fit the description given to police by Mr. Jackson, fleeing down the southeast side of East Capitol –within five minutes of the murder of Ms. Jones. This flight path was the flight path Mr. Jackson told police the killer had followed after escaping from Mr. Jackson.

57.     The person who fled down the southeast side of East Capitol within five minutes of the murder of Ms. Jones was the killer.  This person was running at a very fast clip and the person shown in the video matches the description of the person Mr. Jermaine Jackson saw kill Ms. Jones and the person who he fought with in an effort to apprehend him for police.

58.     Defendants never showed Jermaine Jackson the video from the exterior and interior of America's Best Wings, located at 4524 Benning Road, SE, that showed the actual killer, who was wearing clothing that fit the description given to police by Mr. Jackson.

59.     That person was not and could not have been Mr. Montgomery.

60.     Five and a half years later—and two days before the start of Mr. Montgomery's trial—AUSA Gorman disclosed to Mr. Montgomery's defense counsel this video from America's Best Wings that showed the killer fleeing the murder scene and fleeing from Mr. Jackson.

61.     Upon information and belief this video from America's Best Wings had been in MPD's possession within a few hours after the murder.

62.     In response to the news story of Ms. Jones' death and the video showing Mr. Montgomery walking across East Capitol before the murder, several calls/tips came in identifying the person walking across the street in the video as Mr. Montgomery.

63.     The neighborhood people who knew Mr. Montgomery were able to identify him by a prominent limp that affected his gait as well as his distinctive clothing.

64.     Mr. Montgomery walked with a prominent limp because he had a chronic right leg injury.  He had a large abscess on his leg at that time of the murder of Ms. Jones.

65.     Defendants Wise and Nasr knew, as early as February 4, 2012, that Mr. Montgomery suffered from a large abscess on his right leg because Mr. Montgomery showed the Defendants this ailment during his initial interrogation.

66.     The photograph depicted in paragraph sixty-six shows Mr. Montgomery showing Defendants Wise and Nasr the abscess described herein.



67.     Mr. Montgomery's abscess from February 2012 was so profound that the reminents of this ailment were still visually evident by July 2017.

68.    The photograph depicted in paragraph sixty-eight shows the condition of Mr. Montgomery's abscess as of July 2017.



69.     The man who Jermaine Jackson saw commit the murder, and with whom Mr. Jackson fought in an attempt to subdue him, and then witnessed flee down the southeast side of East Capitol, did not limp. Mr. Jackson's detailed statement to police never mentioned the killer having a limp but did indicate he ran away at a very fast clip.

70.     Mr. Jackson explained to MPD how he chased the killer across Sycamore Street and was surprised when the assailant "got second life" got up, ran and attempted to board a Metro bus at a bus stop across East Capitol Street. Mr. Jackson gave chase, but the killer was running fast or as in the exact words used by Mr. Jackson, was "jive movin."

71.     Mr. Montgomery was first taken into custody during the early morning hours of February 4, 2012, less than 48 hours after the murder.

72.     The February 4, 2012 photos and video of Mr. Montgomery showed him wearing a light camel/brown colored jacket and khaki pants and white tennis shoes. He was not wearing a black jacket or a gray hoodie, both of which items of clothing Mr. Jackson  described the killer as wearing at the time of the murder.

73.     The clothing Mr. Montgomery was wearing at the time of his arrest on February 4, 2012 was the same clothing he had on the night Ms. Jones was murdered.

74.     Mr. Montgomery told the police on February 4, 2012 that he had been wearing the same clothes for several days, which the video footage from February 2, 2012 showed as he was walking across the street.

75.     The photograph depicted in paragraph seventy-five shows Mr. Montgomery on February 4, 2012 wearing the same clothes he was wore on February 2, 2012.



76.    Mr. Jackson's description of the clothing worn by the killer whose jacket could be seen on the America's Best Wings video footage of the actual killer fleeing from Mr. Jackson down East Capitol showed that the killer was wearing a gray hoodie under a black puffy jacket with puffy quilted squares reaching to mid-thigh, just as Mr. Jackson described.



77.    The photo in the foregoing paragraph is from Metro Bus footage of the murderer fleeing down the southeast side of East Capitol Street towards the restaurant, as described to police by Jermaine Jackson. Although the time stamps on the photos show the man approaching and passing the America's Best Wings (the "Old Tropicana") at 9:16 p.m., the restaurant's clock was one hour ahead.  The actual time was 8:16 p.m., just three to four minutes after the stabbing.

78.    The killer of Ms. Jones dropped clothing at the scene of the murder. DNA found on that clothing produced a full male DNA profile that did not match either Mr. Montgomery's DNA or Ms. Jones' DNA.  Under MPD's own theory, this DNA testing excluded Mr. Montgomery as the killer.

79.     Upon information and belief on February 3rd and 5th, 2012, the MPD received calls from three persons, one of which initially identified Mark Johnson as the man depicted in the video.  After later talking with Detective Brian Wise, that caller then said the man shown in the video looked like Mr. Montgomery.   The two other callers said they thought the man walking across the street looked like Mr. Montgomery.  However, February 4, 2012 at 2:15 a.m., there was a call from an anonymous tipster, whose name was never disclosed to Mr. Montgomery's attorneys, and Defendant Wise noted that the "caller states he thinks the suspect is Mark.

80.     Mr. Montgomery's defense counsel only learned of the name of the first tipster who called police in February 2012 and identified Mark Johnson as a suspect on July 24, 2017, over five and a half years later.

81.     On February 7, 2012, the Defendant Brian Wise interviewed Mark Johnson at the Benning Road Metro Station. Mark Johnson admitted during the in-the-street interview to being on the same street around the time of the murder buying heroin.

82.     During the interview of Mark Johnson, Defendant Wise showed a photograph of Gary Montgomery to Mark Johnson.  Mark Johnson said he recognized Mr. Montgomery as someone he has seen in the neighborhood but did not identify him as a person he was with on the evening of February 2, 2012.

83.     Defendant Wise never again interviewed Mark Johnson.  Nor did Defendant Wise or the MPD interview any of the individuals he said he was with the evening of Ms. Jones' murder.

84.     The day after Ms. Jones was stabbed in the head, Mark Johnson's girlfriend filed a petition for a CPO, claiming he tried to kill her with a kitchen knife in 2011 and that he often threatened to attack her with kitchen knives while high on crack cocaine.

85.     It was only seven days before Mr. Montgomery's July 31, 2017 trial when the MPD disclosed the details about Mark Johnson's interview with police.

86.     The MPD and the Government's five-and-a-half-year suppression of exculpatory evidence, including the America's Best Wings video, deprived Mr. Montgomery's defense counsel of an opportunity to locate other possible video showing the killer in the minutes after the murder and otherwise investigating important leads to present to a judge in an attempt to secure Mr. Montgomery's pretrial release.   In the five and a half years since the murder of Ms. Jones, other potential security footage showing the killer would have been recorded over; witnesses' memories faded; and crucial leads run cold.

87.     The MPD also made no effort whatsoever to compare the DNA found on the clothes at the scene to the DNA of Mark Johnson, the other suspect two callers identified as the possible killer—nor did the MPD enter the DNA profile into CODIS – the Federal Bureau of Investigation Combined DNA Index System.

88.     From the inception of the MPD's investigation of the murder of Ms. Jones, the Government had been in possession of exculpatory evidence demonstrating Mr. Montgomery's actual innocence.

89.     Defendants Wise and Nasr, and additional personnel from the MPD and the USAO-DC deliberately withheld from Mr. Montgomery's defense team for five and a half years video footage showing the actual killer and Jermaine Jackson's exculpatory statement. Mr. Montgomery's defense team were not provided the footage until days (two and three, respectively) before the start of Mr. Montgomery's trial on July 31, 2017.

90.     Three days before the start of Mr. Montgomery's July 31, 2017 trial, the Government disclosed Jermaine Jackson's recorded statement that proved Mr. Montgomery did not commit the murder of Ms. Jones

91.     The suppression of exculpatory evidence meant that Mr. Montgomery lost his freedom and was

incarcerated for five and a half (5.5) years.

92.     Mr. Montgomery's defense team made a detailed written request for material covered under

*Brady v. Maryland* at the start of the prosecution of Mr. Montgomery. As of December 18, 2012, Mr.

Montgomery's defense team had only been provided the following materials from the Government:

"[T]he DVD of Mr. Montgomery's post arrest February 10, 2012 videotaped statement to Detective
Wise of the Metropolitan Police Department."
"[T]he February 4, 2012 pre-arrest videotaped statement to Detective Wise and Detective Nasr of the
Metropolitan Police Department."
"[T]he PD 122-A forms with information regarding three of the identification procedures conducted in
this case."
"[T]he death report, autopsy and toxicology report, and forensic biology report."

93.     The December 18, 2012 *Brady* request covered all video footage and all statements, particularly

it would have covered Jermaine Jackson's statement and the five minute America's Best Wings video

showing the killer fleeing.

94.     On June 16, 2017, Mr. Montgomery's defense lawyers made an additional request for *Brady*

materials. This June 16, 2017 *Brady* request was sent to AUSAs Gorman and Jennifer Kerkhoff.

95.     The June 16, 2017 *Brady* request specifically asked for one of two surveillance DVD's, Disc B,

that the United States Attorney's Office in a November 26, 2012 letter to Mr. Montgomery's lawyers

represented they were disclosing but which defense counsel had never received.

96.     On July 7, 2017, AUSA Gorman and AUSA Kerkhoff told Mr. Montgomery's defense lawyers

they would look into the request for Disc B.

97.     Twenty days passed without any response to the request of defense counsel.

98.     As of July 27, 2017, three days before the scheduled start of Mr. Montgomery's trial, his defense

counsel had not yet been provided the missing Disc B.

99.     On Friday, July 28, 2017, Mr. Montgomery's defense counsel sent the Government another

*Brady* letter restating their prior request and specifically asking for Disc B.

100.    AUSA Gorman responded by email on Friday, July 28, 2017.  Mr. Gorman's email informed Mr.

Montgomery's defense counsel that the Government had a *Jencks* Packet that would be ready at 2:00

p.m. that same date.

101.    AUSA Gorman, in this same Friday, July 28, 2017 email, in specific response to defense

counsel's request for Disc B, stated "Regarding the surveillance DVD, can you tell us what you have?"

AUSA Gorman stated further "***there are only two videos of note*** – a home surveillance video that shows

the murder and a DDOT surveillance from up the street." (emphasis supplied)

102.    Mr. Montgomery's defense counsel responded to Mr. Gorman's Friday, July 28, 2017 email that

same date again requesting all surveillance video and reiterating they were missing Disc B. Defense

counsel also stated they were unclear by what Mr. Gorman meant by "surveillance videos of note."

103.    In response to defense counsel's email, AUSA Gorman thereafter emailed defense counsel later

on Friday, July 28, 2017 and stated:

"By `surveillance videos of note' I meant videos that have any value to the case.  I'm not sure what you
are missing, but we provided: (1) a DVD containing private security footage that shows the murder (the
camera is positioned across the street from the bus shelter); (2) a DVD containing DDOT footage from
East Capitol Street (and 50th) that shows the bus shelter from a distance; and (3) a DVD from Metro
Transit bus.  Do you know which of these you are missing?  ***Additionally, there is a five minute
surveillance video from the interior of a store that does not appear to show anything relevant.***  If you
want, I can provide you with a copy of that DVD on Saturday morning.  We also have a DVD that
shows the inside of Mama's Laundromat that does not show anything relevant.  If you want that video, I
can provide it on Saturday morning."  (emphasis added).

104.    AUSA Gorman's statement to defense counsel that "there is a five minute surveillance video

from the interior of a store that does not appear to show anything relevant" and his earlier statement that

"there are only two videos of note" was deliberately false because even a cursory review of the video

reveals that the person shown in the five minute video matched the description of the killer given to police more than half a decade earlier by Jermaine Jackson.

105.    Two days before trial, the Defendants and prosecutors continued to conspire to suppress exculpatory evidence by deception and false statements about the relevance of the video.

106.    The five-minute video which was kept from Mr. Montgomery's defense counsel for five and a half years and which Mr. Gorman told defense counsel on Friday, July 28, 2017 "does not appear to show anything relevant" did in fact show something very relevant, the killer fleeing from the scene of the murder within five minutes of the murder.

107.    The person depicted in this five-minute video matched the description given to police by Jermaine Jackson minutes after the murder on February 2, 2012. Jermaine Jackson fought with the killer seconds after the murder and described to police what the killer looked like and was wearing.

108.    Defendant MPD, did not properly investigate Mark Johnson as the killer or any other potential suspect because they secured what they believed were inculpatory statements from Mr. Montgomery during his nearly six hour February 4, 2012 interrogation—during which Mr. Montgomery was experiencing severe psychosis.

109.    Mr. Montgomery, who has suffered from Schizophrenia for most of his adult life, was subjected to an unconstitutionally coercive and unlawfully discriminatory interrogation at the hands of Defendant Brian Wise, who improperly used the Reid interrogation techniques of contamination, maximization, and minimization to secure unreliable and false inculpatory statements from Mr. Montgomery, who due to his psychosis was unable to accurately understand reality and therefore had an impaired ability to understand and communicate.

110.    The ability to understand and to communicate during an interrogation are essential, neither of which abilities Mr. Montgomery had on February 4, 2012 or on February 10, 2012.

111.    The Reid interrogation technique was developed in 1947.

112.    The Reid interrogation technique recognizes that when mental disabilities are present during an interrogation, use of the techniques can lead to false confessions.

113.    Throughout the February 4, 2012 interrogation, Mr. Montgomery repeatedly showed signs of psychosis manifested by disorganized and jumbled thoughts and a flight of ideas.

114.    Mr. Montgomery's responses to Detective Wise's questions frequently had no apparent meaning. They were not logical or linear and evidenced what clinical psychologists refer to as "word salad."

115.    Because Mr. Montgomery was experiencing psychosis during his February 4, 2012 interrogation, he was unable to accurately understand reality.  Mr. Montgomery's ability to understand information and to communicate information was impaired throughout the February 4, 2012 interrogation and February 10, 2012 interrogation because of his mental illness.

116.    At one point in the interrogation, Detective Wise inquired if Mr. Montgomery had a mental illness:

Detective Wise:  You know uh – have you ever been diagnosed with any mental?
Gary Montgomery:  Nah, nah.

Detective Wise:  Nah?
Gary Montgomery:  Nah. Nah.

Detective Wise:  Never saw a professional …
Gary Montgomery:  Psychiatrist?

Detective Wise:  Yeah.
Gary Montgomery:  Nah.

Detective Wise:  Nothin'?
Gary Montgomery:  Nah.

Detective Wise:  Okay.
Gary Montgomery:  Mm-hmm.

Detective Wise:  Do you believe that you have any type of mental issues?

Gary Montgomery:  Uh, if I'm talkin' to myself.  I'll – I'll – you know, I'll – I'll – I'll go to a psychiatrist, you know.

Detective Wise:  Huh?
Gary Montgomery:  If I start talkin' myself I'll go -

Detective Wise:  If you did, but do you?
Gary Montgomery:  I don't think I do right now, yeah.

Detective Wise:  Have you – so you've never seen a psychiatrist?
Gary Montgomery:  Nah.

Detective Wise:  Okay, I'm no sayin' you need to.  I'm just sayin' have you.
Gary Montgomery:  Yeah.

Detective Wise:  You know.
Gary Montgomery:  Nah.

Detective Wise:  Uh, lots a people could get benefits from that.  Probably includin' me.  Kinda like.

117.    The video of Mr. Montgomery's February 10, 2012 interrogation shows him in an active psychotic state hearing voices and speaking to voices he heard.

118.    The Defendants at no time modified their interrogation of Mr. Montgomery or offered him any type of accommodation that would guard against him being charged with the murder of Ms. Jones based on what MPD claimed were inculpatory admissions and incriminating statements that were in reality the product of a fabricated interrogation, that was discriminatory and illegal, and that preyed on and exploited Mr. Montgomery's inability to communicate and understand.

119.    While Mr. Montgomery never confessed to killing Ms. Jones, and maintained his innocence, the constitutionally invidious aspect of the Defendant Wise's actions is that after feeding him details only known to the killer and the police, he used the fractured responses and sentences of Mr. Montgomery to paste together what the police deemed to be incriminating admissions that were the legal justification for his arrest and prosecution.

120.    During Mr. Montgomery's interrogation, Defendants Wise and Nasr provided to Mr. Montgomery the incriminating notion that he ate Chinese food the day of the incident and hoarded duck sauce.

121.    During Mr. Montgomery's interrogation, Defendants Wise and Nasr provided to Mr. Montgomery non-publicly disclosed investigatory details including, but not limited to, the fact that this incident involved an attempted robbery and purse snatching.

122.    During Mr. Montgomery's interrogation, Defendant Wise provided to Mr. Montgomery non-publicly disclosed investigatory details including, but not limited to, the fact that clothing was left at the bus stop after this incident.

123.    During Mr. Montgomery's interrogation, Defendant Wise provided to Mr. Montgomery non-publicly disclosed details including, but not limited to, the actual killer was confronted by, and got into an altercation with, another man.

124.    During Mr. Montgomery's interrogation, Defendant Wise provided to Mr. Montgomery non-publicly disclosed details including, but not limited to, the fact that the actual killer left a knife on the scene.

125.    Defendants Wise and Nasr's feeding Mr. Montgomery information were naked attempts to secure a confession from an innocent man.

126.    The *sine qua non* of a police interrogation is the ability to communicate with the person suspected of a crime.  Mr. Montgomery was suspected of the murder of Ms. Jones but had an impaired ability to communicate and understand information because he labored under a mental illness that prevented him from accurately understanding reality.

127.    As a direct and proximate result of the Defendants' foregoing unconstitutional, discriminatory and  unlawful conduct and deliberate indifference to and violation of Mr. Montgomery's rights, he was

incarcerated for five and a half (5.5) years and prosecuted for a crime that evidence in the possession of MPD proved he did not commit.  Mr. Montgomery's rights were violated and he was damaged as a result, including but not limited to the loss of his freedom for five and a half years.

128.    The Defendants violated Mr. Montgomery's clearly established rights under the Constitution, the ADA, §504 of the Rehabilitation Act and the laws of the District of Columbia.

129.    Mr. Montgomery suffered extreme mental distress, pain and suffering, humiliation, the loss of his dignity, his liberty and freedom and the loss of his family relations.

130.    Under D.C. Code § 12-101, Mr. Montgomery's rights of action for these injuries prior to his death survive in favor of Plaintiff Estate of Gary Montgomery.

131.    The actual killer of Ms. Deoni JaParker Jones remains at large and Ms. Deoni JaParker Jones' family has still not received justice.

## CLAIMS

### COUNT I
### Survival Action (D.C. Code § 12-101)
### (Civil Conspiracy)

132.    Plaintiff incorporates and adopts paragraphs 1 through 131 of this Complaint.

133.    Defendants Wise and Nasr agreed, amongst themselves, and with personnel from the USAO-DC and MPD, including AUSA Kerkoff and/or AUSA Gorman, to falsely charge Mr. Montgomery with criminal homicide and unlawfully institute criminal proceedings against Mr. Montgomery.

134.    This agreement was formed between February 2, 2012 and February 23, 2012 when the foregoing co-conspirators discussed the status of this investigation, the affidavit in support of arrest warrant, the decision to arrest Mr. Montgomery and charge him with homicide, and the documentary evidence that would be disclosed to defense counsel in advance of the preliminary hearing.

135.    Defendants and their co-conspirators committed several overt acts in furtherance of falsely

charging and prosecuting Mr. Montgomery including (1) Defendant Nasr's false testimony during the

preliminary hearing; (2) AUSAs Gorman and Kerkoff concealing exculpatory evidence for five and a

half years, including the video footage of the actual killer fleeing; (3) concealing from Jermaine Jackson

the video from the exterior and interior of America's Best Wings that showed the actual killer, who was

wearing clothing that fit the description given to police by Mr. Jackson; (4) persisting in this false

prosecution although DNA found on that clothing dropped by the actual killer produced a full DNA

profile that did not match either Mr. Montgomery's DNA or Ms. Jones' DNA, showing Mr.

Montgomery was not the actual killer; (5) concealing for five and a half years the fact that the second

tipster called MPD in the early morning hours of February 2012 and identified "Mark" as a suspect; (6)

AUSA Gorman emailing Mr. Montgomery's counsel on July 28, 2017 with false information; and (7)

Detective Wise's use of the Reid technique on an obviously mentally ill Mr. Montgomery.

136.    The agreement and each of the foregoing overt acts were done under color of law and within the

scope of their employment, and in furtherance of the common scheme to falsely charge Mr.

Montgomery with criminal homicide and unlawfully institute criminal proceedings against Mr.

Montgomery.

137.    As a direct and proximate result of the foregoing conspiracy, Mr. Montgomery suffered loss of

liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and

other grievous injuries and damages.

### COUNT II
### Survival Action (D.C. Code § 12-101)
### (District of Columbia Malicious Prosecution Claim)

138.    Plaintiff incorporates and adopts each allegation contained in paragraphs 1 through 131.

139.    Defendants Brian Wise and Hosam Nasr maliciously arrested, imprisoned and prosecuted Mr. Montgomery without probable cause, knowing there was no evidence connecting Mr. Montgomery with the crime and that they had fabricated statements including admissions attributable to Mr. Montgomery, concerning details about the crime of which Mr. Montgomery was innocent.

140.    The case terminated in Mr. Montgomery's favor.

141.    As a result of this malicious prosecution, Mr. Montgomery suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous injuries and damages.

## COUNT III
### Survival Action (D.C. Code § 12-101)
### (§ 1983 Fifth Amendment Coerced And False Statements)

142.    Plaintiff incorporates and adopts each allegation contained in paragraphs 1 through 136.

143.    Defendants Brian Wise and Hosam Nasr in their official capacity acted deliberately, maliciously, with reckless disregard for Mr. Montgomery's rights, or intentionally under color of law to manufacture and fabricate incriminating statements attributable to Mr. Montgomery.

144.    In the manner described more fully above, Defendants Wise and Nasr, individually, jointly, and in conspiracy with one another and personnel from the USAO-DC, as well as under color of law and within the scope of their employment, forced Plaintiff to incriminate himself falsely and against his will, in violation of his rights secured by the Fifth and Fourteenth Amendments.

145.    As described more fully above, Defendants Wise and Nasr participated in, encouraged, advised, and ordered an unconstitutional, multi-day interrogation of Plaintiff, which caused Plaintiff to make involuntary disjointed statements implicating himself in Ms. Jones' murder.

146.    The involuntary statements elicited by the Defendants and attributed to Mr. Montgomery were used against Mr. Montgomery to his detriment in a criminal case. These statements were the chief reason that Mr. Montgomery was detained and prosecuted for Ms. Jones' murder.

147.    Defendants Wise and Nasr violated Mr. Montgomery's clearly established Fifth Amendment right to a fair trial by using compelled and coerced false inculpatory statements that included references to details of the crime fed to him and which were used against him at trial.

148.    As a result of Defendants' misconduct, Mr. Montgomery suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous injuries and damages.

## COUNT IV
### Survival Action (D.C. Code § 12-101)
### (§ 1983 Fifth Amendment Suppression of Material Exculpatory Evidence)

149.    Plaintiff incorporates and adopts each allegation contained in paragraphs 1 through 131.

150.    Defendants Wise and Nasr, in their official capacity acting deliberately, recklessly or intentionally under color of law failed to disclose the foregoing material exculpatory information to prosecutors.

151.    By failing to disclose this information, defendant police officers, violated Mr. Montgomery's clearly established Fifth Amendment rights, as established by *Brady v. Maryland*, 373 U.S. 83 (1963).

152.    As a direct and proximate result of the Defendants unconstitutional suppression of exculpatory information, Mr. Montgomery was incarcerated for five and a half years (5.5) and prosecuted for a crime that evidence in the possession of the Metropolitan Police Department proved he did not commit. Plaintiff suffered great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous injuries and damages.

**COUNT V**
**Survival Action (D.C. Code § 12-101)**
**(§ 1983 Fourth and Fifth Amendment Malicious Prosecution)**

153.    Plaintiff incorporates and adopts each allegation contained in paragraphs 1 through 131.

154.    Defendants Wise and Nasr, maliciously arrested, imprisoned and prosecuted Mr. Montgomery without probable cause, knowing there was no evidence connecting Mr. Montgomery with the crime and that they had fabricated statements including admissions attributable to Mr. Montgomery, concerning details about the crime of which Mr. Montgomery was innocent.

155.    Defendants Brian Wise and Hosam Nasr in their official capacity acting deliberately, recklessly or intentionally under color of law commenced and/or caused to be continued a criminal prosecution against Mr. Montgomery that was lacking in probable cause, instituted with malice, by disregarding credible evidence demonstrating Mr. Montgomery was innocent, suppressing exculpatory evidence, fabricating and coercing a false confession, failing to adequately investigate the crime and purposely disregarding evidence indicating someone else/Mark Johnson was the perpetrator.

156.    The actions of the defendant police officers violated Mr. Montgomery's clearly established rights under the procedural due process component of the Fifth Amendment and caused his wrongful and unconstitutional incarceration for five and a half (5.5) years.

157.    As a direct and proximate result of Defendants' misconduct, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous injuries and damages.

**COUNT VI**
**Survival Action (D.C. Code § 12-101)**
**(§1983 Supervisory Liability)**

158.    Plaintiff incorporates and adopts each allegation contained in paragraphs 1 through 131.

159.     Defendants John Doe, supervisory police officers, at all times acting in their official capacities and deliberately and under color of law, were supervisory personnel with the District of Columbia MPD with oversight responsibility for training, hiring, screening, instruction, supervision and discipline of Defendants Wise and Nasr.

160.     These supervisory defendants knew or should have known that these defendant officers were conducting unlawful and unconstitutional interrogations of mentally ill suspects, maliciously prosecuting innocent persons, were failing to investigate evidence pointing to other suspects and leads and were fabricating, coercing false confessions, suppressing exculpatory evidence, denying mentally ill suspects needed accommodations and thereby depriving them of due process.

161.     These supervisory defendants were personally involved in failing to take necessary remedial and preventive actions and measures to protect against such constitutional violations, resulting in the injuries suffered by Mr. Montgomery.

162.     Defendant John Doe's personal involvement stems from reviewing and signing investigative reports related to this investigation as early as February 3, 2012 at 6:49 p.m., subsequently authorizing and condoning the tactics used during Mr. Montgomery's interrogations, and failing to take action to prevent these coercive interrogations and this malicious prosecution.

163.     These defendant supervisors knew or in the exercise of due diligence should have known that the conduct of Defendants Wise and Nasr in Mr. Montgomery's case was likely to occur.

The failure of supervisory defendants to train, screen, supervise and discipline the named defendants in this case amounted to gross negligence, deliberate indifference or intentional misconduct which directly and proximately caused the suffering, damages and injuries of Mr. Montgomery and suffered as previously set forth herein.

164.    As a direct and proximate result of Defendants' misconduct, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous injuries and damages.

## COUNT VII
### Survival Action (D.C. Code § 12-101)
### (§1983 Monell Claim – Official Policy and Failure to Train and Supervise)

165.    Plaintiff incorporates and adopts each allegation contained in paragraphs 1 through 131.

166.    The MPD and the District of Columbia City Council by and through its policymakers, failed to ensure through custom, policy and/or practice that detectives, and officers would conduct constitutionally adequate investigations, would never fabricate inculpatory evidence, would not use methods and engage in conduct to falsely arrest and maliciously prosecute innocent persons, discriminate against mentally ill suspects in violation of their right to a reasonable accommodation, fail to disclose to prosecutors material information favorable to suspects, comply with *Brady v. Maryland* and not engage in unconstitutional interrogation techniques.

167.    Since, at least, 1994, the District of Columbia MPD and the District of Columbia City Council by and through its policymakers, had actual or constructive notice of such failures to train, supervise and provide policies to its employees such that it was foreseeable that detectives and other officers would conduct unlawful and unconstitutional interrogations of mentally ill suspects, maliciously prosecute innocent persons, fail to investigate evidence pointing to other suspects and leads, and would fabricate and coerce false confessions, suppress exculpatory evidence, deny mentally ill suspects needed accommodations and thereby would deprive them of due process and their federal right to be free of unlawful discrimination based on handicap or disability. This actual or constructive knowledge stems, in part, from Kim Crafton's 10-month detention in 1994 on charges of robbery and felony murder. There, the MPD used the Reid technique of interrogation and fed Ms. Crofton non-publicly disclosed

investigatory information that led to a coerced and false confession. Ultimately, Ms. Crofton spent ten months incarcerated before her case was dismissed due to her innocence.

168.    The District of Columbia MPD and the District of Columbia City Council by and through its policymakers, failed to adequately supervise, train or discipline their employees, though it was foreseeable that constitutional violations and harm of the type in Mr. Montgomery's case would be the likely result of such failures.

169.    The District of Columbia MPD and the District of Columbia City Council by and through its policymakers had in force and effect at the time of the conduct complained of in this Complaint, a policy, practice or custom of conducting constitutionally inadequate investigations, engaging in discrimination against mentally ill suspects, fabricating inculpatory evidence, failing to ensure suspects would not be maliciously prosecuted and suppressing material exculpatory information and evidence and using unconstitutional and discriminatory interrogation techniques.

170.    Such failure to train, screen, supervise and discipline and such unconstitutional municipal customs, practices and/or policies amounted to gross negligence, deliberate indifference, or intentional misconduct which directly and proximately caused the suffering, damages and injuries of Mr. Montgomery previously set forth herein.

**COUNT VIII**
**Survival Action (D.C. Code § 12-101)**
**(Americans With Disabilities Act Claim)**

171.    Plaintiff incorporates and adopts each allegation contained in paragraphs 1 through 131.

172.    Gary Montgomery was a qualified individual with a disability within the meaning of the Americans With Disabilities Act. 42 U.S.C. § 12131(2).

173.    Mr. Montgomery's disability, Schizophrenia, substantially limited one or more major life activity, such as the ability to work.  Mr. Montgomery had a history of such an impairment.

174.    The Defendant, District of Columbia, is a public entity covered by Title II of the Americans With Disabilities Act. 42 U.S.C. § 12131(1).  As a covered public entity, the Americans With Disabilities Act prohibits the Defendant, District of Columbia, from discriminating against individuals with disabilities. 42 U.S.C. §§ 12131 and 12132.

175.    The Metropolitan Police Department is a covered instrumentality and agency of the District of Columbia under Title II of the Americans With Disabilities Act. 42 U.S.C. § 12131(1)(B).  As a covered instrumentality and agency, the Americans With Disabilities Act prohibits the Metropolitan Police Department from discriminating against individuals with disabilities.  42 U.S.C. §§ 12131 and 12132.

176.    Title II of the Americans With Disabilities Act applies to all activities, services or programs of a covered public entity.  42 U.S.C. § 12132.

177.    Investigatory activities of a law enforcement agency are subject to Title II of the Americans With Disabilities Act.

178.    Title II of the Americans With Disabilities Act requires that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity. 42 U.S.C. § 12132.

179.    Mr. Montgomery was intentionally subjected to discrimination by the Defendant District of Columbia during his February 4, 2012 and February 10, 2012 interrogations.

180.    Mr. Montgomery had a mental illness that impaired his ability to communicate and understand information, rendering him unable to participate in any meaningful way in his interrogations and vulnerable to coercive police interrogation methods employed by Defendant Brian Wise.

181.    It was obvious and indisputably known to Defendants Wise and Nasr that Mr. Montgomery's jumbled and disjointed statements, which were interposed by lengthy illogical rants, were reflective of his mental disability.

182.    In fact, during the course of the February 4, 2012 interrogation Defendant Wise inquired about Mr. Montgomery's mental health and suggested Mr. Montgomery, could benefit from seeing a psychiatrist.

183.    Mr. Montgomery was entitled to and in need of a reasonable accommodation to communicate and understand information to avoid him from making unreliable and false inculpatory statements that could be used to falsely arrest, incarcerate and prosecute him.

184.    The Defendant MPD employed unlawful discriminatory and unconstitutional coercive interrogation methods that exploited Mr. Montgomery's inability to communicate and understand and thereby subjected him to unlawful discrimination during his two interrogations.

185.    The District of Columbia's failure to reasonably accommodate Mr. Montgomery's disability led to him suffering greater injury or indignity than other arrestees in that he was particularly vulnerable to the coercive nature of Defendants Wise and Nasr's interrogations. Indeed, as a result of Mr. Montgomery's inability to communicate and understand due to psychosis, the District of Columbia extracted and used fractured and disjointed sentences uttered by Mr. Montgomery against him as incriminating inculpatory admissions to charge him with the murder of Ms. Jones.

186.    As a direct and proximate result of the actions of the Defendant District of Columbia that violate the Americans With Disabilities Act, Mr. Montgomery was damaged, including but not limited to being charged and confined for five and a half (5.5) years.

**COUNT IX**
**Survival Action (D.C. Code § 12-101)**
**(Section 504 Rehabilitation Act Claim)**

187.    Plaintiff incorporates and adopts each allegation contained in paragraphs 1 through 131.

188.    Section 504 of the Rehabilitation Act states that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance within the meaning of Section 504.  29 U.S.C. § 794(a).

189.    Defendant, District of Columbia, and its agencies, including the Metropolitan Department of Police, receive federal assistance within the meaning of Section 504.

190.    Mr. Montgomery was a qualified individual with a disability within the meaning of Section 504. Mr. Montgomery's disability, Schizophrenia, substantially limits one or more major life activity, such as the ability to work.  Mr. Montgomery has a history of such an impairment.

191.    Mr. Montgomery was a qualified person with disabilities within the meaning of 504 because he was entitled to benefit from the Defendant District of Columbia's Metropolitan Police Department's services.

192.    Mr. Montgomery was intentionally subjected to discrimination by the Defendant District of Columbia during his February 4, 2012 and February 10, 2012 interrogations.

193.     Mr. Montgomery had a mental illness that impaired his ability to communicate and understand information, rendering him unable to participate in any meaningful way in his interrogations and vulnerable to coercive and unlawful discriminatory police interrogation methods.

194.    It was obvious and indisputably known to Defendants Wise and Nasr that Mr. Montgomery's jumbled and disjointed statements, which were interposed by lengthy illogical rants, were reflective of his mental disability.

195.   Mr. Montgomery was entitled to and in need of a reasonable accommodation to communicate and understand information to avoid him from making unreliable inculpatory statements that could be used to falsely arrest, incarcerate and prosecute him.

196.   The Defendant District of Columbia's Metropolitan Police Department employed coercive and discriminatory interrogation methods that exploited Mr. Montgomery's inability to communicate and understand and thereby subjected him to discrimination.

197.   Because the *sine qua non* of a police interrogation is the ability to communicate with the person suspected of a crime, the Defendant District of Columbia's February 4, 2012 and February 10, 2012 interrogations of Mr. Montgomery were discriminatory because he was unable to communicate and understand without a modification or reasonable accommodation.

198.   The District of Columbia's failure to reasonably accommodate Mr. Montgomery's disability led to him suffering greater injury or indignity than other arrestees in that he was particularly vulnerable to the coercive nature of Defendants Wise and Nasr's interrogations. Indeed, Mr. Montgomery's mental illness led to him succumbing to coercive and discriminatory interrogation techniques and uttering fractured and jumbled disjointed sentences and responses that MPD unlawfully used to falsely arrest, charge, and prosecute him.

199.   As a direct and proximate result of the actions of the Defendant District of Columbia, that violate Section 504, Mr. Montgomery was damaged, including being arrested, incarcerated and prosecuted.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff the Estate of Gary Montgomery, prays that this Court grant the following relief:

a.     declare that Defendants violated Mr. Montgomery's Fourth and Fifth Amendment rights;

b.     declare that Defendants violated Mr. Montgomery's rights under *Brady v. Maryland*;

c.      declare that Defendants conspired to violate Mr. Montgomery's constitutional rights;

d.      declare that Defendants denied Mr. Montgomery due process of law;

e.      declare that Defendants suppressed exculpatory evidence;

f.      declare that Defendants violated Mr. Montgomery's federal right to a reasonable accommodation;

g.      declare that Defendants violated Mr. Montgomery's federal right to be free of discrimination based on his status as a person with mental illness;

h.      declare that Defendants violated Mr. Montgomery's constitutional rights by failing to make any effort whatsoever to compare the DNA found on the clothes at the scene to the DNA of Mark Johnson and failing to enter the DNA profile into CODIS – the Federal Bureau of Investigation Combined DNA Index System;

i.      enjoin Defendants from engaging in further misconduct described herein and direct it to take all affirmative steps necessary to properly train MPD officers and prevent additional instances of such conduct from occurring in the future, including, but not limited to, employing the Reid technique of interrogation on mentally ill suspects;

j.      grant a judgment against Defendants, jointly and severally, in the full and just amount of Five Million Dollars ($5,000,000.00),  plus interest and costs, pre and post judgment interest, and attorney's fees, costs, and expenses, and such other and further relief as the court deems just and proper;

k.      enter an award for punitive damages because Defendants Wise and Nasr acted with evil motive, actual malice, deliberate oppression, or with willful disregard for Mr. Montgomery's rights, and Defendants Wise and Nasr's conduct was outrageous, grossly fraudulent, or reckless toward Mr. Montgomery's safety.

## **JURY TRIAL DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,


___/s/_____
Jason G. Downs
D.C. Bar No. 979476
Downs Collins, P.A.
20 S. Charles Street, Suite 901
Baltimore, Maryland  21201
T:  410-462-4529
F:  410-995-7200
Jason@DownsCollins.com
*Counsel for Plaintiffs*

Dated:  August 16, 2018