|  |  |
|---|---|
| BRANDON MONTGOMERY, as personal representative for the estate of Gary Montgomery,<br><br>        Plaintiff,<br><br>    v.<br><br>THE DISTRICT OF COLUMBIA, et al.,<br><br>        Defendants. | Civil Action No. 18-1928 (JDB) |

## MEMORANDUM OPINION

In 2012, Gary Montgomery was charged in Superior Court with first-degree murder for fatally stabbing Deoni JaParker Jones at a bus stop in Washington, D.C. After initially being held at the D.C. Jail, Montgomery spent much of the next five years confined at a psychiatric hospital while proceedings regarding his competency to stand trial unfolded. After finally being determined competent, Montgomery was acquitted at trial in 2017. He died shortly thereafter. Plaintiff Brandon Montgomery, as personal representative for the estate of Gary Montgomery, has brought this action against the District of Columbia and several Metropolitan Police Department officers (collectively "defendants"). Plaintiff alleges that defendants committed various constitutional and statutory violations related to their investigation and detention of Montgomery. Currently pending before this Court is [10] defendants' partial motion to dismiss four counts of the complaint. For the reasons that follow, the Court will grant in part and deny in part defendants' motion.

# BACKGROUND

## I.  FACTS[1]

On February 2, 2012, at approximately 8:12 p.m., Deoni JaParker Jones was stabbed in the head and killed while sitting at a bus stop in northeast Washington, D.C. Compl. [ECF No. 1] ¶ 36. A nearby motorist, Jermaine Jackson, witnessed the murder and provided his account to the Metropolitan Police Department ("MPD") a few hours later. Id. ¶¶ 37, 40. According to Jackson, the killer was between 5'9 and 6'0 tall, between thirty and forty years old, and dressed in a gray hoodie under a black puffy jacket. Id. ¶ 41. After Jones was stabbed, Jackson exited his car and fought with the killer to prevent him from escaping, punching him to the ground and stomping on his head several times. Id. ¶¶ 39, 42. The killer eventually escaped. Id. ¶ 39. Video footage from the interior of America's Best Wings, a business establishment a few blocks from where the murder occurred, showed a person fitting Jackson's description running in the opposite direction of the murder scene. Id. ¶ 56.

The next day, MPD released a different video to the public that showed a man crossing a street in the area of the murder a few minutes before it occurred. Id. ¶ 48. After releasing the video, MPD received several phone calls from individuals identifying the man as Gary Montgomery. Id. ¶ 62. Montgomery, then fifty-five years old, was a mentally disabled resident of the District of Columbia ("the District") who had suffered from Schizophrenia for most of his adult life. Id. ¶ 31. Montgomery was identifiable to his neighbors based on his "prominent limp" and "distinctive clothing." Id. ¶ 63.

MPD first interrogated Montgomery in connection with Jones's murder on February 4, 2012. Id. ¶¶ 65, 71. Photographs and video footage captured by MPD that day show Montgomery

---

[1] For the purposes of defendants' motion, the allegations in plaintiff's complaint are accepted as true. See, e.g., Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 164 (1993).

wearing a light brown jacket, khaki pants, and white tennis shoes, which Montgomery said he had been wearing for several days and which matched the clothing worn by the man crossing the street in the released video. Id. ¶¶ 72–74. Despite Jackson's account of the murder and his fight with the killer, Montgomery "did not appear to be 30[–]40 years old," and his "face was unblemished and free of any bruises or injuries." Id. ¶ 46.

Defendant Officers Brian Wise and Hosam Nasr conducted the interrogation of Montgomery, which lasted for nearly six hours. Id. ¶ 108. The officers used the Reid technique, id. ¶ 109, "a method of interrogation . . . aimed at extracting confessions and evaluating suspect credibility." United States v. Jacques, 744 F.3d 804, 808 n.1 (1st Cir. 2014); see United States v. Preston, 751 F.3d 1008, 1023 & n.19 (9th Cir. 2014) ("The 'Reid method,' named for the manual of which [John E.] Reid was a coauthor, is widely used by law enforcement agencies."). Throughout the interrogation, "Montgomery repeatedly showed signs of psychosis manifested by disorganized and jumbled thoughts," and provided responses to questions that "frequently had no apparent meaning." Compl. ¶¶ 113–14. Montgomery's mental illness limited his "ability to understand information and to communicate information" throughout the interrogation. Id. ¶ 115. At one point, Officer Wise inquired whether Montgomery had a mental illness. Id. ¶ 116. The officers nevertheless did not "make any modification or accommodation to their interrogation of . . . Montgomery to ensure he was able to communicate and understand the information given to him." Id. ¶ 23.

On February 7, Officer Wise interviewed Mark Johnson, who a member of the public had also identified as possibly being the person in the released video. Id. ¶¶ 79, 81. Johnson told Wise that, around the time of the murder, he was buying heroin near the bus stop where Jones was killed. Id. ¶ 81. When Wise showed Johnson a picture of Montgomery, Johnson told Wise he recognized

Montgomery from the neighborhood but did not say Montgomery was with him on the night of the murder. Id. ¶ 82.

At some point between February 4 and 10, MPD arrested Montgomery, after which Officers Wise and Nasr interrogated him for a second time. See id. ¶¶ 2, 92. During the second interrogation, Montgomery was "in an active psychotic state[,] hearing voices and speaking to voices he heard." Id. ¶ 117. As with the first interrogation, Montgomery's ability to understand the officers' statements and communicate with them was limited, id. ¶ 115, but no accommodations for his mental illness were made, id. ¶ 23.

On February 23, the D.C. Superior Court held a preliminary detention hearing pursuant to section 23-1325(a) of the D.C. Code, which authorizes pretrial detention of defendants charged with certain serious crimes, including first-degree murder, upon a showing of (1) probable cause to believe that the defendant committed the offense and (2) clear and convincing evidence that no conditions of release will reasonably assure the safety of the community. Jeffers v. United States, 208 A.3d 357, 359 (D.C. 2019); see United States v. Montgomery, 2012 CF1 002614 (D.C. Sup. Ct. Feb. 11, 2012)[2]; Compl. ¶ 53. When the government asked Officer Nasr, who testified at the hearing, whether anyone aside from Montgomery was near Jones in the minutes leading up to her death, Nasr said no. Compl. ¶ 53. Nasr's testimony was knowingly false, plaintiff alleges, because at the time, MPD possessed footage showing another man sitting next to Jones at the bus stop in the moments before her death—footage that it had not yet disclosed to the public or to

---

[2] The Court may take judicial notice of the public record of proceedings before the D.C. Superior Court. See Turpin v. Ray, 319 F. Supp. 3d 191, 203 n.5 (D.D.C. 2018) ("Because the D.C. Superior Court docket is a public document, the Court may take judicial notice of such documents" in the context of a motion to dismiss.) (citing Covad Commc'ns Co. v. Bell Atl. Corp., 407 F.3d 1220, 1222 (D.C. Cir. 2005)); see also Lewis v. Parker, 67 F. Supp. 3d 189, 195 n.6 (D.D.C. 2014).

Montgomery's defense counsel.[3]  Id. ¶¶ 53–54, 92.  The hearing resulted in a finding that pretrial detention was warranted.  See Seventh Docket Entry of Feb. 23, 2012, Montgomery, 2012 CF1 002614.

Montgomery was indicted on November 7, 2012.  First Docket Entry of Nov. 7, 2012, Montgomery, 2012 CF1 002614.  Shortly thereafter, Montgomery's defense counsel submitted a written request to the government for material covered under Brady v. Maryland, 373 U.S. 83 (1963).[4, 5]  Compl. ¶¶ 92–93.  In response, the government represented that it would disclose a surveillance DVD, but no such DVD was included in the materials Montgomery's counsel received.[6]  Id. ¶¶ 92, 95.

In early 2013, the Superior Court ordered that Montgomery be moved from the D.C. Jail to a psychiatric hospital and examined for competency to stand trial.  Fifth Docket Entry of Jan. 29, 2013, Montgomery, 2012 CF1 002614.  Montgomery was initially found competent to stand trial, but his competency status changed several times over the next few years.  See Docket Entries of Apr. 5, 2013–Nov. 29, 2016, Montgomery, 2012 CF1 002614.  In late 2016, Montgomery was again found competent and a jury trial was scheduled for July 31, 2017.  Seventh Docket Entry of Nov. 29, 2016, Montgomery, 2012 CF1 002614.

---

[3] The complaint also alleges that MPD possessed additional evidence casting doubt on Montgomery's guilt that it did not disclose at the time of the detention hearing, including the results of DNA testing on clothing that the killer dropped at the bus stop, which did not match Montgomery's DNA.  See Compl. ¶¶ 78, 92.

[4] Under Brady, "a prosecutor [must] . . . disclose . . . information favorable to the accused 'that is material [either] to . . . guilt or to punishment.'"  United States v. Bowie, 198 F.3d 905, 908 (D.C. Cir. 1999) (citing Brady, 373 U.S. at 87).

[5] The exact date of the Brady request is unclear, but the complaint alleges it was on or before December 18, 2012.  See Compl. ¶¶ 92–93.

[6] By December 18, 2012, the government had provided Montgomery's defense counsel with the following materials: video footage of MPD's February 2012 interrogations of Montgomery, documentation of three identification procedures conducted in the case, and the death, autopsy and toxicology, and forensic biology reports. Compl. ¶ 92.

Montgomery's counsel made an additional request for Brady material in June 2017. Compl. ¶ 94. In the week preceding the trial, the government disclosed Jackson's eyewitness account of Jones's murder, the America's Best Wings video showing a person fitting Jackson's description of the killer, and details of MPD's interview of Johnson. Id. ¶¶ 60, 85, 90.

After a two-week trial beginning on July 31, 2017, a jury acquitted Montgomery of first-degree murder. Id. ¶¶ 1, 3; Fifth Docket Entry of Aug. 16, 2017, Montgomery, 2012 CF1 002614. Shortly after his release, Montgomery died at sixty-one years of age. Compl. ¶ 31.

## II. PROCEDURAL HISTORY

On August 16, 2018, Brandon Montgomery, as personal representative for Montgomery's estate, filed the present lawsuit. Id. at 7, 39. The complaint consists of nine counts alleging various constitutional and statutory violations committed by the District, Officer Wise, Officer Nasr, and others.[7] Id. ¶¶ 132–199. Defendants move to dismiss four of the nine counts: Count IV (claim under 42 U.S.C. § 1983 alleging Officers Wise and Nasr violated Montgomery's due process rights under Brady); Count VII (claim under section 1983 against the District alleging municipal liability for various constitutional violations under Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978)); Count VIII (claim under Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132); and Count IX (claim under section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a)). Defs.' Mot. for Partial Dismissal of the Compl. ("Mot.") [ECF No. 10] at 1. The motion to dismiss is fully briefed and ripe for resolution.

---

[7] The complaint also names as defendants Officers "John Doe, whose identities are currently unknown, [who] represent those employees of the District of Columbia MPD . . . who had supervisory authority over [d]efendants Brian Wise and Hosam Nasr." Compl. ¶ 35.

**LEGAL STANDARD**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citation and internal quotation marks omitted). Plausibility requires "more than a sheer possibility that a defendant has acted unlawfully." Id. (citation omitted). "Legal conclusions cast in the form of factual allegations" are insufficient. Browning v. Clinton, 292 F.3d 235, 242 (D.C. Cir. 2002) (citation and internal quotation marks omitted). A court must accept factual allegations as true and grant the plaintiff the benefit of all inferences that can be drawn from the facts alleged. Id. (citation and internal quotation marks omitted).

**ANALYSIS**

**I.  BRADY CLAIM**

In Count IV, plaintiff brings a section 1983 claim against Officers Wise and Nasr for their alleged failure to disclose material, exculpatory information to prosecutors (and hence to defense counsel) prior to Montgomery's detention hearing, which resulted in his confinement for over five years and his prosecution for a crime that he did not commit. Compl. ¶¶ 150–52. Because section 1983 "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred," the first step in analyzing a plaintiff's claim is to "identify the specific constitutional right allegedly infringed." Albright v. Oliver, 510 U.S. 266, 271 (1994) (citation and internal quotation marks omitted).

Here, plaintiff alleges that the officers violated Montgomery's due process rights under Brady, which sets forth the government's duty "to disclose . . . information favorable to the accused that is 'material [either] to . . . guilt or to punishment.'" Bowie, 198 F.3d at 908 (quoting Brady, 373 U.S. at 87); Compl. ¶ 151. Defendants' primary response is that, even if Montgomery's Brady

rights were violated, Officers Wise and Nasr are protected by the doctrine of qualified immunity. See Mot. at 6–8.

Qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established . . . constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231 (2009) (citation and internal quotation marks omitted). Qualified immunity therefore bars relief unless the plaintiff can establish both (1) the violation of a constitutional right and (2) that the right at issue was "clearly established" at the time of the violation. Id. at 232; see Saucier v. Katz, 533 U.S. 194, 200–01 (2001). Following the Supreme Court's decision in Pearson, courts may consider this two-step inquiry in either order. 555 U.S. at 236. Here, the Court will not resolve the first inquiry—whether a police officer's failure to disclose exculpatory material prior to a detention hearing violates a defendant's right to due process under Brady—but instead will move directly to the second: whether, even if it does, such a right was clearly established at the time of the alleged misconduct. See Kenley v. District of Columbia, 83 F. Supp. 3d 20, 38 (D.D.C. 2015) (taking the same approach in resolving similar section 1983 claim).

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier, 533 U.S. at 202. "In determining whether officers strayed beyond clearly established bounds of lawfulness," courts in this district look to cases from the Supreme Court and the D.C. Circuit, "as well as to cases from other courts exhibiting a consensus view." Johnson v. District of Columbia, 528 F.3d 969, 976 (D.C. Cir. 2008). Unless "existing precedent" has "placed the statutory or constitutional question beyond debate," the defendants may not be held liable. Reichle v. Howards, 566 U.S. 658, 664 (2012).

Plaintiff has not met the "clearly established" standard. Relying on cases interpreting _Brady_, plaintiff contends that there is ample authority establishing that exculpatory evidence "must be [timely] disclosed 'pretrial.'" Pl.'s Mem. of P. & A. in Opp'n to Defs.' Mot. for Partial Dismissal of the Compl. ("Opp'n") [ECF No. 15] at 10–11 (citation omitted). That may be true, but that is not the constitutional right plaintiff alleges was infringed. The right that forms the basis of plaintiff's section 1983 claim would require the government to disclose exculpatory information to the defense prior to a _preliminary detention hearing_ in order to prevent unfair pretrial detention decisions. _See_ Compl. ¶¶ 150–52; Opp'n at 10–12. But neither the Supreme Court nor the D.C. Circuit has clearly recognized _Brady_ rights in the context of pretrial proceedings. To the contrary, both have indicated that the purpose of _Brady_ is to preserve defendants' right to a fair _trial_ and to avoid wrongful _convictions_, rather than to provide broader protections in other proceedings. _See, e.g._, _Strickler v. Greene_, 527 U.S. 263, 281 (1999) ("[T]here is never a real '_Brady_ violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different _verdict_.") (emphasis added); _Kyles v. Whitley_, 514 U.S. 419, 433 (1995) (finding _Brady_ obligations to exist "when suppression of the evidence would be of sufficient significance to result in the denial of the defendant's right to a fair _trial_") (emphasis added) (citation and internal quotation marks omitted); _United States v. Straker_, 800 F.3d 570, 603 (D.C. Cir. 2015) (defining the prejudice element of _Brady_ claims as requiring "a reasonable probability that an earlier disclosure [of evidence] would have changed the _trial's_ result") (emphasis added) (citation omitted).

To comply with _Brady_, the government must therefore disclose material, exculpatory evidence "at such a time as to allow the defense to use the favorable material effectively in the preparation and presentation of its case" at trial. _United States v. Celis_, 608 F.3d 818, 835 (D.C.

Cir. 2010); see United States v. Pollack, 534 F.2d 964, 973–74 (D.C. Cir. 1976) (explaining that to determine whether Brady disclosure is timely courts "balance . . . the potential dangers of early discovery against the need . . . [to] avoid[] wrongful convictions," and that Brady is not violated where "the timing of the government's disclosures" does not "heighten[]" "the possibility of [defendants'] convictions"). What this timeliness requirement means in practice will vary depending on the facts of each case and the nature of the favorable material. But what it does not mean is that there is a clear constitutional right to Brady material immediately after arrest or prior to a preliminary detention hearing.

Moreover, courts in other jurisdictions "disagree[] about whether the due-process rights articulated in Brady are implicated at all where plaintiffs were not convicted in their criminal cases," Kenley, 83 F. Supp. 3d at 39 (emphasis in original), with many finding they are not, see, e.g., Bianchi v. McQueen, 818 F.3d 309, 320 (7th Cir. 2016) ("A violation of Brady requires a showing of prejudice, which can't be made here because the plaintiffs were acquitted."); Flores v. Satz, 137 F.3d 1275, 1278 (11th Cir. 1998) ("Plaintiff . . . was never convicted and, therefore, did not suffer the effects of an unfair trial. As such, the facts of this case do not implicate the protections of Brady.").

Here, Montgomery was acquitted, not convicted. And plaintiff's section 1983 claim asserting a Brady violation is premised not on any alleged unfairness at trial, but rather on a pretrial detention proceeding held approximately two weeks after Montgomery's arrest—at which detention was ordered—and the fact of Montgomery's prosecution. Based on the lack of existing precedent that has resolved the question in plaintiff's favor, this Court is not persuaded that Montgomery had a clearly established constitutional right to exculpatory evidence prior to his

detention hearing. Hence, Officers Wise and Nasr are entitled to qualified immunity, and defendants' motion to dismiss Count IV will be granted.

## II. MONELL CLAIM

In Count VII, plaintiff alleges that the District is liable under section 1983 for various violations of Montgomery's rights arising out of his arrest, interrogation, and prosecution. Compl. ¶¶ 165–170. In Monell, the Supreme Court held that municipalities like the District do not enjoy absolute immunity from section 1983 liability. 436 U.S. at 690, 694. But while municipalities may be held liable under that section, they are "responsible only for their own illegal acts" and "are not vicariously liable . . . for their employees' actions." Connick v. Thompson, 563 U.S. 51, 60 (2011) (emphasis in original) (citations omitted); see also Monell, 436 U.S. at 692. Hence, a plaintiff that "seek[s] to impose liability on local governments under § 1983 must prove that 'action pursuant to official municipal policy' caused their injury." Connick, 563 U.S. at 60 (quoting Monell, 436 U.S. at 691). Generally, "[o]fficial municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." Id. at 61. "In limited circumstances," however, "a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." Id.

Plaintiff contends that this case falls within that rare situation—i.e., that while Montgomery's injuries did not result from any express District policy, they did arise out of the District's failure to adequately train its officers. See Compl. ¶ 168; Opp'n at 15. Specifically, plaintiff alleges that the District failed to train its officers not to "conduct[] constitutionally inadequate investigations, engag[e] in discrimination against mentally ill suspects, fabricat[e]

11

inculpatory evidence, . . . maliciously prosecute[ suspects,] . . . suppress[] material[,] exculpatory information and evidence[,] and us[e] unconstitutional and discriminatory interrogation techniques." Compl. ¶ 169.

Because "[a] policy of inadequate training is far more nebulous" than an explicit municipal policy, a "municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." Connick, 563 U.S. at 61 (citations and internal quotation marks omitted). Accordingly, to successfully make out a "failure-to-train" claim, a plaintiff must clear a high hurdle: he must establish that the municipality's purported failure to train "amount[ed] to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" Id. (alteration in original) (citations omitted). "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Id. (citation omitted). Ordinarily, to establish deliberate indifference, a plaintiff must allege a pattern of constitutional violations by inadequately trained employees that are similar to the instant violation. Id. at 62. Such a pattern demonstrates a "continued adherence to an approach that [the municipality] know[s] or should know has failed to prevent . . . [unconstitutional] conduct by employees," and thus "may establish the conscious disregard for the consequences of [its] action—the 'deliberate indifference'—necessary to trigger municipal liability." Bd. of Cty. Comm'rs of Bryan Cty. v. Brown, 520 U.S. 397, 407 (1997). Allegations of a pattern of constitutional violations stemming from "inadequately trained employees" also "may tend to show that the lack of proper training, rather than . . . factors peculiar to the officer involved in a particular incident," caused the plaintiff's injury. Id. at 408 (citation omitted).

Here, plaintiff fails to adequately allege such a pattern of similar constitutional violations. Although plaintiff references MPD's 1994 interrogation of a suspect for a different crime that

allegedly resulted in a "coerced and false confession," Compl. ¶ 167, a conclusory mention of a single incident twenty years before Montgomery's interrogation is insufficient to allege a pattern of misconduct. It hardly amounts to adequately alleging, as is necessary here, "that 'the city itself [decided] to violate the Constitution" by "disregard[ing] a known or obvious consequence of" its failure to train its employees. Robinson v. Pezzat, 818 F.3d 1, 12 (D.C. Cir. 2016) (quoting Connick, 563 U.S. at 61–62).

The absence of any alleged pattern of constitutional violations, however, does not end the inquiry. The Supreme Court has left open the possibility that a plaintiff can, "in a narrow range of circumstances," successfully allege Monell liability based on a single incident of unconstitutional conduct by municipal employees. Connick, 563 U.S. at 63 (citation omitted). If such conduct was a "patently obvious" consequence of the municipality's failure to train its employees, the Court explained, such conduct may be enough to imply the municipality's deliberate indifference to the plaintiff's rights. Id. at 63–64. Under this "single-incident" theory, it is not enough for a plaintiff simply to allege, without more, that employee training could have prevented the alleged constitutional violation. Instead, the complaint must allege facts that establish an obvious "affirmative link" between the failure to adequately train employees and the alleged constitutional violation, such that the failure to train, rather than the employee's errors or negligence, "was the 'moving force' behind the constitutional violation." Baker v. District of Columbia, 326 F.3d 1302, 1306 (D.C. Cir. 2003) (citation omitted); see City of Canton v. Harris, 489 U.S. 378, 391 (1989) ("[A]dequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable.").

Plaintiff does not meet this stringent standard. The complaint contains only generalized allegations that Officers Wise and Nasr are guilty of engaging in illegal conduct—including,

among others things, fabricating inculpatory evidence, engaging in discrimination against mentally ill suspects, and conducting constitutionally inadequate investigations—coupled with the bald assertion that the District "failed to adequately . . . train . . . [its] employees." Compl. ¶ 168. Absent from the complaint is any suggestion that the District, despite being faced with some "obvious need for specific" training that might prevent conduct resulting in constitutional violations, declined to offer it.[8] Connick, 563 U.S. at 64. Indeed, plaintiff offers no explanation for why specialized training—apart from whatever ordinary training MPD officers receive as a matter of course—is even necessary to prevent much of the alleged misconduct. Presumably police officers know, without any additional specific training, not to—for instance—fabricate evidence. See id. (noting that the narrow circumstances under which single-incident liability for failure to train might be warranted include situations where there is "no reason to assume" that officers were aware of what constituted unconstitutional misconduct, and where, absent training, there was "no way for novice officers to obtain" such knowledge). Plaintiff's summary allegations are insufficient to assert that the District itself was the moving force behind such violations. Hence, regardless of how egregious the officers' treatment of Montgomery may have been, plaintiff has

---

[8] Plaintiff at least implicitly suggests that MPD officers did not receive training instructing them not to use the Reid technique on mentally ill suspects. See Compl. ¶ 112; Opp'n at 16. However, while plaintiff alleges that "the Reid technique . . . can elicit false confessions" when used on mentally ill suspects, Compl. ¶ 112 (emphasis added), that could be said of any interrogation technique, and does not in itself allege an affirmative link between the District's purported failure to train and the constitutional violations plaintiff alleges here. Moreover, plaintiff does not cite any cases suggesting that constitutional violations are such a "patently obvious" consequence of using the Reid technique on mentally ill suspects that the District may be held liable merely for failing to instruct employees not to use it. While courts have "expressed concern about approaches such as the Reid Technique" in the context of assessing the voluntariness of confessions, Dassey v. Dittman, 877 F.3d 297, 321 (7th Cir. 2017) (Wood, C.J., Rovner & Williams, J.J., dissenting)—particularly when used on juveniles or individuals with disabilities, see United States v. Monroe, 264 F. Supp. 3d 376, 393 n.153 (D.R.I. 2017)—the Court is aware of no authority suggesting that failing to prevent its use—whether on competent adults, juveniles, or the mentally disabled—creates enough risk of unconstitutional conduct to impose municipal liability for deliberate indifference. See Stoot v. City of Everett, 582 F.3d 910, 929–30 (9th Cir. 2009) (rejecting Monell claim alleging that city's failure to train officers not to use Reid technique in "conducting juvenile interrogations" "amount[ed] to . . . deliberate indifference"); Monroe, 264 F. Supp. 3d at 393 ("[T]here is nothing impermissible as a matter of law with . . . [the Reid technique]."). Hence, irrespective of whether the officers' use of the Reid technique in this instance violated Montgomery's constitutional rights—a question this Court has no occasion to decide—plaintiff has not alleged sufficient facts to establish, nor is there authority to support, municipal liability stemming from the District's policies or practice.

14

failed to state a <u>Monell</u> claim against the District based on an unconstitutional policy, and defendants' motion to dismiss Count VII will be granted.

## III.  STATUTORY DISCRIMINATION CLAIMS

In Count VIII and Count IX, plaintiff alleges that the District, through its employees Officers Wise and Nasr, interrogated Montgomery in a manner that violated Title II of the Americans with Disabilities Act ("ADA") and section 504 of the Rehabilitation Act, respectively. <u>See</u> Compl. ¶¶ 171–199. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The ADA is "directly patterned on the Rehabilitation Act," and the elements of an ADA Title II claim are nearly identical to the elements of a Rehabilitation Act section 504 claim.[9] <u>Adams v. Rice</u>, 531 F.3d 936, 948 (D.C. Cir. 2008). Because Title II and section 504 claims are "similar in substance[,] . . . cases interpreting either are applicable and interchangeable." <u>Chenari v. George Wash. Univ.</u>, 847 F.3d 740, 746 (D.C. Cir. 2017) (citation omitted). Hence, this Court will analyze Counts VIII and IX as one set of claims, and the analysis below applies to both the Title II and section 504 claims.

To state a claim under Title II, a claimant must allege sufficient facts to establish that (1) he is a qualified individual with a disability,[10] (2) a public entity excluded him from participation in or denied him the benefits of the entity's services, programs, or activities, or subjected him to discrimination, and (3) the public entity discriminated against him by reason of the disability. <u>See</u>

_____

[9] Unlike Title II, section 504 specifically prohibits discrimination under programs or activities that receive federal financial assistance or are conducted by an Executive agency or by the United States Postal Service. <u>See</u> 29 U.S.C. § 794(a). Defendants do not dispute that the District's activities are within section 504's scope. <u>See</u> Mot. at 11–14.

[10] Defendants do not dispute plaintiff's assertion that Montgomery was a qualified individual with a disability within the meaning of the ADA. <u>See</u> 42 U.S.C. § 12131(2); Compl. ¶ 172.

<u>Pierce v. District of Columbia</u>, 128 F. Supp. 3d 250, 267 (D.D.C. 2015). "It is clear beyond cavil that the core principle that underlies the protections of [s]ection 504 and Title II is equal access," and that equal access requires public entities "to provide reasonable accommodations" to qualifying individuals. <u>Id.</u> at 268.

Plaintiff alleges that police investigations are subject to Title II and that Officers Wise and Nasr, who were aware of Montgomery's disability, engaged in intentional discrimination by failing to reasonably accommodate his disability during his interrogation. Compl. ¶¶ 177, 179–81. Defendants respond that MPD's interrogation of Montgomery is outside the scope of Title II because it was not a program that was intended to benefit Montgomery, or a program that he was excluded from participating in. Mot. at 12 (arguing that the ADA exclusively "protects the rights of disabled persons to public <u>benefits</u> or to <u>participation</u> in a public program"); <u>see also</u> Reply in Supp. of Defs.' Mot. to Dismiss [ECF No. 18] at 6–7 ("[T]he text of Title II of the ADA does not contemplate the provision of accommodations to a suspect in a police investigation.").

The Court rejects defendants' categorical assertion that Title II does not apply to arrests and interrogations. Contrary to defendants' supposition, a public entity need not intend to benefit an individual through a program or activity to be subject to Title II. On its face, the statutory language of Title II establishes two separate circumstances under which a qualified individual with a disability might have a claim against a public entity: (1) the individual was "excluded from participation in or . . . denied the benefits of the services, programs, or activities of a public entity," <u>or</u> (2) the individual was "subjected to discrimination by any such entity."[11] 42 U.S.C. § 12132; <u>see</u> <u>Williams v. Taylor</u>, 529 U.S. 362, 404 (2000) (applying the "cardinal principle of statutory

---

[11] Similarly, section 504 establishes three sets of circumstances under which a qualified individual has a claim against a public entity subject to the statute: (1) the individual was excluded from participation in, (2) denied the benefits of, <u>or</u> (3) subjected to discrimination under any of the entity's programs or activities. <u>See</u> 29 U.S.C. § 794(a).

construction" requiring courts to "give effect, if possible, to every clause and word of a statute," including independent clauses); see also Haberle v. Troxell, 885 F.3d 170, 180 (3d Cir. 2018) (explaining that Title II "is framed in the alternative" and allows a plaintiff to "attempt to show an ADA claim under [only] the final clause in the . . . statute").

Every court of appeals to have considered the question has found that Title II applies to police conduct under at least the second provision. See Gray v. Cummings, 917 F.3d 1, 16 (1st Cir. 2019) (accepting the "uncontroversial premise that the . . . activities of a municipal police department are generally subject to the provisions of Title II of the ADA"); Haberle, 885 F.3d at 180 ("[W]e believe that [Title II of] the ADA can indeed apply to police conduct . . . ."); Seremeth v. Bd. of Cty. Comm'rs Frederick Cty., 673 F.3d 333, 338 (4th Cir. 2012) (holding that "the ADA applies to police interrogations"); Bircoll v. Miami-Dade Cty., 480 F.3d 1072, 1084–85 (11th Cir. 2007) (deciding that police officers may subject individuals to discrimination under Title II regardless of whether arrests qualify as a program, service, or activity); Hainze v. Richards, 207 F.3d 795, 801–02 (5th Cir. 2000) (holding that Title II applies to police conduct after the officers responding to a disturbance have secured the scene and ensured that there is no threat to human life); Gohier v. Enright, 186 F.3d 1216, 1221 (10th Cir. 1999) ("[A] broad rule categorically excluding arrests from the scope of Title II . . . is not the law."). So too have other courts in this district. See, e.g., Sacchetti v. Gallaudet Univ., 181 F. Supp. 3d 107, 128–30 (D.D.C. 2016) (noting that, while the exact "extent to which Title II of the ADA applies to arrests and post-arrest conduct by police officers . . . is not yet settled," a plaintiff may plausibly state a claim "under Title II of the ADA against the MPD for failure to accommodate [a plaintiff's] disabilities," including an obvious "mental illness," during and after arrest).

This Court agrees. Congress enacted the ADA "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). To that end, the ADA "must be interpreted broadly to include the ordinary operations of a public entity in order to carry out the purpose of prohibiting discrimination." Gorman v. Bartch, 152 F.3d 907, 913 (8th Cir. 1998). Hence, reading the "'subjected to discrimination' phrase in Title II" as "a catch-all phrase that prohibits all discrimination by a public entity," Haberle, 885 F.3d at 180, including in the arrest and interrogation contexts, comports both with the text and purpose of the ADA.[12] Drawing all reasonable inferences in plaintiff's favor, the detailed allegations of MPD's failure to accommodate Montgomery's obvious disability during his arrest and interrogation, see Compl. ¶¶ 21–23, 113–118, 171–199, are enough, at this stage, to state a plausible claim, see Gohier, 186 F.3d at 1220–21; Sacchetti, 181 F. Supp. 3d at 129. Whether the specific arrest or post-arrest conduct plaintiff alleges here in fact amounts to discrimination under Title II is best addressed on a more fully-developed record. See Sacchetti, 181 F. Supp. 3d at 130 ("Whether [plaintiff] can establish that the MPD officers' alleged conduct amounted to a denial of reasonable accommodation[] for [plaintiff's] disabilities is a question properly reserved for resolution until a meaningful opportunity for discovery is provided.").

Defendants raise one additional argument. Even if the ADA applies to police conduct, they say, plaintiff has failed to state a claim for compensatory damages because he has not adequately alleged intentional discrimination by the District. Mot. at 14; Sacchetti, 181 F. Supp. 3d at 126 ("A plaintiff may recover compensatory damages for violations of Title II of the ADA . . . [only] if he proves that the defendant's discriminatory actions were intentional.") (quoting Pierce, 128 F.

---

[12] As pointed out in Sacchetti, 181 F. Supp. 3d at 129 n.11, this conclusion is further confirmed by regulations implementing Title II of the ADA, which broadly provide that public entities like MPD "shall take appropriate steps to ensure that communications with . . . members of the public . . . with disabilities are as effective as communications with others." 28 C.F.R. § 35.160(a)(1) (emphasis added).

Supp. 3d at 278); see Haberle, 885 F.3d at 181 (the remedy of compensatory damages under Title II "is not available absent proof of intentional discrimination") (citation and internal quotation marks omitted).

The Court finds that plaintiff has adequately alleged intentional discrimination. Neither party disputes that, to state a claim for intentional discrimination under Title II or section 504, a plaintiff must sufficiently allege at least "deliberate indifference," defined in this context as "knowledge that a harm to a federally protected right is substantially likely, and a failure to act despite that likelihood." Pierce, 128 F. Supp. 3d at 278–79 (citation omitted) (collecting cases). Courts in this district have found that standard satisfied where MPD officers or other District personnel were allegedly aware that a suspect or arrestee had a disability, but nevertheless failed to assess whether accommodations were necessary, or to provide those accommodations. See Sacchetti, 181 F. Supp. at 126 (holding that plaintiff successfully stated a claim for intentional discrimination under Title II where "MPD knew that [the plaintiff] was . . . suffering from a mental illness, . . . and despite this knowledge, failed to . . . transport him to a medical or mental health facility"); Pierce, 128 F. Supp. 3d at 279 (finding that plaintiff "easily satisfie[d]" the "deliberate indifference" standard under Title II . . . where "[t]he District's employees and contractors knew that [the plaintiff] had a hearing disability, and yet they did not undertake an assessment of the accommodations that [he] might need in order to access prison services").

Here, plaintiff has not only alleged that MPD employees failed to assess whether Montgomery needed an accommodation during his interrogations, but also that they willfully took advantage of his disability. Due to Montgomery's "fractured thoughts and disconnected sentences" during a several-hour interrogation, plaintiff alleges, Officer Wise paused to "ask . . . Montgomery if he had a mental illness," to which Montgomery responded, "if I'm talkin' to myself

19

I'll – you know, I'll go to a psychiatrist." Compl. ¶¶ 17, 116. The video of the interrogation also shows, according to plaintiff, that Montgomery was "in an active psychotic state[,] hearing voices and speaking to voices he heard." Id. ¶ 117. Despite clearly being aware of Montgomery's mental impairment and inability to comprehend the proceedings based on this behavior, plaintiff alleges, neither Wise nor Nasr made "any modification or accommodation to their interrogation . . . to ensure [Montgomery] was able to communicate and understand the information given to him." Id. ¶ 23. Moreover, plaintiff continues, the officers proceeded to "intentionally . . . exploit []Montgomery's mental illness," id. ¶ 20, "prey[ing] on . . . [his] inability to communicate and understand" the questions asked, id. ¶ 118. These allegations satisfy plaintiff's burden to plausibly claim that the District, through its officers, exhibited deliberate indifference to their duties under the ADA and the Rehabilitation Act.[13]

Having rejected defendants' challenges to plaintiff's Title II and section 504 claims, the Court will deny defendants' motion to dismiss Counts VIII and IX.

---

[13] Relying on the Third Circuit's decision in Haberle, defendants suggest that, in bringing an intentional discrimination claim under Title II and section 504, plaintiff may not rely on "the specific acts of the detectives," but only on the District's express policies. Mot. at 14 (citing Haberle, 885 F.3d at 181). But Haberle did not reach whether conduct by a public entity's employees may be relied on to state a Title II claim for intentional discrimination. Instead, the court there determined that a plaintiff can rely on a public entity's policies and practices to establish deliberate indifference—but that plaintiff's attempt to do so failed. See Haberle, 885 F.3d at 181 (rejecting the plaintiff's "general allegations that the [public entity] has 'a history of violating the civil rights of residents'"). And, in this and other jurisdictions, courts frequently have permitted plaintiffs asserting intentional discrimination to rely on the specific action, or lack of action, taken by police officers or other public-entity personnel in failing to provide reasonable accommodation. See, e.g., J.H. ex rel. J.P. v. Bernalillo Cty., 806 F.3d 1255, 1261 (10th Cir. 2015) (relying on individual officer's conduct and knowledge to resolve plaintiff's reasonable accommodation claim); Gorman, 152 F.3d at 913 (noting that whether plaintiff "can prove he was discriminated against" under Title II and section 504 turns on "[t]he facts of what actually occurred on the night of the arrest," including police officers' conduct); Sacchetti, 181 F. Supp. 3d at 130 (finding allegations concerning "MPD officers' alleged conduct" in failing to offer reasonable accommodation sufficient to state a claim against the District under the ADA) (emphasis added); Pierce, 128 F. Supp. 3d at 279 (finding deliberate indifference where "[t]he District's employees and contractors knew that [plaintiff] had a hearing disability, and yet they did not undertake an assessment of the accommodations that Pierce might need in order to access prison services") (emphases added). Moreover, the District itself has previously conceded that "a public entity can be held liable under the ADA for deliberate indifference of its employees or agents." Hunter ex rel. A.H. v. District of Columbia, 64 F. Supp. 3d 158, 170 (D.D.C. 2014). The Court therefore rejects defendants' suggestion that plaintiff cannot rely on the "specific acts" of Officers Wise and Nasr here.

## **CONCLUSION**

For the foregoing reasons, the Court will grant defendants' motion to dismiss Counts IV and VII, and deny the motion as to Counts VIII and IX. A separate order will issue on this date.

_____/s/_____

JOHN D. BATES

United States District Judge

Dated: August 5, 2019