# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

BRANDON MONTGOMERY,

          *Plaintiff*,

    v.

DISTRICT OF COLUMBIA, *et al*.,

       *Defendants*.

Civil Action No. 1:18-cv-01928-JDB

## <u>DEFENDANT DISTRICT OF COLUMBIA'S MOTION FOR SUMMARY JUDGMENT</u>

Defendant District of Columbia (the District) respectfully moves under Fed. R. Civ. P. 56(a) for summary judgment on all counts in Plaintiff's Amended Complaint [48]. Plaintiff Brandon Montgomery brings this civil action on behalf of the estate of his father, Gary Montgomery (Montgomery). Plaintiff claims that Montgomery's rights under Title II of the Americans with Disabilities Act (Count VIII) and Section 504 of the Rehabilitation Act (Count IX) were violated when he was interviewed by two Metropolitan Police Department detectives on February 4, 2012 and February 10, 2012, about a homicide.

The District is entitled to judgment as a matter of law on Plaintiff's claims. The ADA and Rehabilitation Act do not apply to the February 4, 2012 and February 10, 2012 police interviews. And even if they do, the District did not violate the statutes. According to Plaintiff's own experts, the District satisfied the standard. Alternatively, Montgomery was not in need of an accommodation. Further, Plaintiff cannot demonstrate that the District was deliberately indifferent to Montgomery's rights. Finally, Plaintiff is not entitled to injunctive relief.

A memorandum of points and authorities, a statement of undisputed material facts, and a proposed order are attached for the Court's consideration.

Date:  September 27, 2021                     Respectfully submitted,

                                             KARL A. RACINE
                                             Attorney General for the District of Columbia

                                             CHAD COPELAND
                                             Deputy Attorney General
                                             Civil Litigation Division

                                             */s/ Alicia M. Cullen*
                                             ALICIA M. CULLEN [1015227]
                                             Chief, Civil Litigation Division, Section III

                                             */s/ Aaron Finkhousen*
                                             ROBERT A. DEBERARDINIS, JR. [335976]
                                             Senior Assistant Attorney General
                                             AARON J. FINKHOUSEN [1010044]
                                             Assistant Attorney General
                                             Civil Litigation Division
                                             400 6th Street NW
                                             Washington, D.C. 20001
                                             Phone:  (202) 724-6642; (202) 724-7334
                                             Fax:  (202) 730-0493
                                             Email:  robert.deberardinis@dc.gov;
                                             aaron.finkhousen@dc.gov
                                             *Counsel for Defendant District of Columbia*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| BRANDON MONTGOMERY, | |
| *Plaintiff*, | |
| v. | Civil Action No. 1:18-cv-01928-JDB |
| DISTRICT OF COLUMBIA, *et al*., | |
| *Defendants*. | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT
DISTRICT OF COLUMBIA'S MOTION FOR SUMMARY JUDGMENT**

On February 10, 2012, Gary Montgomery was arrested and charged with the fatal

stabbing of Deoni JaParker Jones at a bus stop in Southeast Washington, D.C.  His arrest was

based on an arrest warrant approved by a Superior Court judge, who found that the supporting

affidavit demonstrated probable cause to believe that Montgomery had committed felony

murder.  After hearing the evidence against Montgomery at a preliminary hearing, a second

Superior Court judge found that the prosecutor had submitted sufficient evidence to believe that

Montgomery had committed felony murder.  At the close of that hearing, the prosecution and

defense requested a forensic screening of Montgomery to determine his competency to stand

trial.  This resulted in Montgomery's commitment to St. Elizabeths Hospital, where he was held

for five years while his lawyer and the prosecutor litigated his competency to stand trial.

Ultimately, Montgomery went to trial in 2017, and was acquitted.  He died several months after

his acquittal.

Plaintiff Brandon Montgomery brings this civil action on behalf of the estate of his

deceased father.  Plaintiff alleges that Montgomery suffered from schizophrenia at the time of his

arrest and interrogation by homicide detectives of the Metropolitan Police Department (MPD). Plaintiff claims that the detectives should have recognized Montgomery's mental illness and provided him accommodations as required by Title II of the Americans with Disabilities Act (ADA) and the Rehabilitation Act.  Am. Compl. [48] ¶¶ 136-39.  Plaintiff further alleges that, because of the detectives' failure to accommodate Montgomery's disability during his interrogation, Montgomery made inculpatory statements that resulted in him being charged, prosecuted, and committed to a psychiatric hospital for five years.  *Id.* ¶¶ 136-39.

As demonstrated below, the District is entitled to summary judgment on Plaintiff's claims under both the ADA (Count VIII) and the Rehabilitation Act (Count IX).  There was ample evidence establishing probable cause to charge and prosecute Montgomery for murder, even without the inculpatory statements.  As a result, any failure to accommodate Montgomery did not proximately cause his prosecution and detention.  Moreover, Montgomery was provided with accommodations recommended by Plaintiff's own experts.  Finally, in seeking damages from the District, Plaintiff improperly relies on *respondeat superior* liability, imputing the alleged violations of the individual detectives to the District.  As many courts have recently recognized, such vicarious liability for damages is not available under Title II of the ADA or the Rehabilitation Act.  Instead, Plaintiff must prove that the District itself was deliberately indifferent to the alleged violation of Montgomery's rights.  Plaintiff cannot make that showing. Plaintiff's own experts acknowledge that MPD's policies are appropriate, and there is no evidence that MPD had actual or constructive knowledge that its agents would probably violate Montgomery's rights.

## BACKGROUND

On February 2, 2012, Ms. Deoni JaParker Jones was fatally stabbed in the head while

sitting at a bus stop at the intersection of East Capitol and Sycamore Street, NE.  Statement of Undisputed Material Facts (SUMF) ¶ 1.  Metropolitan Police Department (MPD) homicide detectives Brian Wise and Hosam Nasr investigated the crime and concluded that Gary Montgomery had murdered Jones.  *Id.* at ¶ 2.

Police spoke with Attalah Gabriel, a bystander who left the bus stop minutes before Jones's murder.  *Id.* at ¶ 3.  Gabriel noticed a man staring at Jones the entire time she was sitting at the bus stop.  *Id.* at ¶ 4.  She also noticed the smell of marijuana and that the man had "really big eyes like he was high on something."  *Id.*  Based on her observations, Gabriel concluded that the man was making Jones feel uncomfortable as he stared at her because she turned her body away from him.  *Id.*  Days later, Gabriel identified the man sitting at the bus stop as Gary Montgomery when shown a photo array.  *Id.*

Surveillance footage shows that, shortly after Gabriel left, the man followed Jones as she left the bus stop.  *Id.* at ¶ 5.  The video shows the man, or someone who looks like him, continuing to follow her as she returns four minutes later.  *Id.*  The man then stands up, walks over to Jones, and stabs her in the head, killing her.  *Id.*

From the street, Sakeithia Taylor watched from the driver seat of her vehicle as the man stabbed Jones.  *Id.* at ¶ 6.  Taylor alerted her passenger, Jermaine Jackson, to the attack, and they both exited the vehicle to intervene.  *Id.*  The surveillance footage depicts Jackson chasing after the man while Taylor tends to Jones.  *Id.* at ¶ 7.  Taylor was later unable to fully describe the man, but she claimed his "big wide eyes" left a lasting impression.  *Id.* at ¶ 8.  Based on the totality of the circumstances, MPD concluded that the man with the big wide eyes who followed Jones from the bus stop was the same man who pursued Jones back to the bus stop and murdered her.  *Id.* at ¶ 9.

At least three witnesses identified the man in the surveillance footage as Gary Montgomery.  *Id.* at ¶ 10.  Shortly after the murder, MPD sought tips to identify the suspect and released a short video depicting the murderer walking across the street.  *Id.* at ¶ 11.  MPD received three separate tips in response to the video.  *Id.* at ¶ 12.  Two of the tipsters, Rosalind Tyums and Arthur Medley, could not identify Montgomery by name but could provide identifying information:  Tyums provided an address where Montgomery was staying, and Medley identified a location where Montgomery frequented and a police officer who knew Montgomery by name.  *Id.* at ¶ 13.  Tyums also later identified Montgomery from a photo array. *Id.*  The third tipster, Michael Harris, first identified the suspect in the video as Mark Johnson, but later changed his mind and stated that the video depicted Montgomery.  *Id.* at ¶ 14.  These three tips, taken together, provided a reasonable belief that the man depicted in the video was Gary Montgomery.

Based on this evidence, the detectives, in conjunction with the United States Attorney's Office, sought a warrant for Montgomery's arrest for Jones's murder.  *Id.* at ¶ 15.  The warrant was approved by a Superior Court judge on February 10, 2012.  *Id.* at ¶ 16.

Detective Wise interviewed Montgomery on February 4, 2012 (before his arrest) and on February 10, 2012 (after his arrest).  *Id.* at ¶ 17.  It is from these two interviews that Plaintiff's ADA and Rehabilitation Act claims arise.  During the first interview, Montgomery made several incriminating statements, including that he "crushed" Jones.  *Id.* at ¶ 18.  He also described the murder weapon as a knife that he had lost.  *Id.*  After the interview, Montgomery accompanied Detectives Wise and Nasr to the place he was living—the same address provided by Tyums— and to the bus stop where Jones was murdered.  *Id.* at ¶ 19.  While at the bus stop, Montgomery admitted to being there the night of the murder.  *Id.*  None of the inculpatory statements made by

Montgomery were included in the affidavit in support of the arrest warrant.  *Id.* at ¶ 20.

On February 11, 2012, the Superior Court conducted Montgomery's preliminary hearing.

Montgomery was charged with second degree murder on February 11, 2012.  *Id.* at ¶ 21. After his arrest, he underwent a psychological screening and later a comprehensive psychological evaluation.  *Id.* at ¶ 22.  The psychological screening included inquiries into whether Montgomery had received or was receiving mental health services; whether he was experiencing signs or symptoms of depression or suicidal ideations; and prior drug use.  *Id.* at ¶ 23.  A social worker also conducted a comprehensive psychological evaluation of Montgomery on February 11, 2012.  *Id.* at ¶ 24.

On February 23, 2012, the Superior Court conducted Montgomery's preliminary hearing. *Id.* at ¶ 25.  Detective Nasr was called as the Government's only witness.  *Id.*  Nasr adopted the affidavit in support of the arrest warrant as part of his testimony.  *Id.* at ¶ 26.  Although Nasr also testified about Montgomery's inculpatory statements, the prosecutor informed the Court that the Government was "not relying on the pre-arrest statement as the affidavit clearly does not."  *Id.* at ¶ 27.  At the close of the hearing, the Court found that "overall, the Court is satisfied that there is probable cause to believe the defendant committed this offense [felony murder]."  *Id*. at ¶ 28.

Further, at the preliminary hearing, the Government and Montgomery's counsel jointly requested a forensic screening of Montgomery.  *Id.* at ¶ 29.  As can be gleaned from the docket, for the next five years there was a dispute as to whether Montgomery was competent to stand trial, and he remained confined at St. Elizabeths Hospital while receiving mental health services for several years.  *Id.* at 30.  Ultimately, Montgomery was tried and acquitted of the murder of Jones in 2017. *Id.* at 30.

## PROCEDURAL HISTORY

Plaintiff Brandon Montgomery, as personal representative of the estate of his deceased

father, brought suit on August 16, 2018, against the District, Brian Wise, Hosam Nasr, and several John Doe officers.  Compl. [1].  The complaint included nine counts, which alleged a variety of constitutional, statutory, and common law claims, all stemming from the investigation and subsequent prosecution of Gary Montgomery (Montgomery).  *Id.* ¶¶ 132-199.  In response to Defendants' Motion for Partial Dismissal [10], the Court dismissed Plaintiff's Fifth Amendment claim against the detectives, which alleged that they withheld exculpatory evidence from the prosecutor.  Mem. Op. [20] at 7-11.  The Court also dismissed Plaintiff's *Monell* claim (Count VII) against the District which alleged that customs and practices of the District of Columbia proximately caused the constitutional violations inflicted upon Montgomery by the detectives.  *Id.* at 11-15.

During discovery, on May 27, 2021, Plaintiff filed a consent motion to dismiss the individual defendants and motion to amend his complaint [46].  The Court dismissed Detectives Wise and Nasr, along with the John Doe officers, with prejudice.  [47.]  The Court also dismissed Counts I, II, III, V, and VI with prejudice.  *Id.*  All that remains of the case, then, are two claims against the District:  violation of Montgomery's rights under Title II of the ADA, 42 U.S.C. § 12131 *et seq.* (Count VIII), and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 (Count IX).  Plaintiff claims that Montgomery suffered from schizophrenia, an impairment that Plaintiff alleges should have been accommodated by Detectives Wise and Nasr when they interrogated him on February 4 and 10, 2012.  Am. Compl. [48] ¶¶ 128-35.

## LEGAL STANDARD

Under Rule 56, a court should "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party has the initial burden of demonstrating the

absence of a genuine dispute as to any material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

(1986).  If that burden is met, the non-moving party must "designate specific facts showing that

there is a genuine issue for trial."  *Id*. at 324 (internal quotation marks omitted).  Although the

court must view the evidence in the light most favorable to the non-moving party and draw all

reasonable inferences in its favor, the "mere existence of a scintilla of evidence in support of" the

non-moving party is "insufficient" to stave off summary judgment.  *Anderson v. Liberty Lobby*,

*Inc.*, 477 U.S. 242, 252 (1986).  The non-moving party must adduce "evidence on which the jury

could reasonably find for" it at trial.  *Id.*

**ARGUMENT**

**I.      The ADA and Rehabilitation Act Do Not Apply to the February 4 or February 10,
          2012 Police Interviews of Gary Montgomery.**

The Court should grant summary judgment to the District because the ADA and

Rehabilitation Act have no application to MPD's February 4 or the February 10, 2012 interviews

of Gary Montgomery.  The District incorporates the argument raised in its motion to dismiss that

the ADA and Rehab Act do not apply in this scenario at all.  Mot. for Partial Dismissal [10].  The

District notes that the Court has already ruled against it on that argument in its August 5, 2019

Memorandum Opinion granting in part and denying in part the District's motion to dismiss, and,

therefore, the District merely incorporates rather than repeats the argument raised in its October

22, 2018 motion.  *See* [10] at 11-14; *Rosen v. Montgomery Cnty. Maryland*, 121 F.3d 154, 157-

158 (4th Cir. 1997).  In short, because Montgomery was not facing any type of mental health

crisis during the February 4 or February 10, 2012 interviews, MPD was under no obligation to

accommodate his mental illness.

**II.     Even if the ADA or the Rehabilitation Act Applied, the District Did Not Violate the
          Statutes.**

Even if the ADA or § 504 of the Rehabilitation Act applied to the February 4 and 10 interviews, the District appropriately accommodated Montgomery, even according to Plaintiff's experts.  The ADA and Rehabilitation Act require a public agency to assure meaningful access to public programs, which may require reasonable accommodations in the program or benefit to be made.  *Alexander v. Choate*, 469 U.S. 287, 301 (1985).  Failure to provide a reasonable and necessary accommodation may be discriminatory.  *Id.* at 300.  But, when interpreting the ADA and Rehabilitation Act, courts must "be responsive to two powerful but countervailing considerations—the need to give effect to the statutory objectives and the desire to keep § 504 within manageable bounds."  *Id.* at 299.  To prove his claim, Plaintiff must show that (1) Montgomery was disabled within the meaning of the ADA and Rehabilitation Act; (2) Montgomery was otherwise qualified; and (3) Montgomery was excluded from, denied the benefit of, or subject to discrimination under a program or activity.  *See, e.g.*, *Am. Council of the Blind v. Paulson*, 525 F.3d 1256, 1266 (D.C. Cir. 2008).

A.   **The District Provided An Accommodation That Plaintiff's Own Experts Say Was Sufficient.**

Plaintiff's liability experts, Jesse Trevino and Joseph Smarro of SolutionPoint+, opined that, to satisfy the ADA and Rehab Act, the District should have accommodated Montgomery.[1] SUMF ¶ 31.  Specifically, they identified five possible actions that would have accommodated Montgomery's disability:

> 1.  Stopp[ing] the interrogation and call[ing] for a trained CIT officer, or
> 2.  Call[ing] for a trained CIT officer after the interrogation, or
> 3.  Document[ing] the symptoms of mental illness and notif[ying] any decision-maker during the interrogations or the custodial arrest

---

[1]    Plaintiff relies on his experts for evidence about the District's acts and omissions that violated the ADA and Rehabilitation Act which Plaintiff claims proximately caused damage to Montgomery.  SUMF ¶ 34.

process, or

4. Notif[ying] the local mental health authority and call[ing] for a
Mobile Crisis Team, or

5. Notif[ying] the jail during the booking process of Mr.
Montgomery's symptoms of mental illness.

SUMF ¶ 31; Ex. 13 at 15-16.  The report elaborates on the final possible accommodation, noting

that it could be implemented by a jail intake practice of asking all arrestees about past or present

mental health treatment, along with past or present suicide attempts or ideations.  *Id*.

Plaintiff's experts listed these five possible accommodations in the disjunctive.  SUMF ¶

31.  Consistent with this framing, Mr. Trevino confirmed in his deposition that the provision of

any *one* of these accommodations would have satisfied the District's obligations to Montgomery

under the ADA or Rehab Act.  *Id*. ¶ 36.

That is in fact what *did* happen.  On February 11, 2012, the District Department of

Corrections subjected Montgomery to a mental health screening, which inquired, among other

things, whether he was receiving or had a history of receiving mental health services; whether he

had or was having suicidal thoughts; and whether he had any of a host of other indicators of

possible mental health concerns.  SUMF ¶¶ 22-23.  Later that day, Montgomery was also

subjected to a comprehensive mental health assessment by a licensed independent clinical social

worker.  *Id.* ¶¶ 24.  Thus, even if the ADA and Rehabilitation Act apply, the District

appropriately accommodated Montgomery's mental illness according to Plaintiff's own experts.

Consequently, the Court should enter summary judgment in the District's favor.

**B.**    **Montgomery Was Not in Need of an Accommodation.**

Montgomery did not need an accommodation to benefit from the public program—here,

police interviews.  Under the ADA and Rehabilitation Act, a plaintiff must first identify an

obstacle that impedes his access to a government program or benefit as opposed to a fundamental

alteration or expansion of an existing program. *Paulson*, 525 F.3d at 1268. But where a plaintiff cannot demonstrate that they have been denied meaningful access to a public benefit, they cannot make out a claim under the ADA. *Alexander*, 469 U.S. at 301.

While the facts of this case stretch the actual terms of the ADA and Rehabilitation Act, Montgomery faced no obstacle that prevented him from accessing the government program or benefit at issue, to wit police interviews during a homicide investigation. While some of Montgomery's responses during the interviews were non sequiturs, most of time he was capable of understanding what was being asked and responding to direct questions. Feb. 4, 2012 Tr. at 4:1-7:22, attached as Exhibit 19. Indeed, among the five possible accommodations Plaintiff's expert identifies as satisfactory, three could have been accomplished after the interview was completed. Ex. 13 at 15-16. That is, the detectives could have "[c]alled for a trained CIT officer after the interrogation," "[d]ocumented the symptoms of mental illness and notified any decision-maker during the . . . custodial arrest process," or "[n]otified the jail during the booking process of Mr. Montgomery's symptoms of mental illness," after the February 4, 2012 and February 10, 2012 interviews. Logically, if half of the reasonable accommodations for Montgomery's mental illness could have been accomplished *after* the interviews, then an accommodation during the interview could not have been necessary for Montgomery to "benefit" from the interviews. SUMF ¶ 31 (indicating any one of the accommodations would have satisfied the ADA and Rehab Act); *Cf. Durkin v. City of Chicago*, 341 F.3d 606, 614-15 (7th Cir. 2003) (noting, in a Title VII case, the general legal principle that an event cannot be proximately caused by a later occurrence).

Moreover, Plaintiff's expert opined that a crisis intervention officer only needed to be brought into the room if the interviewee is "in crisis in front of them." Trevino Tr. 120:13-19.

10

He described a mental health crisis as "a distressing event that causes instability or danger and is destructive in society." Trevino Tr. 152:3-12. And nothing in the record suggests Montgomery was dangerous, or destructive during the interviews. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (holding that where a moving party correctly points out that the opposing party lacks evidence to support its claims, the moving party is entitled to summary judgment). Thus, Montgomery was not in need of an accommodation to be subject to the police interview.

III.   **Even If Montgomery's Statutory Rights Were Violated, He Cannot Show *Intentional* Discrimination And Therefore Cannot Obtain Damages From The District.**

Under Title II of the ADA and the Rehabilitation Act, different liability standards apply depending on the nature of the relief sought. To obtain injunctive relief, even unintentional discrimination may suffice (assuming the plaintiff has standing to seek such relief). But damages are different. "All circuits to decide the question have held that to recover compensatory damages under either the ADA or the Rehabilitation Act, a plaintiff must establish that the agency's discrimination was intentional." *Meagley v. City of Little Rock*, 639 F.3d 384, 389 (8th Cir. 2011).

This requirement is fatal to Plaintiff's claims. Plaintiff (Montgomery's estate) lacks standing to seek injunctive relief because Montgomery is deceased and thus faces no danger of further discrimination. Since damages are the only possible remedy, Plaintiff must show intentional discrimination. But Plaintiff's attempt to show intentional discrimination rests on the premise that the District can be held vicariously liable for its *agents'* discrimination. As explained below, that premise is wrong, and Plaintiff cannot show that the District *itself* engaged in intentional discrimination.

A.   **Plaintiff Lacks Standing To Seek Injunctive Relief.**

11

In his prayer for relief—along with seeking monetary damages—Plaintiff requests that the Court:

> enjoin Defendant from engaging in further misconduct described herein and direct it to take all affirmative steps necessary to properly train MPD officers and prevent additional instances of such conduct from occurring in the future, including, but not limited to, employing the Reid technique of interrogation on mentally ill suspects.

Am. Compl. [48] at 28-29.  Even if he prevails upon his ADA and Rehabilitation Act claims, Plaintiff cannot obtain injunctive relief from the Court.

The basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies.  *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982).  A plaintiff seeking injunctive relief must demonstrate that injury is likely to occur.  *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).  Thus, a plaintiff seeking injunctive relief must show a "real and immediate threat of repeated injury" demonstrated by more than "past exposure to illegal conduct."  *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974)).  Unless a plaintiff can show he is "realistically threatened by a repetition of his experience [giving rise to the injury] . . . he has not met the requirements for seeking an injunction in federal court."  *Id*. at 109.

Here, Plaintiff is not entitled to injunctive relief unless he can demonstrate that Montgomery would likely be subject to a similar violation in the future.  *Armstrong v. Turner Indus.*, 41 F.3d 554, 563-64 (5th Cir. 1998) (ADA plaintiff not entitled to injunctive relief where he failed to allege only a single past statutory violation and did not assert that he was likely subject to violation in the future); *Sidiakina v. Bertoli*, 612 Fed. Appx. 477, 488 (9th Cir. 2015) (ADA Plaintiff not entitled to injunctive relief where threat of future injury was remote and speculative).

12

It is important to note that Gary Montgomery died before this suit was filed and the case is being brought by Brandon Montgomery, as the personal representative of Gary Montgomery's estate. Given that Gary Montgomery is deceased, there is no chance that he will again suffer harm for the alleged violation of his rights under the ADA and, accordingly, his estate is not entitled to injunctive relief. *See Plumley v. Landmark Chevrolet Inc*., 122 F.3d 308 (5th Cir. 1997) (Plaintiff's ADA claim for injunctive relief does not survive his death); *Pope v. Ward*, 94 F.3d 656, *2 (10th Cir. 1996) (unpublished disposition) (death of plaintiff moots out claim for injunctive relief); *Brown-Dickerson v. City of Philadelphia*, C.A. No. 15-4940, 2016 WL 1623438, *7 (E.D. Pa. April 25, 2016) (decedent's estate lacked standing to bring class action claim for injunctive relief); *Prescott v. Rady Children's Hospital-San Diego*, 265 F. Supp. 3d 1090, 1103, n.7 (S.D. Cal. 2017) (mother may not seek injunctive relief on behalf of deceased son); *See Pecha by and through Pecha-Weber v. Lake*, 700 F. App'x. 840, 845 (10th Cir. 2017) (dead are not susceptible to continuing or future harm; therefore, claims for injunctive relief brought by deceased plaintiffs ordinarily are moot).

**B.  Plaintiff Cannot Show That The District Engaged In Intentional Discrimination.**

Since damages are the only relief Plaintiff can seek, he must show intentional discrimination. Although the D.C. Circuit has not addressed this question, many courts have held that, under Title II of the ADA and § 504 of the Rehabilitation Act, "deliberate indifference satisfies the requisite showing of intentional discrimination." *S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 262 (3d Cir. 2013); *see id.* at 262-63 (collecting cases). Deliberate indifference requires "both (1) knowledge that a harm to a federally protected right is substantially likely, and (2) a failure to act upon that likelihood." *Id.* at 263 (internal quotation marks omitted). Importantly, it is not enough for Plaintiff to show that Detectives Wise and Nasr

13

exhibited deliberate indifference; vicarious liability through *respondeat superior* is not allowed

here.  Plaintiff must instead show that the *District* was deliberately indifferent, a burden he

cannot carry.

1.       **The District Cannot Be Held Vicariously Liable For Damages Under The ADA And Rehabilitation Act.**

Even if Plaintiff could show that Officers Wise and Nasr were deliberately indifferent to

Montgomery's ADA and Rehabilitation Act rights, that would not be enough to justify awarding

damages against *the District*.  Nowhere does Plaintiff's Amended Complaint allege that any

District custom, practice, or policy caused the violation of Montgomery's rights.  Instead, it

appears that Plaintiff seeks to hold the District vicariously liable on a *respondeat superior*

theory.  *See* Am. Compl. [48] ¶ 113 ("*Agents of the Defendant District of Columbia* at no time

modified their interrogation of Mr. Montgomery or offered him any type of accommodation that

would guard against him being charged with the murder . . . . ." (emphasis added)); *Id.* ¶ 123

("The Defendant, *through its agents*, violated Mr. Montgomery's clearly established rights

under, the ADA, and §504 of the Rehabilitation Act." (emphasis added)).  But this approach is

fatally flawed because, as many courts have now recognized, Title II of the ADA and § 504 of

the Rehabilitation Act do not permit vicarious liability for damages.

To understand why that is so, start with the text of the ADA.  Title II provides that the

"the remedies, procedures, and rights" available "to any person alleging discrimination on the

basis of disability" by a public entity are the same as those available under the Rehabilitation

Act.  42 U.S.C. § 12133 (citing 29 U.S.C. § 794a).  The Rehabilitation Act, in turn, states that the

"remedies, procedures, and rights" applicable to § 504 are those "set forth in title VI of the Civil

Rights Act of 1964."  29 U.S.C. § 794a(a)(2).  "Thus," the Supreme Court has summarized, "the

remedies for violations of § 202 of the ADA and § 504 of the Rehabilitation Act are coextensive

14

with the remedies available in a private cause of action brought under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*, which prohibits racial discrimination in federally funded programs and activities." *Barnes v. Gorman*, 536 U. S. 181, 185 (2002); *see id.* at 189 (holding that because punitive damages are not available under Title VI, they are not available under Title II of the ADA or § 504 of the Rehabilitation Act).  It follows, then, that whether a plaintiff can obtain damages through vicarious liability under Title II of the ADA and § 504 of the Rehabilitation Act depends on whether such vicarious liability is permitted under Title VI.

The clear answer is no.  Although the D.C. Circuit has not yet addressed this question, several others have, and all have held that "[t]here is no vicarious liability under Title VI."  *M.J. by & through S.J. v. Akron City Sch. Dist. Bd. of Educ.*, 1 F.4th 436, 453 n.11 (6th Cir. 2021); *accord Rodgers v. Smith*, 842 F. App'x 929 (5th Cir. 2021); *United States v. Cty. of Maricopa, Ariz.*, 889 F.3d 648, 652 (9th Cir. 2018).  District courts in other circuits, including this one, agree.  *See, e.g.*, *Arthur v. D.C. Hous. Auth.*, No. 18-CV-2037, 2020 WL 1821111, at *11 (D.D.C. Apr. 11, 2020); *Hurd v. Delaware State Univ.*, No. 07-CV-117, 2008 WL 4369983, at *6 (D. Del. Sept. 25, 2008); *Goonewardena v. New York*, 475 F. Supp. 2d 310, 328 (S.D.N.Y. 2007).

The reason for this unanimity is *Gebser v. Lago Vista Independent School District*, 524 U.S. 274 (1998).  In *Gebser*, the Supreme Court addressed the scope of damages liability under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*, and concluded that the statute does not allow vicarious liability through *respondeat superior*.  524 U.S. at 285 (holding "that it would 'frustrate the purposes' of Title IX to permit a damages recovery against a school district for a teacher's sexual harassment of a student based on principles of *respondeat superior* or constructive notice"); *see Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 642, 119 S. Ct.

15

1661, 1671, 143 L. Ed. 2d 839 (1999) ("[*Gebser*] rejected the use of agency principles to impute liability to the district for the misconduct of its teachers.").  Critically, in reaching this holding, the Court highlighted that Title IX is "parallel to" and "modeled after Title VI," such that "[t]he two statutes operate in the same manner."  *Gebser*, 524 U.S. at 286; *see Barnes*, 536 U.S. at 185 ("[T]he Court has interpreted Title IX consistently with Title VI.").  Because, as *Gebser* holds, there is no vicarious liability for damages under Title IX, there is likewise none under Title VI.

It follows in turn (to get back to the statutes at hand) that there is also no vicarious liability for damages under Title II of the ADA or § 504 of the Rehabilitation Act.  A number of courts have recently recognized this logic.  *See Arthur*, 2020 WL 1821111, *11; *Lake v. Bd. of Cty. Comm'rs*, No. 3:18-cv-143, 2020 WL 1164778, *5-6 (S.D. Ohio Mar. 11, 2020); *Cotton v. Douglas Cty.*, No. 4:18-CV-3138, 2020 WL 11039199, at *8-9 (D. Neb. Jan. 2, 2020); *Jones v. City of Detroit*, No. 17-CV-11744, 2019 WL 2355377, *5-6 (E.D. Mich. June 4, 2019), *appeal docketed*, No. 21-1055 (6th Cir.); *Ravenna v. Vill. of Skokie*, 388 F. Supp. 3d 999, 1004-07 (N.D. Ill. 2019); *cf. Liese v. Indian River Cty. Hosp. Dist.*, 701 F.3d 334, 348-49 & n.10 (11th Cir. 2012) (noting that *Gebser* governs the scope of Rehabilitation Act liability, but not conclusively resolving whether vicarious liability is permitted).  This Court should join that chorus.[2]

To be sure, three older court of appeals decisions say that vicarious liability for damages *is* permitted under Title II of the ADA and the Rehabilitation Act.  *See Delano-Pyle v. Victoria Cty.*, 302 F.3d 567, 574-75 (5th Cir. 2002); *Duvall v. Cty. of Kitsap*, 260 F.3d 1124, 1141 (9th

---

[2]     As the Court noted in its August 5, 2019 Memorandum Opinion, the District once took the position that a public entity could in theory be held vicariously liable for violations of Title II of the ADA.  *Montgomery v. District of Columbia*, C.A. No. 18-1928 (JDB), 2019 WL 3557369, *9, n.13 (D.D.C. August 5, 2019) (citing *Hunter on behalf of A.H. v. District of Columbia*, 64 F. Supp. 3d 158, 170 (D.D.C. 2014)).  But in light of the numerous intervening decisions cited above, the District has re-examined this issue and, for the reasons explained here, is persuaded that these recent decisions are correct.

Cir. 2001); *Rosen v. Montgomery Cty.*, 121 F.3d 154, 157 n.3 (4th Cir. 1997).  But these decisions are unpersuasive for several reasons.  First and most importantly, none acknowledge the relevance of *Gebser*.  Indeed, none even mention the fact that the remedies available under Title II of the ADA and the Rehabilitation Act are linked to Title VI.  Instead, *Duvall* relies on gauzy purposivism, noting that vicarious liability "would be entirely consistent with the policy of [the statutes], which is to eliminate discrimination against the handicapped."  260 F.3d at 1141 (internal quotation marks omitted).  By that logic, though, punitive damages should also be available, since they too would help eliminate discrimination.  Yet that is not the law.  *Barnes*, 536 U.S. at 189.

 *Delano-Pyle* and *Rosen* make a different error:  they rely on cases decided under *Title I* of the ADA, which governs employment discrimination.  *See Delano-Pyle*, 302 F.3d at 575 (citing *Silk v. City of Chicago*, 194 F.3d 788, 806 (7th Cir. 1999), and *Mason v. Stallings,* 82 F.3d 1007, 1009 (11th Cir. 1996)); *Rosen*, 121 F.3d at 157 n.3 (citing *U.S. EEOC v. AIC Sec. Investigations, Ltd.*, 55 F.3d 1276, 1279 (7th Cir. 1995)).  The different titles of the ADA are not interchangeable in this way.  Vicarious liability exists under Title I of the ADA because that title—like Title VII of the Civil Rights Act of 1964, and the Age Discrimination in Employment Act—defines "employer" to include "any agent" of an employer.  42 U.S.C. § 12111(5)(A); *see Gebser*, 524 U.S. at 283 (explaining that it is this same feature of Title VII's definition of "employer," *see* 42 U.S.C. § 2000e(b), that creates vicarious liability).  In contrast, Title II's definition of "public entity" does *not* include individual agents, employees, officers, or officials. *See* 42 U.S.C. § 12131(1).  When Congress wishes to include such individual government actors within a definition, it says so.  *See, e.g.*, 16 U.S.C. § 4903(4); 17 U.S.C. § 910(a); 33 U.S.C. § 1402(e).  That Congress did not do so in Title II of the ADA is all the more reason to conclude

that vicarious liability does not apply here.

**2.**      **Plaintiff Cannot Show That the District Itself Was Deliberately Indifferent.**

Plaintiff relies on the findings and conclusions of their liability experts, Jesse Trevino and Joseph Smarro of SolutionPoint+, as evidence of the deliberate indifference by the District of Columbia.  *See* Plaintiff's Second Supplemental Answer to Defendants' Interrogatory 23, attached as Exhibit 15.  But their report contains insufficient evidence to allow Plaintiff to avoid summary judgment.  Most of their report criticizes Detectives Wise and Nasr for the way they interacted with Montgomery; their alleged failure to recognize that he suffered from severe mental illness; and their alleged failure to undertake measures that would have accommodated that mental illness.  *See generally* SolutionPoint Report at 3-10 (Report), attached as Ex. 13.

In particular, the Report criticizes Detectives Wise and Nasr for ignoring MPD policy in dealing with Montgomery who was mentally ill.  Ex. 13, Report at 9 (Detective Nasr "purposely ignored [MPD] policy and disregarded Mr. Montgomery's disability."); *Id*. at 1 ("They denied Mr. Montgomery psychiatric care violating the law and MPD policy."); *Id*. at 1 ("Detective Wise and Detective Nasr did not know of, understand, or follow the policies of the MPD, especially those involving mental health consumers."); *Id.* at 3 ("This desire to close a murder case also led to the Homicide Unit failing to follow MPD policy." ); *Id.* at 3 (Members of the MPD Homicide Unit failed to recognize and/or address Mr. Montgomery's untreated serious mental illness, violating MPD policy."); *Id*. at 9 (Detective Nasr purposefully ignored policy); *Id.* at 10 ("At different times in each of their depositions, the detectives admit to not knowing policy, ignoring policy, or interpreting policy as they see fit.").

Most tellingly, nowhere does the Report find that, in 2012, a failure by the District to have policies in place to protect the mentally ill proximately caused a violation of the ADA.

Rather, the Report states, "Detectives Wise and Nasr should have followed [MPD General Order] GO-OPS-308.4, which would have likely led to a better outcome for Mr. Montgomery and for the detectives' investigation."  Report, attached as Exhibit 13 at 14.  The Report goes so far as to say that "[t]here were policies and procedures [GO-OPS-308.4] in place to protect Mr. Montgomery and the integrity of the murder investigation but none was followed."  *Id*. at 12.

The purpose of the General Order "is to establish the policy and procedures for the treatment, processing and disposition of suspected mentally ill persons taken into custody by members of this Department."  GO-OPS-308.4, I, attached as Exhibit 20.  The General Order, in relevant part, provides procedural guidelines to MPD officers for the transportation of suspected mentally ill persons, the hospitalization of suspected mentally ill persons, the initiation of emergency hospitalization, and procedures, dealing with suspected mentally ill persons charged with a crime.  *Id*. at Sections A, B, C, and D.

In short, this is not a case in which Plaintiff claims that MPD failed to have necessary policies in place for the protection of the mentally ill Montgomery.  Instead, in light of the General Order, Plaintiff's experts opine that the detectives "were not thoroughly aware of this policy [GO-OPS- 308.4]."  Report, attached as Exhibit 13 at 6.  They further caution that "[s]upervisors need to make sure they and their subordinates are aware of and understand the policy as they would with any other general order or policy.  *Id*. at 15.  Thus, the gravamen of the experts' criticism of MPD is that MPD failed to properly train its homicide detectives as to MPD procedures in dealing with the mentally ill.  This criticism, without more, falls short of establishing the District's deliberate indifference to Montgomery's ADA rights.

Deliberate indifference is determined by analyzing whether the municipality knew or should have known of the risk of violations by its employees but did not act.  *Jones v. Horne,*

634 F.3d 588, 601 (D.C. Cir. 2011) (alleged constitutional violation case).  This standard is

stringent, and mere negligence is insufficient.  *Harris v. Gov't of District of Columbia,* C.A. No.

189-2390, 2019 WL 3605877, at *4 (D.D.C. August 6, 2019) (constitutional claim).  Deliberate

indifference "does *not* require the [municipal actor] to take reasonable care to discover and

prevent violations.  It simply means that, faced with actual or constructive knowledge that its

agents will probably violate . . . rights, the [municipal actor] may not adopt a policy of inaction."

*Warren,* 353 F.3d 36, 39 (D.C. Cir. 2004 (emphasis in original) (constitutional claim)).

      Showing a pervasive pattern of similar violations is the most common and accepted way

to satisfy the deliberate indifference standard.  *See Connick v. Thompson*, 563 U.S. 51, 62 (2011)

("A pattern of similar violations by untrained employees is ordinarily necessary' to demonstrate

deliberate difference" in failure-to-act cases) (constitutional claim); *Carter v. District of*

*Columbia*, 795 F.2d 116, 123-26 (D.C. Cir. 1986) (constitutional claim); *Davis v. District of*

*Columbia*, 800 F. Supp. 2d 28, 34 (D.D.C. 2011) (constitutional claims).  This applies to

situations where policymakers knew of and tacitly authorized a pattern of similar violations by

non-policymaking employees.  *City of Canton*, *Ohio v. Harris*, 489 U.S. 378, 397 (1989)

(O'Connor, J., concurring in part and dissenting in part).

      Here, Plaintiff claims that the District was deliberately indifferent to Montgomery's ADA

and Rehabilitation Act rights.  Yet, there is no record evidence of complaints before

Montgomery's arrest in 2012 for violations of arrestees' ADA or Rehabilitation Act rights that

would have placed MPD on notice that additional training was necessary to assure that the

impairments of mentally ill arrestees would be accommodated.  As a result, policymakers of the

District were not on notice of a problem involving the ADA rights of mentally ill arrestees that

needed to be addressed by greater training of MPD detectives.  Consequently, the Court should

grant judgment to the District on Plaintiff's claims.  *See Page v. Mancuso*, 999 F. Supp. 2d 269, 284 (D.D.C. 2013) (Brown Jackson, J.) (citing *Parker v. District of Columbia,* 850 F.2d 708, 712 (D.C. Cir. 1988) (she must allege concentrated, fully packed, precisely delineated scenarios as proof that an unconstitutional policy or custom exists)).

IV.    **Even if the District Failed to Accommodate Montgomery Under the ADA or Rehabilitation Act, the Violation Did Not Proximately Cause Montgomery's Prosecution.**

Alternatively, the Court should enter judgment for the District because Plaintiff cannot prove that the District's alleged failure to accommodate Montgomery's disability caused Montgomery to be prosecuted.  Under the ADA and the Rehabilitation Act, a plaintiff must prove that the discrimination or lack of access to a public benefit was the but-for cause of his injuries. 42 U.S.C. § 12132 (forbidding discrimination "by reason of" a person's disability); 29 U.S.C. § 794(a) ("solely by reason of"); *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 350-352 (2013) (holding that "by reason of" or "because of" requires the application of but-for causation); *Tardif v. City of New York*, 991 F.3d 394, 405 (2d Cir. 2021) ("'[i]n assessing whether one cause among many constitutes [a] proximate cause,' plaintiffs must establish that their 'disabilities were a substantial cause of their inability to obtain services,' rather than 'so remotely or insignificantly related to their disabilities as not to be "by reason" of them') (alterations in original) (quoting *Henrietta D. v. Bloomberg*, 331 F.3d 261, 278-80 (2d Cir. 2003)) (internal citations omitted).

Given that there was probable cause to believe that Montgomery committed the murder, the question before the Court is had the detectives accommodated Montgomery would he not have been arrested and prosecuted.  The District posits that based upon the record in this case there is absolutely no evidence to support the proposition that without the inculpatory statements

21

Montgomery would not have been prosecuted.

Here, Montgomery was arrested and prosecuted because of the eyewitness statements and identifications from third party tipsters.  Consequently, Plaintiff cannot demonstrate that his prosecution (and concomitant confinement) was "by reason of" his disability.  *See* Ex. 1, Affidavit in Support of An Arrest Warrant (stating the reasons supporting probable cause for Montgomery's arrest and omitting the incriminating statements Montgomery made during the interviews).  Instead, ample evidence of probable cause known to the detectives and the prosecutor at the time of Montgomery's arrest supported Montgomery's prosecution for Jones's murder, and the accommodations proposed by Plaintiff's experts would not have avoided Montgomery's prosecution.

It is noteworthy that the affidavit in support of the arrest, which was approved by a Superior Court judge, made no mention of the inculpatory statements.  SUMF ¶ 1.  Moreover, the prosecutor informed the court at the preliminary hearing that it was not relying upon the inculpatory statements to establish probable cause.  *Id.* ¶ 27.  Two Superior Court judges evaluated the Government's evidence and found that there was probable cause to believe that Montgomery had committed murder.  *Id* ¶ 28.

A. **There was Ample Evidence of Probable Cause for the Prosecution.**

Even apart from Montgomery's inculpatory statements, ample evidence supported probable cause to arrest and prosecute Montgomery.  Specifically, evidence from two eyewitnesses, video surveillance footage, and three tipsters formed probable cause to believe that Montgomery had murdered Jones, without the need for the inculpatory statements elicited during Montgomery's interrogation.  To determine whether an officer had probable cause for an arrest, "we examine the events leading up to the arrest, and then decide 'whether these historical facts,

22

viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause." *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018).  Probable cause is a "practical, nontechnical conception." *Brinegar v. United States*, 338 U.S. 160, 176 (1949).  "In dealing with probable cause, . . . as the very name implies, we deal with probabilities.  These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Id.* at 175.  "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983).  At bottom, probable cause "is not a high bar" and requires only "a probability or substantial chance of criminal activity." *Wesby*, 138 S. Ct. at 588 (internal quotation marks and citations omitted).

To establish probable cause for murder, the detectives had to establish that someone had killed another purposefully.  *See* D.C. Code §§ 22-2101, *et seq.* (defining murder).  Thus, to support the prosecution of Montgomery, the detectives had to have had probable cause to believe that Montgomery had killed Jones.  Here, the detectives had video evidence of the act, so they knew that a murder had been committed.

The detectives knew, based on the video evidence, that a man followed Jones away from the bus stop and a similar looking man followed her back, before stabbing her in the head and killing her.  SUMF ¶ 5.  The detectives sought to identify the man in the video and ensure it was the same man in both parts of the video.  *Id.* ¶ 11.  Thus, the probable cause inquiry in this case is readily broken down into two parts:  identifying the individual seen on camera before the murder and determining whether that individual is the same person who murdered Jones.

The evidence available to the detectives constituted probable cause that Montgomery was

depicted in the video surveillance footage.  Three individuals had called in tips to identify Montgomery in video that was released to the public.  SUMF ¶¶ 10.  That one of the tipsters had originally identified a different individual does not, under the totality of the circumstances, undermine the reliability of the information identifying Montgomery because Harris later identified Montgomery and represented he was certain of the identification and because Tyums later picked Montgomery from a photo array.  SUMF ¶¶ 10-14; *see Gates*, 462 U.S. at 233 (applying a totality of the circumstances approach to tips).  Thus, probable cause supports the belief that Montgomery was at the bus stop around the time of the murder because three witnesses identified Montgomery from the publicly-released video.

Second, probable cause exists to support the inference that Montgomery followed Jones away from the bus stop and back to it.  Gabriel observed a man, who she later identified as Montgomery in a photo array, staring at Jones to the point that Jones became visibly uncomfortable.  SUMF ¶ 4.  Shortly after Gabriel left, Jones got up to leave as well, followed by the man.  SUMF ¶ 5.  Jones then returned to the bus stop followed by a man who appeared on video to be the same person as before.  *Id.*  Taylor then watched as the man stabbed Jones in the head before fleeing the scene.  *Id.* ¶ 6.  Both Taylor and Gabriel observed and separately identified the same characteristics of the man, his wide-open eyes.  *Id.* ¶¶ 4, 8.  The video evidence and general description of the two men also matched, and the general description matched that of Montgomery.  *Id.* ¶ 5; *see also* Ex. 1, Affidavit in Support of An Arrest Warrant at 2.

Under these circumstances, a reasonable police officer could infer that Jones left because she was apprehensive about the man sitting next to her at the bus stop who would not stop staring at her.  Jones then returned to the bus stop because she was being followed, could not escape,

and believed the bus stop, a place of public congregation, was safer than walking about aimlessly.  This inference is reasonable because, ordinarily, people do not walk away and then return when waiting on a bus at a bus stop.  They simply wait at the bus stop or arrange other transportation.  Thus, Jones's behavior was abnormal.  And the man's behavior was abnormal as well—not insusceptible of innocent explanation but abnormal and suspicious under the circumstances.  The reasonable explanation for this abnormal behavior was provided by Gabriel: Jones was fearful of the man who was staring at her.  SUMF ¶ 4.  The totality of the circumstances here supports the belief that the same man who followed Jones away from the bus stop continued to follow her as she returned.

Importantly, nothing in this theory of probable cause relies on any statement from Montgomery.  Given that there was ample evidence to support probable cause, there is no basis to conclude that, but for the inculpatory statements, Montgomery would not have been arrested and prosecuted.  Plaintiff most certainly has not uncovered any evidence during the litigation of this matter supporting such a proposition.

### B. Providing Plaintiff's Proposed Accommodations Would Not Have Changed Montgomery's Prosecution.

The types of accommodations proposed by Plaintiff's experts would not have changed the outcome for Montgomery.  As explained above, Plaintiff retained Jesse Trevino and Joseph Smarro as expert witnesses with respect to the intersection of the ADA and Rehabilitation Act and police practices. Ex. 13, SolutionPoint+ Report.  Their joint report identified a different course of action that they believe the detectives should have taken with respect to Montgomery, and they made several recommendations for accommodations.  *Id.* at 14-16.

But, the accommodations identified by Plaintiff's experts would not have altered Montgomery's outcome.  Plaintiff identified the following possible accommodations:  (1)

pausing the interview to await a crisis intervention officer; (2) calling for a crisis intervention officer after the interview; (3) documenting Montgomery's symptoms of mental illness and providing the list to a decision maker during the interviews or during the arrest process; (4) calling for a mental health crisis intervention team; or (5) notifying the jail during the booking process of Montgomery's mental health symptoms.  Ex. 13 at 15-16.  Importantly, Plaintiff's experts opine that any one of these of accommodations would have sufficed.  Ex. 13; SUMF ¶ 36.  Thus, if the District had called for a crisis intervention officer after the interview or merely notified the jail or a supervisor after the interview, the ADA and the Rehabilitation Act would have been satisfied, according to Plaintiff's experts.  SUMF ¶¶ 31-37.

None of these accommodations would have altered the other evidence against Montgomery.  And, at least with the final proposed accommodation, the District would have already arrested Montgomery for the murder of Jones before it had to do anything differently.  Indeed, Plaintiff's expert testified that he could not state whether providing the accommodations would have changed anything for Montgomery.  Trevino Dep. Tr. 87:15-88:5 ("I cannot say, sir.").  Under these circumstances, the Court should find that, even if the District violated the ADA or the Rehabilitation, its violations did not cause Montgomery to be prosecuted or arrested.

## CONCLUSION

For the reasons stated above, the Court should grant the District summary judgment as to Plaintiff's ADA and Rehabilitation Act claims.

Date:  September 27, 2021                        Respectfully submitted,

                                                KARL A. RACINE
                                                Attorney General for the District of Columbia

                                                CHAD COPELAND
                                                Deputy Attorney General
                                                Civil Litigation Division

*/s/ Alicia M. Cullen*
ALICIA M. CULLEN [1015227]
Chief, Civil Litigation Division, Section III


*/s/ Robert A. DeBerardinis, Jr.*
ROBERT A. DEBERARDINIS, JR. [335976]
Senior Assistant Attorney General
AARON J. FINKHOUSEN [1010044]
Assistant Attorney General
Civil Litigation Division
400 6th Street NW
Washington, D.C. 20001
Phone:  (202) 724-6642; (202) 724-7334
Fax:  (202) 730-0493
Email:  robert.deberardinis@dc.gov;
aaron.finkhousen@dc.gov
*Counsel for Defendant District of Columbia*

27