**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

BRANDON MONTGOMERY,

      *Plaintiff*,

    v.

DISTRICT OF COLUMBIA,

      *Defendant*.

Civil Action No. 1:18-cv-01928-JDB

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S
<u>MOTION FOR SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

I.      The ADA and Rehabilitation Act Apply to the February 2012 Interrogations ................. 2

II.     The District Violated the ADA and Section 504 By Refusing to Provide a
        Reasonable Accommodation Despite Mr. Montgomery's Obvious Mental Disability ...... 3

        A.      The District Failed to Provide Any Accommodation to Mr. Montgomery. .......... 3

        B.      Mr. Montgomery Needed an Accommodation, and That Need Was Obvious ..... 11

III.    The District Intentionally Discriminated Against Mr. Montgomery. ............................. 18

        A.      MPD Ignored Mr. Montgomery's Obvious Psychosis and Failed to Offer
                Any Accommodation. ................................................................... 19

        B.      MPD Detectives Exploited Mr. Montgomery's Disability. ................................. 21

                1.      MPD Detectives Preyed on Mr. Montgomery's Hyper-Religiosity. ........ 21

                2.      MPD Manipulated Mr. Montgomery's Confusion and Vulnerability. ..... 23

        C.      MPD Failed to Implement Appropriate Policies and Procedures. ....................... 24

        D.      MPD Made No Real Effort to Train its Officers Regarding the ADA and
                Section 504 in General or How to Accommodate Mentally-Ill Individuals
                in Particular. ................................................................................ 27

IV.     The District's Vicarious Liability Argument Readily Fails. ............................................ 28

        A.      This Court Should Not Revisit a Legal Issue It Already Has Decided ................. 29

        B.      Vicarious Liability Applies Under Title II of the ADA and Section 504 ............. 30

        C.      Even on the District's Own Terms, Summary Judgment is Inappropriate. .......... 34

V.      The District's Proximate-Cause Argument is Baseless—and Dangerous. ...................... 35

CONCLUSION .................................................................................................... 37

CERTIFICATE OF SERVICE ................................................................................ 38

i

# TABLE OF AUTHORITIES

**Cases**

*A.K.B. By & Through Silva v. Indep. Sch. Dist. 194*,
   2020 WL 1470971 (D. Minn. Mar. 26, 2020) ........................................................ 33

*Allen v. Muskogee, Okl.*,
   119 F.3d 837 (10th Cir. 1997) ............................................................................... 28

*Berryman-Turner v. District of Columbia*,
   233 F. Supp. 3d 26 (D.D.C. 2017), *aff'd*, 720 F. App'x 1 (D.C. Cir. 2018) ............ 29

*Biondo v. Kaledia Health*,
   935 F.3d 68 (2d Cir. 2019) ..................................................................................... 25

*Bircoll v. Miami-Dade County*,
   480 F.3d 1072 (11th Cir. 2007) ............................................................................... 7

*Bonner v. Lewis*,
   857 F.2d 559 (9th Cir. 1988) ................................................................................. 33

*Campos v. Stone*,
   201 F. Supp. 3d 1083 (N.D. Cal. 2016) ............................................................... 5, 6

*Castle v. Eurofresh, Inc.*,
   731 F.3d 901 (9th Cir. 2013) ................................................................................. 33

*City & Cty. of San Francisco, Calif. v. Sheehan*,
   575 U.S. 600 (2015) ............................................................................................... 32

*DeVito v. Chicgao Park Dist.*,
   83 F.3d 878 (7th Cir. 1996) ................................................................................... 34

*Disabled in Action v. Bd. of Elections in City of New York*,
   752 F.3d 189 (2d Cir. 2014) ................................................................................... 36

*Duvall v. County of Kitsap*,
   260 F.3d 1124 (9th Cir.2001) ................................................................................. 30

*Est. of Saylor v. Regal Cinemas, Inc.*,
   54 F. Supp. 3d 409 (D. Md. 2014) ......................................................................... 31

*Freeman v. MedStar Health Inc.*,
   185 F. Supp. 3d 30 (D.D.C. 2016) ......................................................................... 29

*Gebser v. Lago Vista Independent School District*,
   524 U.S. 274 (1998) ..................................................................................... 30, 32, 34

*Geness v. Pennsylvania*,
   503 F. Supp. 3d 318 (W.D. Pa. 2020) ................................................................... 31

*Gorman v. Bartch*,
  152 F.3d 907 (8th Cir. 1998) ............................................................................ 31, 36

*Hainze v. Richards*,
  207 F.3d 795 (5th Cir. 2000) ...................................................................................... 36

*Henrietta D. v. Bloomberg*,
  331 F.3d 261 (2d Cir. 2003) ....................................................................................... 31

*Hunter on behalf of A.H. v. D.C.*,
  64 F. Supp. 3d 158 (D.D.C. 2014) ............................................................................ 32

*J.H. ex rel. J.P. v. Bernalillo County*,
  806 F.3d 1255 (10th Cir. 2015) .................................................................................. 31

*Keating v. Helder*,
  2011 WL 3703264 (W.D. Ark. Aug. 23, 2011) ......................................................... 25

*Liese v. Indian River Ct. Hosp. Dist.*,
  701 F.3d 334 (11th Cir. 2012) .................................................................................... 31

*Loeffler v. Staten Island Univ. Hosp.*,
  582 F.3d 268 (2d Cir. 2009) ....................................................................................... 25

*Long v. Cty. of Los Angeles*,
  442 F.3d 1178 (9th Cir. 2006) .................................................................................... 28

*Patton v. Dumpson*,
  498 F. Supp. 933 (S.D.N.Y.1980) .............................................................................. 32

*Pierce v. District of Columbia*,
  128 F. Supp. 3d 250 (D.D.C. 2015) .................................................................. 18, 21, 31, 32

*Proctor v. Prince George's Hosp. Ctr.*,
  32 F. Supp. 2d 820 (D. Md. 1998) ............................................................................... 7

*Reed v. Columbia St. Mary's Hosp.*,
  782 F.3d 331 (7th Cir. 2015) ...................................................................................... 30

*Rosen v. Montgomery Cty. Maryland*,
  121 F.3d 154 (4th Cir. 1997) ...................................................................................... 30

*Russo v. City of Cincinnati*,
  953 F.2d 1036 (6th Cir. 1992) .................................................................................... 28

*Sacchetti v. Gallaudet Univ.*,
  181 F. Supp. 3d 107 (D.D.C. 2016) ........................................................................... 21

*Sacchetti v. Gallaudet Univ.*,
  344 F. Supp. 3d 233 (D.D.C. 2018) .................................................................... *passim*

*Seremeth v. Board of County Commissioners of Frederick Cty*,
  673 F.3d 333 (4th Cir. 2012) ...................................................................................... 35

*Sunderland v. Bethesda Hosp., Inc.*,
    686 F. App'x 807 (11th Cir. 2017) ........................................................ 34

*T.O. v. Fort Bend Indep. Sch. Dist.*,
    2 F.4th 407 (5th Cir. 2021) ................................................................ 30

*T.W. ex rel. Wilson v. Sch. Bd. of Seminole Cty., Fla.*,
    610 F.3d 588 (11th Cir. 2010) .............................................................. 31

*Thomas v. Cumberland County*,
    749 F. 3d 217 (3d Cir. 2014) ................................................................ 28

*United Spinal Ass'n v. Bd. of Elections in City of New York*,
    882 F. Supp. 2d 615 (S.D.N.Y. 2012) .................................................... 36

*United States v. Monroe*,
    264 F. Supp. 3d 376 (D.R.I. 2017) ...................................................... 5, 6

*Updike v. Multnomah County*,
    870 F.3d 939 (9th Cir. 2017) .............................................................. 4, 7

*Young v. City of Providence ex rel. Napolitano*,
    404 F.3d 4 (1st Cir. 2005) ................................................................... 28

*Young v. Sunbury Police Dep't*,
    160 F. Supp. 3d 802 (M.D. Pa. 2016) ..................................................... 7

**Statutes**

42 U.S.C. § 12101(b)(1) ........................................................................ 32

42 U.S.C. § 12131(1)(A)-(B) .................................................................. 33

42 U.S.C. § 12132 ................................................................................ 36

**Regulations**

28 C.F.R. § 35.130(b)(1) ........................................................................ 33

**Other Authorities**

Hermann, P. "Police identify man fatally shot by officer at apartment building in Northwest
    Washington," The Washington Post (Sept. 1, 2021),
    https://www.washingtonpost.com/local/public-safety/police-shooting-
    washington/2021/09/01/a9981326-0b2c-11ec-aea1-42a8138f132a_story.html. ...................... 1

Lowery, W., Kindy, K., Alexander, K. L., & Rich, S. "Distraught people, deadly results,"
    The Washington Post (May 30, 2015),
    http://www.washingtonpost.com/sf/investigative/2015/06/30/distraught-people-deadly-results/
    .................................................................................................... 1

National Institutes of Mental Health, Mental Health Information—Mental Health,
    https://www.nimh.nih.gov/health/statistics/mental-illness ...................................... 1

Results and Analysis from the 2012 Point-in-Time Count of Homeless Persons in the Metropolitan Washington Region" (May 2012), *available at* https://www.mwcog.org/documents/2021/05/05/homelessness-in-metropolitan-washington-results-and-analysis-from-the-annual-point-in-time-pit-count-of-persons-experiencing-homelessness-featured-publications-homelessness/............................................ 13

Saul M. Kassin, *On the Psyhology of Confessions: Does Innocence Put Innocents at Risk?*, 60:3 Am. Psychologist 215, 219 (April 2005) .......................................................................... 5

Treatment Advocacy Center, "Overlooked in the Undercounted:  The Role of Mental Illness in Fatal Law Enforcement Encounters" (December 2015), https://www.treatmentadvocacycenter.org/storage/documents/overlooked-in-the-undercounted.pdf............................................................................................................................... 1

## INTRODUCTION

Millions of adults in our country have a severe mental illness.[1] These individuals have an outsized impact on the criminal justice system—they generate a disproportionate number of calls for police service and occupy a disproportionate number of prison beds.[2] Historically, many police officers have not been adequately trained on how to interact with the mentally ill, which can lead to tragic results.[3] That is starting to change. In the District of Columbia and elsewhere, politicians and community leaders are rethinking how police interact with the mentally ill.[4] These changes are promising. But they are too late for Gary Montgomery, the African-American man at the center of this case.

Gary Montgomery had a severe mental disability—Schizophrenia. He experienced psychotic symptoms, including hallucinations and scrambled thinking. He also was homeless and struggled with drug use. In 2012, Mr. Montgomery was interrogated—twice—by Metropolitan Police Department ("MPD") detectives in connection with a murder investigation. Mr. Montgomery had no history of violence, but he was present at a bus stop around the time a

---

[1] National Institutes of Mental Health, Mental Health Information—Mental Health, https://www.nimh.nih.gov/health/statistics/mental-illness.

[2] Treatment Advocacy Center, *Overlooked in the Undercounted: The Role of Mental Illness in Fatal Law Enforcement Encounters* (December 2015), https://www.treatmentadvocacycenter.org/storage/documents/overlooked-in-the-undercounted.pdf.

[3] Wesley Lowery et al., *Distraught people, deadly results*, The Washington Post, May 30, 2015, http://www.washingtonpost.com/sf/investigative/2015/06/30/distraught-people-deadly-results/.

[4] *E.g.*, Press Release, Government of the District of Columbia, Mayor Bowser Launching New Mental Health Emergency Dispatch Pilot Program (May 18, 2021). Of course, many challenges remain with respect to police interactions with the mentally ill. *See, e.g.*, Peter Hermann, *Police identify man fatally shot by officer at apartment building in Northwest Washington*, The Washington Post, Sept. 1, 2021, https://www.washingtonpost.com/local/public-safety/police-shooting-washington/2021/09/01/a9981326-0b2c-11ec-aea1-42a8138f132a_story.html.

murder occurred there. Not surprisingly, given the severity of his mental disability, Mr. Montgomery hallucinated and showed other psychotic symptoms during the interrogations.

MPD detectives interrogated Mr. Montgomery for over eight hours. During that time, the detectives ignored the mental-health crisis unfolding before them. They did not assess Mr. Montgomery's mental-health needs, and they did not offer to accommodate his mental disability. Instead, they exploited Mr. Montgomery's Schizophrenia by using coercive interrogation tactics—tactics that experts say should not be used on mentally-ill individuals—in order to extract a confession. After doing so, prosecutors charged Mr. Montgomery with murder and incarcerated him for over five years in the D.C. Jail and St. Elizabeths Hospital, a psychiatric facility. In 2017, after Mr. Montgomery was deemed fit to stand trial, a jury found him not guilty, and he was released. But the years of incarceration had taken a toll—Mr. Montgomery, back on the streets, soon was dead.

What happened to Mr. Montgomery was an unlawful tragedy. The District failed to assess whether Mr. Montgomery needed an accommodation, failed to provide him with an accommodation despite his obvious need, and exploited his disability by employing coercive techniques. Accordingly, the District violated the Americans with Disabilities Act and Section 504 of the Rehabilitation Act and was deliberately indifferent to Mr. Montgomery's rights. This Court should reject the District's Motion For Summary Judgment and permit the family of Gary Montgomery to seek a modicum of justice on his behalf at trial. The District's arguments in support of its motion readily fail, for the following reasons.

## I.       The ADA and Rehabilitation Act Apply to the February 2012 Interrogations.

The District first resurrects its failed argument that the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act ("Section 504") have "no application" to MPD interrogations. Mot. for Summ. J. [ECF 53] at 9; *see* Mot. to Dismiss [ECF No. 10] at 14

(the District arguing that, "because police interrogation of a suspect does not provide any benefit

to Montgomery, neither Title II nor § 504 applies to the police interrogation here").[5] This Court

already has rejected this argument. Order re Mot. to Dismiss [ECF No. 20] at 16 ("The Court

rejects defendants' categorical assertion that Title II does not apply to arrests and

interrogations."). As this Court has noted, "[e]very court of appeals to have considered the

question has found that Title II applies to police conduct." *Id.* at 17–18. There is no reason for

this Court to revisit this issue, and the District provides none. This Court should affirm its prior

legal conclusion that the ADA and Section 504 apply to police interrogations.[6]

## II.     The District Violated the ADA and Section 504 By Refusing to Provide a Reasonable Accommodation Despite Mr. Montgomery's Obvious Mental Disability.

The District next argues that it provided an appropriate accommodation to Mr.

Montgomery, or, in the alternative, that he did not need an accommodation in the first place.

Mot. for Summ. J. 9–13. Both arguments are unavailing.

### A.      The District Failed to Provide Any Accommodation to Mr. Montgomery.

The District's argument—that it complied with the ADA and Section 504 because it

provided an appropriate accommodation to Mr. Montgomery—is incorrect. MPD detectives

concede they never accommodated Mr. Montgomery despite his obvious disability. Ex. 1,

Deposition of Detective Brian Wise ("Wise Dep.") 213:6–17 (MPD detectives did not offer Mr.

Montgomery any accommodation because of his mental illness); Ex. 2, Deposition of Detective

Hosam Nasr ("Nasr Dep.") 174:15–18, 176:16–178:11 (MPD detectives did not offer

---

[5] With respect to pagination, this Opposition cites the page numbers stamped by the Court at the top of the District's electronic filings, not the numbers listed within the document at the bottom.

[6] The District also suggests that MPD had no obligation to accommodate Mr. Montgomery because he "was not facing any type of mental health crisis" during the interrogations. Mot. for Summ. J. at 9. To the extent the District means to argue that, although the ADA and Section 504 applies to interrogations, there was no need for an accommodation given the facts here, the argument fails for reasons addressed in Section II.B, *infra*.

accommodations, because the ADA did not come into play with respect to the interrogations, but if necessary "the courts" could have helped Mr. Montgomery with his "mental health stuff" post-arrest); Ex. 3, SolutionPoint+ Report at 5 ("MPD Homicide Detectives failed to provide any accommodations for Mr. Montgomery's apparent disability"); Ex. 4, Deposition of J. Trevino ("Trevino Dep.") 167:20–168:1 (MPD provided "none" of the possible accommodations listed in the SolutionPlus+ expert report); Ex. 5, Deposition of Dr. Kenneth Stefano ("Stefano Dep.") 61:20–62:1 (Mr. Montgomery "was not provided with reasonable accommodation[s]" for his mental illness during the two interrogations).[7] Instead, MPD held Mr. Montgomery in police custody, interrogated him for over eight hours, and arrested him—all without "any accommodations at all." Ex. 4, Trevino Dep. 168:2–5; Ex. A, Flowers Affidavit ¶¶ 24, 25.

With respect to the two interrogations, Plaintiff's expert and former San Antonio police officer Jesse Trevino testified it was "just wrong" for MPD to interrogate Mr. Montgomery without offering accommodations. Ex. 4, Trevino Dep. 111:19. In general, it is "highly problematic to do any interrogation" with an individual experiencing symptoms of mental illness. *Id.* 90:20–91:6. Here, however, it was far worse—the fact that MPD detectives observed Mr. Montgomery "in a state of psychosis and just ignore[ed] it to conduct an interrogation is—it's inhumane," Mr. Trevino opined. *Id.* 102:14–19; *see generally Updike v. Multnomah County*, 870 F.3d 939, 951 (9th Cir. 2017) ("A public entity may not disregard the plight and distress of a disabled individual."). At the least, MPD's inaction shows the detectives and their supervisors

---

[7] The SolutionPoint+ Report (Ex. 3) was written by two of Plaintiff's experts, Jesse A. Trevino and Joseph A. Smarro. Mr. Trevino and Mr. Smarro—both of whom are former police officers—are the co-founders of SolutionPoint+, a law enforcement training company. Their qualifications are listed in their expert report. The District deposed Mr. Trevino, who testified on behalf of SolutionPoint+. Dr. Kenneth Stefano is a licensed psychologist and president of Kenneth Stefano & Associates. Dr. Stefano serves as an expert for Plaintiff, and his qualifications are listed in his amended expert report (Ex. 6). The District did not designate an expert.

"lacked a basic general awareness of mental illness and how to fulfill their obligation to accommodate it." Ex. 3 at 16.

Rather than accommodate Mr. Montgomery during the interrogations, MPD ignored the needs of a human being in the throes of a mental health crisis. *E.g.*, Ex. 5, Stefano Dep. 62:17–22 (the MPD detectives "did not acknowledge, or do anything, about the fact that [Mr. Montgomery] was clearly responding to internal stimuli"); Ex. 6, Stefano Report ¶ 22 ("A review of the February 2012 interrogation videos reveals that Mr. Montgomery was exhibiting obvious signs of active psychosis."). Worse, over the course of more than eight hours, MPD detectives employed the so-called Reid Technique (or a variant thereof) when questioning Mr. Montgomery.[8] That means they used "coercive," "accusatory," "persistent," and "deceptive" tactics in an attempt to extract inculpatory statements from Mr. Montgomery. *Id.* ¶ 46; Ex. 4, Trevino Dep. 88:11–14; Ex. 3 at 5. The coercive Reid Technique is generally disapproved even when interviewing able-minded people. *See* Ex. 4, Trevino Tr. 88:11–14; Ex. 6, Stefano Report ¶¶ 29, 46; *Campos v. Stone*, 201 F. Supp. 3d 1083, 1098 n.4 (2016) ("The scientific community is coming to realize that the Reid technique has a strong tendency to elicit false confessions as well as true ones."); *United States v. Monroe*, 264 F. Supp. 3d 376, 394 (D.R.I. 2017) (noting the "weaknesses of the Reid Technique" and "strongly" urging law enforcement to "shift from a reliance on accusatorial and coercive methods . . . toward less confrontational procedures"). But it certainly should not be used on the mentally ill—especially on persons who, like Mr.

---

[8] The Reid Technique "is designed to get suspects to incriminate themselves by increasing the anxiety associated with denial and minimizing the perceived consequences of confession." *Campos v. Stone*, 201 F. Supp. 3d 1083, 1098 n.4 (N.D. Cal. 2016) (quoting Saul M. Kassin, *On the Psyhology of Confessions: Does Innocence Put Innocents at Risk?*, 60:3 Am. Psychologist 215, 219 (April 2005). "Other countries, including Canada and the United Kingdom, have phased out the use of the Reid technique in favor of interrogation methods that psychologists believe are less likely to result in false confessions or unreliable statements." *Id.*

Montgomery, are experiencing psychosis. Ex. 4, Trevino Dep. 88:11–14, 90:16–91:6; Ex. 6 ¶ 21, 28, 29, 46; Ex. 3 at 5. That is partly because mentally-ill individuals "are especially susceptible to such techniques" and find them "overwhelming." Ex. 6 ¶ 46. When such individuals are overwhelmed, they may falsely confess. Ex. 3 at 5 ("Research continues to show that the Reid Technique often leads to false confessions, especially when used on people suffering from mental illness or mental disabilities."); *Monroe*, 264 F. Supp. 3d at 394 (noting the Reid Technique may lead to false confessions, especially when used on "vulnerable populations"); *see generally Campos*, 201 F. Supp. 3d at 1098 n.4. Far from accommodating Mr. Montgomery, the MPD detectives exploited his disability. *See* Section III.B, *infra*.

Here, the District discriminated against Mr. Montgomery by failing to provide him with *any* accommodation during the February 4 and 10 interrogations and his subsequent arrest. *See Sacchetti v. Gallaudet Univ.*, 344 F. Supp. 3d 233, 271 (D.D.C. 2018) (unlawful discrimination includes failing to accommodate mental limitations of an individual with a disability). Indeed, that is undisputed—the District concedes that MPD offered no accommodation during the two interrogations. The District argues only that this Court should overlook this discrimination, because, after the interrogations had ended and after Mr. Montgomery had been arrested, different individuals questioned Mr. Montgomery regarding his mental health when checking him into the D.C. jail. Mot. for Summ. J. at 10–11.  That argument fails, for at least two reasons.

First, MPD's failure to accommodate Mr. Montgomery during the February 4 and 10 interrogations and arrest is not absolved by the actions of different individuals who interacted with Mr. Montgomery in a different context (detention facility processing) on February 11. That is because courts "do[] not evaluate the provision of accommodations as a whole" across multiple days and encounters between an individual and a public entity, but rather "focus[] on

specific instances during the interaction between the disabled individual and the . . . public entity" in order to determine if discrimination occurred at any point. *See Proctor v. Prince George's Hosp. Ctr.*, 32 F. Supp. 2d 820, 827–28 (D. Md. 1998). In *Bircoll v. Miami-Dade County*, for instance, the court examined "three separate points at which [the plaintiff] contends [police officers] subjected him to discrimination." 480 F.3d 1072, 1085 (11th Cir. 2007). Similarly, in *Updike v. Multnomah County*, the court separately examined whether an arrestee was denied accommodations during booking, a jailhouse medical examination, a recognizance interview with a police officer, and interactions with pretrial services. 870 F.3d 939, 954–57 (9th Cir. 2017). *See also Young v. Sunbury Police Dep't*, 160 F. Supp. 3d 802, 811–12 (M.D. Pa. 2016) (separately examining whether ADA and Section 504 were violated when a plaintiff with a mental disability was arrested and when that plaintiff was subsequently interrogated while "in medical distress"). Thus, this Court should reject any suggestion that the failure to accommodate Mr. Montgomery during a pre-arrest February 4 interrogation, for instance, was cleansed by post-arrest jailhouse processing procedures that occurred one week later.

Second, although the District contends otherwise, the District did not "appropriately accommodate[] Montgomery's mental illness according to Plaintiff's own experts." Mot. Summ. J. at 11. As explained *supra*, the District never provided an accommodation. The District cites records showing that, when being processed at the D.C. jail on February 11, Mr. Montgomery's mental health (as well as his physical health, immunization history, surgery and hospitalization history, etc.) was evaluated. *See* ECF No. 53–11. That evaluation concluded he had a history of mental illness (including schizoaffective disorder) but was not currently in mental health distress and was not hallucinating. *Id.* at 3. As a result, Mr. Montgomery was treated like any other arrestee. *See id.* at 3, 8 (concluding that Mr. Montgomery's recommended jailhouse housing was

"Open Population").[9] The documents make no mention of Mr. Montgomery receiving an accommodation—much less one recommended by Plaintiff's experts. Nor does the District cite any specific accommodation he received.

Because the District did not offer any accommodation to Mr. Montgomery, it certainly did not provide him "with accommodations recommended by Plaintiff's own experts." Summ. J. Mem. at 4. Concerning what MPD should have done, Plaintiff's experts rendered two principal opinions. First, they opined that MPD "should have followed GO-OPS-308.4"—MPD's policy concerning the processing of persons who may suffer from mental illness. Ex. 3 at 14–15; *see* Ex. 8, GO-OPS-308.4 (Sept. 22, 2000).[10] That policy—at least on its face—imposes an affirmative obligation on MPD members to evaluate whether an individual may have a mental illness and, if so, to respond accordingly. In particular, it provides that, "[w]hen coming into contact with a suspected mentally ill person, members of the force should determine if there is reason to believe" the person "[i]s likely to injure himself/herself . . . as manifested by . . . evidence of any inability to provide for his/her basic human needs, including food, clothing, shelter, essential medical care, or personal safety." Ex. 8 at 3.[11] If so, the member "should detain the mentally ill person for observation and evaluation." *Id.* As further explained in Section III.C,

---

[9] Mr. Montgomery's mental struggles while incarcerated are well documented. *See* Ex. 7 at PLAINTIFF 000373 (noting he had been observed eating food out of trash can and "often talks to himself"); *id.* at PLAINTIFF 000372 (noting he had been "sitting on the floor with a bag tied around his neck" and had all of his belongings "packed in a bag"); *id.* at PLAINTIFF 000372 (after Mr. Montgomery was referred to the medical unit for wrapping his neck with plastic, he described the plastic as "jewelry," and was unable to understand that it was a potentially dangerous activity.); *id.* at PLAINTIFF 000331 (noting that one of Mr. Montgomery's "Current Problems" is "schizoaffective disorder").

[10] The version of GO-OPS-308.4 attached to the District's motion as Exhibit 20 (ECF 53-20) did not become effective until February 9, 2015 and thus is irrelevant for present purposes.

[11] GO-OPS-308.4 defines a person with a "Mental Illness" broadly to include someone unable to "think rationally" or "take reasonable care of [their] welfare with regard to basic provisions for clothing, food, shelter, or safety." *Id.* at 1.

*infra*, MPD detectives and their supervisors did not know about this policy and do not follow it. Detective Wise did not recognize the policy at his deposition and testified that he was unaware of anything "special or different" he was supposed to do when interacting with a suspect with mental illness. Ex. 1, Wise Dep. 57:3–11, 99:2–100:1, 101:22–102:14; *see* Ex. 9, Deposition of Sergeant Kevin S. Rice ("Rice Dep.") 123:10–13 ("there's not a policy for how to deal with suspects suspected of having a mental illness"); *see also* Ex. 3 at 8. Similarly, Detective Nasr could not recall a single instance when he did something differently because the person with whom he was interacting had a mental disability. Ex. 2, Nasr Dep. 76:21–77:2, 84:2–4; *see* Ex. 3 at 10. Although GO-OPS-308.4 requires MPD members to identify "suspected mentally ill person[s]" and determine if further evaluation is needed, in practice MPD detectives and their supervisors treat a mentally-ill individual the same as everyone else so long as the mentally-ill person is not suicidal. Ex. 1, Wise Dep. 98:20–99:1; Ex. 2, Nasr Dep. 76:21–77:2, 84:4; Ex. 10, Deposition of Lieutenant Robert Alder ("Alder Dep.") 54:4–20; Ex. 9, Rice Dep. 66:8–67:21. MPD detectives did not apply GO-OPS 308.4 when interrogating Mr. Montgomery, and Plaintiff's experts opined they should have. Ex. 3 at 14–15.

Second, the experts opined that MPD "should have also had better and more robust policies that would have required that [MPD] accommodate Mr. Montgomery's disability in several other ways." Ex. 3 at 15. The experts proposed five reasonable accommodations that, in conjunction with following MPD's own policies, would have helped ensure that Mr. Montgomery was treated appropriately. *See id.* at 14–15. For instance, they opined the detectives could have stopped the interrogation and called for a trained crisis intervention team member to de-escalate Mr. Montgomery's mental health crisis. *Id.* at 15. They also opined that MPD could have "[d]ocumented the symptoms of mental illness and notified any decision-maker during the

interrogations or the custodial arrest process." *Id.* In another recommendation, the experts opined

that MPD detectives could have "[n]otified the jail during the booking process of Mr.

Montgomery's symptoms of mental illness." *Id.*

When arguing that Mr. Montgomery "was provided with accommodations recommended

by Plaintiff's own experts," Summ. J. Mem. at 4, the District simply ignores that MPD did not

follow its own policies when interacting with Mr. Montgomery—a key recommendation in the

experts' report. Moreover, the District's claim that it complied with the experts' final additional

recommendation is incorrect. In that recommendation, the SolutionPoint+ experts opined that

MPD detectives could have "[n]otified the jail during the booking process of Mr. Montgomery's

symptoms of mental illness." Ex. 3 at 15. There is no evidence the detectives had *any*

communication with the D.C. jail regarding Mr. Montgomery—and the District cites none.

Indeed, as Mr. Trevino stressed, MPD "didn't do anything," despite witnessing Mr.

Montgomery's psychosis firsthand. Ex. 4, Trevino Dep. 127:4–8.

To explain its inaction, the District relies on an "example" the experts provided in

conjunction with their final additional recommendation. That reliance is misplaced. In this

"example," the experts noted that one county in Texas asks all arrestees questions concerning

their mental health prior to booking, including, "Have you ever been diagnosed as having a

mental illness by a doctor or by a mental health professional?" If an arrestee answers "yes" to

any of these mental-health questions, "jail diversion processes and/or necessary accommodations

are implemented." Ex. 3 at 15–16. Plaintiff's experts never suggested compliance with this

"example" necessarily would have sufficed.[12] Regardless, the District failed even that low bar.

---

[12] The District's focus on this "example" also is misguided because the experts were not asked to
render an opinion on whether any one of their suggested accommodations would have satisfied
the District's legal requirements under the ADA or Section 504. Ex. 4, Trevino Dep. 167:12–16.

Although the individuals evaluating Mr. Montgomery at the D.C. jail knew that he previously had been treated for mental illness, and although his diagnosis was recorded, there is no evidence that the District implemented "jail diversion processes and/or necessary accommodations" in light of Mr. Montgomery's mental disability. *See* ECF 53-11 at 3, 8.[13]

MPD did not follow its own policies and did not accommodate Mr. Montgomery in other ways that Plaintiff's experts recommended. Indeed, the evidence makes plain that MPD "didn't do anything" in light of his mental disability. Ex. 4, Trevino Dep. 127:4–8. At the least, a genuine dispute exists as to whether the District appropriately accommodated Mr. Montgomery.

### B.   Mr. Montgomery Needed an Accommodation, and That Need Was Obvious.

Not surprisingly—since Mr. Montgomery never received one—the District next argues Mr. Montgomery "did not need an accommodation" in the first place. Summ. J. Mem. at 11. In particular, the District argues that Mr. Montgomery "faced no obstacle that prevented him from accessing the government program or benefit at issue," which the District defines as "police interviews." *Id.* at 12. Although the District concedes that "some" of Mr. Montgomery's responses were "non sequiturs," it asserts that he "was capable of understanding what was being asked and responding to direct questions" at least "most of the time," and, for that reason, did not need an accommodation. *Id.* at 11–12. This argument borders on frivolous.[14]

---

As Mr. Trevino, one of the authors of that report, explained, "I'm not a lawyer and I'm not going to . . . sit here and talk about the Americans with Disabilities Act." *Id.* 140:17–19.

[13] The District's reliance on an "example" offered by Plaintiff's experts is further undermined by the fact that, in his deposition, Mr. Trevino made clear that the situation in Bexar County, Texas is illustrative and highly dependent on the specific facts in that county. He noted the Bexar County jail "has an entire floor dedicated to mental health beds" where mentally-ill arrestees may be placed. Ex. 4, Trevino Dep. 58:8-10. It is unclear whether the District has similar facilities that might enable a sound comparison between District and Bexar County procedures.

[14] It also stands in stark contrast to the position taken by prosecutors at trial. Prosecutors played lengthy portions of the videotaped interrogations for jurors in order to convey to the jury that Mr.

The evidence is overwhelming that Mr. Montgomery was experiencing a severe mental health crisis during the two interrogations, and thus required an accommodation. The SolutionPoint+ experts—former police officers with significant experience interacting with mentally-ill individuals and who reviewed the interrogation transcripts and videos—opined that Mr. Montgomery "was obviously experiencing a mental health crisis" during the interrogations. Ex. 3 at 2. Mr. Montgomery was "detach[ed] from reality" and "lacked the mental capacity to understand what was happening," they concluded. *Id.* at 2, 7. As the detectives interrogated him, Mr. Montgomery was "experiencing psychosis" and "responding to internal stimuli, experiencing hallucinations, [and] responding incongruently to questions." *Id.* at 5, 7–8. Due to his disability, "[a]t no point in the interrogation did Mr. Montgomery appear to contextually understand why he was in an interrogation room or what was happening," the SolutionPoint+ experts explained. *Id.* at 8. Indeed, he "probably couldn't discern between fantasy or reality" and "was just too sick to communicate with." Ex. 4, Trevino Dep. 159:5–21; *see* Ex. 22; Ex. 23. Mr. Montgomery also "exhibited bizarre socially unacceptable behavior," like urinating in the interrogation room rather than asking to use the MPD bathroom. Ex. 3 at 7–8.

Kenneth Stefano, an expert in diagnosing severe mental illness, agreed. After reviewing the interrogation transcripts and videos, he too concluded that Mr. Montgomery "was exhibiting obvious signs of active psychosis" during the interrogations. Ex. 6 at ¶ 22; *see* Ex. 5, Stefano Dep. 56:20–57:1; Ex. 22; Ex. 23. As an initial matter, Mr. Montgomery "looked like somebody who was mentally ill," including because, at the time of the interrogations, he was "disheveled," his clothes were "dirty," he had an untreated leg wound, and he "did not seem at all distressed by

Montgomery "sounds unhinged" at the time of the interrogations. *See* Ex. 12, Aug. 8, 2017 Trial Tr. 100:17–21. Prosecutors also agreed to an instruction given by the judge to the jury that, in the videotape, the jurors "will hear and see evidence that Mr. Montgomery was mentally ill at the time of the interviews on February 4th and 10th, 2012." *Id.* 117:16–18.

the situation he was in." Ex. 5, Stefano Dep. 72:4–14, 72:20–22, 73:5–7; *see* ECF 48 at 8, 11, 12,

14 (pictures of Mr. Montgomery and his leg wound).[15] Moreover, with respect to his behavior,

Mr. Montgomery was "responding to internal stimuli (e.g., talking to himself)" during the

interrogations and "responding to questions in a disjointed, illogical, and tangential manner." Ex.

6 at ¶ 22. According to Dr. Stefano, "[i]t wasn't clear at times whether he was in a fantasy,

talking fantasy or talking [about] things that really happened." Ex. 5, Stefano Dep. 63:2–4.

"These psychotic symptoms," Dr. Stefano opined, "impaired his ability to communicate,

understand questions, and accurately perceive and respond to coercive interrogation tactics such

as leading questions." Ex. 6 ¶ 22. Mr. Montgomery also demonstrated "bizarre and inappropriate

behavior"—further underscoring his mental disability. Ex. 5, Stefano Dep. 62:22–63:1.

Although they ultimately chose not to do anything about it, even the MPD detectives

"appeared to acknowledge there was something wrong with Mr. Montgomery's mental health."

*See* Ex. 3 at 8. During the first interrogation, Detective Wise asked Mr. Montgomery if he had

mental health issues. Ex. 1, Wise Dep. 216:13–17. Although Detective Wise did not typically ask

interrogation subjects this question, he did so here "[b]ecause of some of the answers" Mr.

Montgomery had provided earlier in the interrogation, which made the detective suspect Mr.

Montgomery may be mentally ill. *Id.* 217:6–13, 218:11–17. Indeed, Detective Wise testified that

some of Mr. Montgomery's answers made "no sense" and were "incoherent." *Id.* 200:11–18,

---

[15] Detective Wise also knew, from the very start of the first interrogation, that Mr. Montgomery
was homeless and had been wearing the same clothes for four days. Ex. 13, Feb. 4. Interrogation
Tr. 7:5–6, 8:16–9:14, 10:3–5, 123:17–125:20, 242:16–17, 245:15–18, 247:7–249:2; Ex. 1, Wise
Dep. 186:15–187:13. Many homeless individuals in the District—now and in 2012—suffer from
severe mental illness. *See, e.g.*, Metropolitan Washington Council of Governments Homeless
Services Planning and Coordinating Committee, *Homeless in Metropolitan Washington: Results
and Analysis from the 2012 Point-in-Time Count of Homeless Persons in the Metropolitan
Washington Region* (May 2012), https://www.mwcog.org/documents/2021/05/05/homelessness-
in-metropolitan-washington-results-and-analysis-from-the-annual-point-in-time-pit-count-of-
persons-experiencing-homelessness-featured-publications-homelessness/.

205:3–206:10, 207:14–17. Detective Nasr agreed Mr. Montgomery's answers could be

"nonsensical" and that his behavior was "strange," "erratic," and "weird." Ex. 2, Nasr Dep.

151:20–152:4; 166:4–7, 169:19–20, 172:11–12. "[S]omething was off" with Mr. Montgomery,

Detective Nasr suspected—"maybe something's wrong with the guy." *Id.* 164:9–18, 169:7–8.

Detective Wise's decision to question Mr. Montgomery about his mental health led to the

following exchange, in which Mr. Montgomery tells the detective that he talks to himself:

> Wise: Do you believe that you have any type of mental issues?
> Montgomery: Uh, if I'm talkin' to myself I'll – I'll you know, I'll – I'll go to a
> psychiatrist, you know.
> Wise: Huh?
> Montgomery: If I start talkin' myself I'll go –
> Wise: If you did, but do you?
> Montgomery: I don't think I do right now, yeah.

Ex. 13, Feb. 4 Interrogation Tr. 120:10–19.[16]

The District's argument—that Mr. Montgomery did not need an accommodation because

"most of [the] time he was capable of understanding what was being asked and responding to

direct questions," Summ. J. Mot. at 12—ignores this expert testimony and is not supported by

any evidence or testimony in the District's favor. Indeed, the District's argument about what Mr.

Montgomery could do "most of the time" does not even consider the totality of the two

interrogations. To support its argument, the District cites a mere *four pages* of the February 4

interrogation transcript during which Mr. Montgomery confirms his name, date of birth, weight,

---

[16] Mr. Montgomery talked to himself and hallucinated when the detectives left him alone in the
interrogation room. Ex. 3 at 5, 7–8; Ex. 6 ¶ 22; Ex. 14, Feb. 4 Interrogation Tr. 116:15–117:6,
221:22–222:22, 241:14–20, 251:16–19, 408:10–409:1; Ex. 14, Feb. 10 Interrogation Tr. 3:5–12;
4:3–7:14; 8:7–18:11, 44:5-12, 44:20–45:4. MPD had set up a video monitor that enabled
detectives to see and hear Mr. Montgomery while he was alone in the interrogation room.
Detective Wise testified that he may have watched Mr. Montgomery on that monitor when Mr.
Montgomery was left alone in the interrogation room. Ex. 1, Wise Dep. 191:18–192:9.

and social security number and answers other introductory questions. *See* Mot. Summ. J. at 12.[17]
The District ignores the rest of the February 4 transcript—which is over 400 pages long—and
does not even mention the second interrogation, which also was lengthy (the transcript exceeds
60 pages). *See* Exs. 14 & 15. As those transcripts make plain, Mr. Montgomery was responding
to internal stimuli and hallucinating during both interrogations. Ex. 13, Feb. 4 Interrogation Tr.
116:15–117:6, 221:22–222:22, 241:14–20, 251:16–19, 408:10–409:1; Ex. 14, Feb. 10
Interrogation Tr. 3:5–12; 4:3–7:14; 8:7–18:11, 44:5–12, 44:20–45:4. Mr. Montgomery also
frequently responded to questions in an illogical and incongruent manner. *E.g.*, Ex. 13, Feb. 4 Tr.
Interrogation Tr. 30:8–32:6, 41:10–42:3, 71:22–72:20, 115:13–116:14, 162:21–163:22, 223:1–
225:16, 271:5–272:21. For example, when Detective Wise asked him to explain "what happened
at the bus stop" on the night of the murder, Mr. Montgomery responded:

> In the process we're goin' (inaudible) this whole (inaudible) man, you know, I
> woulda been stop right there, you know, by the decency, you know. This, they
> know, this I did, you know, dead, honestly, you know. Cause I'm come, you
> know, come across things you know, in that order before. And um, the outcome
> pretty timely gets through man, I mean, dead, you know? Uh, it – it wasn't too
> much I could do like around the . . . four, you know, the end a wherever it was
> that was gonna be because entirely, entirely off from the way of oral hydrates and
> that's come to (inaudible) and a man is, you know, a man's like is, like I said,
> victimized. You know the wages of sin is death and that's what I woulda got, you
> know. And that's victimized, you know. A smoker. In the process of goin' – all
> are victimized when you're goin', you know, in the fall of entirely, you see. And
> that would be, like I said, (inaudible). I mean, I wouldn't be able to even talk to
> you, be what a victim is. Depends on what type a victim but somethin's happened
> to somebody would be the definition of the term victim. You know. Uh, a bit or
> beginnin' of some type a thing or the whole failure, that you know, victimize, the
> whole precedence of someone. And that woulda been, you know, uh, my
> outcome. To be anything. To be anything. You know. And was startin' to go that
> way but that's when this whole place, cause it's only the beginnin', what's here
> and then (inaudible) others, and once, like I said, a person sees, like – it's like a

---

[17] It appears that Mr. Montgomery even failed to correctly answer these introductory questions.
For instance, during the February 4 interrogation, Mr. Montgomery said he weighed about 158
pounds. ECF No. 53-19 at 7:2. That appears wildly incorrect; during his jailhouse processing one
week later, a nurse recorded that he weighed only 129 pounds. ECF No. 53-11 at 4.

backstop on a baseball field. Sees the whole impetus, you know, of uh, what the – what the world is – is (inaudible) trans – you know – transferrin' to anything, transmittin' – the person knows he dies on that, um, that date. I mean, I talk to so many people (inaudible), you know, they just go right – right where it is they are.

*Id.* 44:15–46:16; Ex. 22 (video excerpt).

In light of the expert opinions by the SolutionPoint+ experts and Dr. Stefano, and in light of the video evidence (Exs. 22 & 23) and the testimony of MPD detectives themselves, there is at least a genuine dispute as to whether Mr. Montgomery was experiencing an obvious mental health crisis during the interrogations and, for that reason, needed an accommodation.[18]

Relatedly, the District also suggests that, because Plaintiff's experts advanced a range of potential accommodations—some steps MPD could have taken during the interrogations and some steps MPD could have taken afterwards—that must mean Mr. Montgomery did not require an accommodation during the interrogations. Mot. Summ. J. at 12. Not so. This argument misconstrues the testimony of Mr. Trevino, who opined it was "just wrong" and "inhumane" for MPD to ignore Mr. Montgomery's psychosis and continue interrogating him. Ex. 4, Trevino Dep. 102:14–19, 111:19. MPD should have accommodated Mr. Montgomery during the interrogations and arrest, but it failed to do so. Moreover, because MPD detectives witnessed Mr. Montgomery's mental disability first-hand, they were required by law to investigate further and determine which accommodations Mr. Montgomery required. *See* Order re Mot. to Dismiss at 19

---

[18] Decades before his arrest, Mr. Montgomery's disability was obvious to everyone who encountered him. By high school, Mr. Montgomery "seemed strange" and "crazy." Ex. 15, Deposition of Emma Moton ("Moton Dep.") 10:2–4, 12:13–14:21. As a young man, Mr. Montgomery "would go and stay in the corner and talk to himself," and he struggled to hold a conversation. *Id.* 33:19–22, 62:19–63:3. "We all knew he had something wrong with him. The whole neighborhood knew something was wrong with him." *Id.* 66:5–11. Likewise, Mr. Montgomery's son "knew that [his father] was schizophrenic," and, decades before his father's arrest, it was "apparent to people that he was suffering from mental illness," including because he "would continuously talk to himself." Ex. 16, Deposition of B. Montgomery ("B. Montgomery Dep.") 16:15–19, 20:1–2, 24:11–12. "Like, full discussions," he said. *Id.* 20:4–8.

(the District may be liable for compensatory damages under the ADA and Section 504 "where MPD officers or other District personnel knew of the plaintiff's disability, but nevertheless failed to assess whether accommodations were necessary, or to provide those accommodations"); *Sacchetti*, 344 F. Supp. 3d at 272–73 ("It is well-settled that Title II ... create[s] a duty to gather sufficient information from the disabled individual and qualified experts as needed to determine what accommodations are necessary."). Here, as in *Sacchetti*, "there is no evidence that the MPD officers or the District made any attempt whatsoever to determine what, if any, accommodations [Mr. Montgomery] needed" during the interrogations. "Consequently, the lack of any evidence to show that the District satisfied its obligations to investigate what . . . accommodations [Mr. Montgomery] required" during the interrogations "precludes summary judgment" for the District on Mr. Montgomery's claims. *See id.* at 272.

Finally, the District argues Mr. Montgomery did not require an accommodation because he was not "in crisis" during the interrogations. Mot. Summ. J. at 12–13. But the SolutionPoint+ experts unequivocally concluded he was, and the interrogation transcripts confirm this conclusion. *See, e.g.*, Ex. 3 at 2 (Mr. Montgomery "was obviously experiencing a mental health crisis while in [MPD] custody"); *id.* at 7 ("Mr. Montgomery's social status, his appearance, his responses, and his behavior clearly indicated he was experiencing a mental health crisis due to psychosis."). Dr. Stefano similarly concluded that Mr. Montgomery "was exhibiting obvious signs of active psychosis" during the interrogations. Ex. 6 ¶ 22; *see* Ex. 5, Stefano Dep. 56:20–57:1. Also, as Mr. Trevino explained, a mental health crisis need not endanger third parties—the "disruption" that characterizes a crisis can occur when a person is "a danger to themselves because of their level of psychosis." Ex. 4, Trevino Dep. 27:18–28:2. The District offers no evidence to the contrary—no percipient witness, no expert witness, and no document. The

District's argument also ignores the fact that, whether or not Mr. Montgomery was in "crisis," it is "highly problematic" to interrogate anyone exhibiting severe symptoms of mental illness—let alone interrogate them using coercive tactics. *Id.* 90:20–22; 91:1–6. That is not only because such mentally-ill individuals may be "dangerous" to themselves or others but also because they may feel "overwhelmed" and falsely confess. *Id.* 90:20–22, 91:1–6; Ex. 6 ¶ 46; Ex. 3 at 5. In these circumstances, the ADA and Section 504 do more than just protect against physical harm—the statutes also help safeguard the integrity of the criminal legal system.[19] In sum, Mr. Montgomery was in "crisis." But, even if he were not, an accommodation was required.

## III.    The District Intentionally Discriminated Against Mr. Montgomery.

A plaintiff may recover compensatory damages for violations of the ADA or Section 504 if he proves the defendant was "deliberately indifferent" to his rights. *Pierce v. District of Columbia*, 128 F. Supp. 3d 250, 278–79 (D.D.C. 2015). Deliberate indifference does not require proving the defendant harbored discriminatory animus. Instead, "deliberate indifference requires only knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that likelihood." *Id.* at 279. "The 'knowledge' element is satisfied where the [defendant] has notice of the plaintiff's accommodation need, and the 'failure to act' element is satisfied by conduct that is more than negligent, and involves an element of deliberateness." *Id.* at 278. That standard is easily satisfied here. Indeed, the record not only shows that MPD was deliberately

---

[19] The District's argument also fails because it considers only whether an accommodation was needed to enable Mr. Montgomery to "benefit" from police interrogations. Liability under the ADA and Section 504 does not turn on that narrow question. As this Court explained, "a public entity need not intend to benefit an individual through a program or activity to be subject to Title II." Order re Motion to Dismiss at 16. Rather, Title II "establishes two separate circumstances under which a qualified individual with a disability might have a claim against a public entity: (1) the individual was 'excluded from participation in or . . . denied the benefits of the services, programs, or activities of a public entity,' or (2) the individual was 'subjected to discrimination by any such entity.'" *Id.* at 15 (quoting 42 U.S.C. § 12132). MPD is still liable if it "subjected [Mr. Montgomery] to discrimination," and there is a genuine dispute as to whether it did so.

indifferent to Mr. Montgomery's rights, but that MPD sought to exploit Mr. Montgomery's disability in order to extract a confession. At the very least, there is a genuine factual dispute with respect to deliberate indifference, which precludes summary judgment.[20]

The District was deliberately indifferent to Mr. Montgomery's rights under the ADA and Section 504 for four distinct reasons: (1) MPD ignored Mr. Montgomery's crisis, did not investigate whether he needed an accommodation, and offered no accommodations; (2) MPD affirmatively attempted to exploit Mr. Montgomery's disability in order to extract a confession from him; (3) MPD failed to implement policies and procedures to ensure it complied with federal disability rights laws, and (4) MPD has made no real effort to train its officers regarding the ADA and Section 504 in general and how to accommodate mentally-ill individuals in particular. These stark failures are explored in turn.

### A.    MPD Ignored Mr. Montgomery's Obvious Psychosis and Failed to Offer Any Accommodation.

The District concedes (by making no argument to the contrary) that Detectives Wise and Nasr were deliberately indifferent to Mr. Montgomery's rights. *See* Mot. Summ. J. at 16. Nor could the District argue otherwise. As explained in Section II.B, *supra*, the undisputed evidence is that Mr. Montgomery was experiencing an obvious mental health crisis during the interrogations that made it impossible for him to fully understand both the questions posed by MPD detectives and, more generally, the situation he was in and what was happening to him. Even the MPD detectives suspected Mr. Montgomery might be mentally ill.

Despite observing obvious symptoms of psychosis first-hand and concluding Mr. Montgomery may be mentally ill, "the detectives continued to pressure him for a confession."

---

[20] The District suggests Plaintiff relies only on the conclusions of their experts as evidence of the District's deliberate indifference, ECF No. 53 at 18, Plaintiff has never stated as much and relies on the entire record in order to support its argument that summary judgment is improper.

Ex. 3 at 2, 8. They offered no accommodations. Ex. 1, Wise Dep. 213:12–17; Ex. 2, Nasr Dep. 174:15–18, 176:16–178:11; Ex. 3 at 5; Ex. 4, Trevino Dep. 167:20–168:1; Ex. 5, Stefano Dep. 61:20–62:1. They did not immediately inform their supervisor that Mr. Montgomery might be mentally ill. Ex. 1, Wise Dep. 213:20–22. They did not document that Mr. Montgomery might be mentally ill or was exhibiting symptoms of psychosis. *Id*. 214:19; Ex. 2, Nasr Dep. 176:19–20. They made no effort to undertake a mental-health assessment or provide mental-health resources to him. Ex. 1, Wise Dep. 215:17–20; Ex. 2, Nasr Dep. 176:22–177:19. In sum, faced with Mr. Montgomery's psychosis and incoherency, Detective Wise simply "[m]oved on with the interview." Ex. 1, Wise Dep. 208:2–5; *see* Ex. 5, Stefano Dep. 62:17–22 (the detectives "did not acknowledge, or do anything, about the fact that he was clearly responding to internal stimuli"). That is because, the detectives explained, it is not their job to help Mr. Montgomery. Section II.A., *supra*. Although he made no notation in the case file regarding Mr. Montgomery's mental health issues, Detective Wise said the U.S. Attorney's Office could determine for itself whether Mr. Montgomery was mentally ill and whether he needed an accommodation as a result. Ex. 1, Wise Dep. 214:4–215:16 (the prosecutors "can make whatever interpretation they want" after reviewing the case file and "could have made their own observations and made their own statements about" his mental health). Detective Nasr was even more blunt: "This guy needs help, whatever, he's with the courts." Ex. 2, Nasr Dep. 178:8–11.

Courts "frequently have permitted plaintiffs asserting intentional discrimination to rely on the specific action, or lack of action, taken by police officers or other public-entity personnel." Order re Mot. to Dismiss at 20 n.13. Because the MPD detectives did nothing despite observing Mr. Montgomery's severe mental disability first-hand, a genuine dispute exists as to whether the District was "deliberately indifferent" to his rights. *See id.* at 19 (deliberate indifference standard

met "where MPD officers or other District personnel" knew of the plaintiff's disability "but nevertheless failed to assess whether accommodations were necessary, or to provide those accommodation"). MPD made no attempt to assess his accommodation needs, and "such a failure easily satisfies the deliberate indifference standard." *Sacchetti*, 344 F. Supp. 3d at 277; *see also Sacchetti v. Gallaudet Univ.*, 181 F. Supp. 3d 107, 126 (D.D.C. 2016) (allegation that "MPD knew that [plaintiff] was . . . suffering from a mental illness . . . and, despite this knowledge, failed to . . . transport him to a medical or mental health facility" sufficed to state a claim that MPD's conduct constituted deliberate indifference). MPD's failure to act in the face of Mr. Montgomery's psychosis also was "more than negligent" and "involve[d] an element of deliberateness." *Pierce*, 128 F. Supp. 3d at 278. This was no mere oversight or mistake. *See* Sections III.B, III.C, & III.D, *infra*. Indeed, Detective Wise testified it was not his job to note concerns he may have had about Mr. Montgomery's mental health in the case file—let alone actually provide accommodations to Mr. Montgomery. *See* Ex. 1, Wise Dep. 214:16–215:4 (mental health concerns "wouldn't be something I would have documented and put in the case file"). Others might help Mr. Montgomery somewhere down the line—but not him.

### B.     MPD Detectives Exploited Mr. Montgomery's Disability.

Detectives Wise and Nasr did not merely ignore Mr. Montgomery's mental illness—they actively exploited it in an attempt to extract statements that could be construed as inculpatory. They did so by establishing the MPD interrogation as a religious event in Mr. Montgomery's mind and by employing coercive tactics that should not be used on the mentally ill.

#### 1.     MPD Detectives Preyed on Mr. Montgomery's Hyper-Religiosity.

Mr. Montgomery, like many mentally-ill individuals, showed signs of "hyper-religiosity," and the detectives tried to exploit this symptom of his mental illness. *See* Ex. 3 at 8 ("This symptom was repeatedly addressed and exploited by Detective Wise throughout the

interview."). Suspecting Mr. Montgomery may have mental health issues and knowing Mr. Montgomery was religious, *e.g.*, Ex. 13, Feb. 4 Interrogation Tr. 7:5–6, 18:3–19:11, Detective Wise cast himself as an agent of God and the interrogation as Mr. Montgomery's final chance to exorcise the Devil (with the detectives' help) and achieve salvation through confession to murder. Detective Wise told Mr. Montgomery that:

- The Devil is inside Mr. Montgomery and is making him tell lies. *Id.* at 386:14–18 ("Right now you have the Devil in ya, son. I'm tellin' ya 100% you got him in you and I know cause you speak with his tongue, you lie."); *see id.* 47:1–18;

- Mr. Montgomery must renounce the Devil in order to reach Heaven. *Id.* 386:8–10 ("God is not gonna accept you into the kingdom of Heaven until you renounce the Devil and accept Jesus Christ as your savior."). If Mr. Montgomery does not stop lying, God is going to shut the "door of mercy" and banish him to Hell. *Id.* 33:9–35:1, 383:17–385:11;

- The detectives were sent by God to give him one final chance at salvation. *Id.* 387:20–21 ("God sent us to keep that door open."). Detective Wise is "a soldier of God." *Id.* 61:5–6. And the detectives were at the interrogation to perform an exorcism. *Id.* 47:3–4 ("And we – we gotta do uh, an exorcism right now and get the Devil out [of] you.");

- To exorcise the Devil and attain salvation, Mr. Montgomery must confess to MPD as he would to a priest. *Id.* 183:5–184:22. "[W]e're kinda like a confession, I'm the priest," Detective Wise explained. *Id.* 261:22–262:1. "Let it out. Let it out. It's the only way the Devil's gonna leave you is if you let it out," the detective said. *Id.* 393:21–22.

- Any chance of salvation would be lost if Mr. Montgomery did not confess and exorcise the Devil before the interrogation concluded. *Id.* 387:20–21 ("God sent us to keep that door open. When we get outta here, that door's closed.").

In yet another line of questioning meant to manipulate his hyper-religiosity, MPD detectives suggested to Mr. Montgomery that he killed Ms. Deoni JaParker Jones—a transgender woman—because doing so was God's work. *See id.* 259:10–11 ("Did you ever have to – ever do God's work and kill someone before?); *id.* 295:10–12 ("[Y]ou can't be a religious man and follow your religion to the T without people tryin' [to] label you as a law-breaker or as evil or somethin' like that."); *id.* 268:10–14 ("People doin' certain things and maybe dressin' certain ways that they're not supposed to, you know, that . . . can go against somebody's faith."); *see*

*also* Ex. 14, Feb. 10 Interrogation Tr. 46:1–48:4 (pointing out to Mr. Montgomery that the

murder victim was transgender and asking, "What do you feel about people who do that? What

do you think about he/shes? Does it bother you or not bother you?").

MPD's attempted exploitation of Mr. Montgomery's hyper-religiosity goes far beyond

"deliberate indifference" and underscores why summary judgment is inappropriate here.

### 2. MPD Manipulated Mr. Montgomery's Confusion and Vulnerability.

The detectives also "manipulated" Mr. Montgomery "in an effort to get Mr. Montgomery

to provide evidence that would implicate him in the crime." Ex. 5, Stefano Dep. 57:1–6; *see id.*

153:15–154:2 ("what they were trying to do was to get Mr. Montgomery to confess to facts,

quote/unquote, 'facts' about the case, and by his difficulty being clear and not answering they

used that as evidence that he was being deceptive"). Mr. Montgomery's psychotic symptoms

"impaired his ability to . . . accurately perceive and respond to coercive interrogation tactics such

as leading questions." Ex. 6 at ¶ 22. That is, it was difficult for Mr. Montgomery to "perceive

correctly whether he was being guided or led down a particular path," and he "demonstrated a

pattern of agreeing and acquiescing regardless of what [the detectives] were asking" him. Ex. 5,

Stefano Dep. 57:15–21, 58:1–18, 153:19–154:2; *see* Ex. 4, Trevino Dep. 81:8–12, 92:15–16,

162:6–7; Ex. 5 ¶ 22. MPD sought to exploit Mr. Montgomery's confusion and vulnerability. For

instance, Detective Wise repeatedly told Mr. Montgomery that Mr. Montgomery had done wrong

and was wracked with guilt, and Mr. Montgomery repeatedly agreed in rote fashion but showed

no real understanding of what he was saying:

> Wise: You know what happened wasn't right.
> Montgomery: True.
> Wise: And it's – and it is messin' with your brain.
> Montgomery: Mm-hmm. Yeah.
>
> . . .

Wise: This is eatin' you up.
Montgomery: Yeah, yeah.
Wise: All right? Because you're a man that – who has a conscience.
Montgomery: Right.

. . .

Wise: It's gotta be yours. You can't blame it on anybody else, you gotta blame it
on yourself and then you gotta move forward.
Montgomery: Yeah.
Wise: I messed up.
Montgomery: Yeah.
Wise: I messed up.
Montgomery: Hm-hmm.
Wise: Okay?
Montgomery: Right.
Wise: You messed up.
Montgomery: Yeah.
Wise: Okay?
Montgomery: Yeah.
Wise: You messed up and it's okay.
Montgomery: Hm-hmm. All right.

Ex. 13, Feb. 4 Interrogation Tr. 132:21–134:20, 142:1–16.

Worse, despite his evident psychosis, MPD detectives also employed the Reid Technique

against Mr. Montgomery—even though that technique should not be used on persons with

mental illness (because it may overwhelm them) and "often" leads to false confessions when it

is. *E.g.*, Ex. 4, Trevino Dep. 88:11–14; Ex. 3 at 5; Ex. 6 ¶ 46.

Again, MPD's calculated exploitation of the effects of Mr. Montgomery's disability

amounts to much more than deliberate indifference to his rights under Title II and Section 504.

### C.     MPD Failed to Implement Appropriate Policies and Procedures.

That MPD detectives "disregarded the well-being of Mr. Montgomery," Ex. 3 at 2—and

even exploited his disability—reflects the District's and MPD's broader failure to implement

policies and procedures to ensure all MPD personnel comply with federal laws.

Although MPD has a policy governing MPD interactions with mentally-ill individuals, *see* Section II.A., *supra*, that policy (GO-OPS-308.4) is just words on a page—at least when it comes to the work of MPD homicide detectives.[21] *See* Section II.A, *supra*. "Sergeant Kevin Rice, Detective Wise, and Detective Nasr did not know of, understand, or follow the policies of the MPD, especially those involving mental health consumers." Ex. 3 at 3. Detective Wise did not recognize the policy, Ex. 1, Wise Dep. 99:2–19, while Sergeant Rice testified that "there's not a policy for how to deal with suspects suspected of having a mental illness," Ex. 9, Rice Dep. 123:10–13. The detectives and their supervisors were not expected to follow that policy in interrogations, and they did not treat non-suicidal, mentally-ill individuals differently from anyone else. Ex. 3 at 7–8, 10, 12–13; Ex. 2, Nasr Dep. 171:12–18; Ex. 4, Trevino Dep. 101:8–18, 105:2–11; Ex. 9, Rice Dep. 65:13–19; Ex. 1, Wise Dep. 57:3–11, 99:8–100:1, 101:22–102:14.

Indeed, MPD detectives and supervisors repeatedly confirmed that MPD's written policy does not apply in practice to interrogations like Mr. Montgomery's. *See Biondo v. Kaledia Health*, 935 F.3d 68, 76 n.4 (2d Cir. 2019) (public entity acts with deliberate indifference if it "fail[s] to put in place a policy that would reasonably enable a [person] to obtain the relief guaranteed by [Section 504]"). MPD's 30(b)(6) witness testified that, unless the person is suicidal, "there is nothing the police department . . . is supposed to do differently in terms of interrogating someone when they think a person might have a mental illness." Ex. 17, Deposition of 30(b)(6) Representative Robert Parker ("Parker Dep.") 97:13–98:1; *see also* Ex. 3 at 12. That

---

[21] The mere existence of a written policy does not defeat a deliberate indifference claim. *See Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 275–76 (2d Cir. 2009) (deliberate indifference exists if public entity has an appropriate policy but staff members do not know about it and do not follow it); *Sacchetti*, 344 F. Supp. 3d at 278 (rejecting argument that the mere existence of policies defeats a claim of deliberate indifference). Indeed, were the law otherwise, "the mere placing of an acceptable policy on the books would insulate [public entities] from liability. *See Keating v. Helder*, 2011 WL 3703264, at *5 (W.D. Ark. Aug. 23, 2011).

is because "it's not the officer's responsibility to . . . say, well, this guy here has a mental illness. I can no longer talk to him." Ex. 17, Parker Dep. 98:18–99:1; *see also* Ex. 9, Rice Dep. 64:18–21 (Sergeant Rice was unable to recall policies covering MPD detectives' interactions with mentally-ill persons).[22] MPD detectives said they were not required to accommodate Mr. Montgomery, because they could not "diagnose" his mental illness. As Detective Nasr explained, the detectives "may have discussed maybe something's wrong with the guy. Obviously, you can hear how he was talking . . . . But again, we're not going to be able to diagnose the guy. I'm not a mental doctor." Ex. 2, Nasr Dep. 164:11–21; *see* Ex. 1, Wise Dep. 118:2–9 ("I wouldn't say it is up to me to diagnose mental illness."). The detectives' decision to ignore Mr. Montgomery's crisis reflected the fact that MPD policy, as practiced, did not apply to interrogations.[23]

More broadly, MPD's inaction when faced with Mr. Montgomery's psychosis reflected the "culture of apathy the MPD has for those suffering from mental illness." Ex. 3 at 9. The SolutionPoint+ experts opined that "[t]he level of apathy towards persons suffering from mental health illness" evidenced by the depositions of Detective Wise, Detective Nasr, Sergeant Rice, and MPD's 30(b)(6) witness "is like nothing we have encountered before." *Id.* at 9, 14. That apathy further underscores the District's deliberate indifference.

---

[22] Although the 30(b)(6) witness testified a detective "should" inform a supervisor of suspected mental illness after-the-fact, he conceded that "there's nothing the sergeant can do with the information" at that point. Ex. 17, Parker Dep. 96:19–97:4. Here, Detective Wise informed Sergeant Rice that he thought something was mentally "off" with Mr. Montgomery, but Sergeant Rice "didn't do anything as a result of that knowledge." Ex. 9, Rice Dep. 146:9–16.

[23] Moreover, the District's argument—that Plaintiff advances only a "failure-to-train" theory of deliberate indifference, Mot. Summ. J. at 21—is simply incorrect. Because MPD construes its own policy to not apply to interrogations like the one Mr. Montgomery endured, there is, for all practical purposes, no relevant policy at all.

### D.  MPD Made No Real Effort to Train its Officers Regarding the ADA and Section 504 in General or How to Accommodate Mentally-Ill Individuals in Particular.

The systemic failures at MPD are no surprise, because MPD has made no real effort to train its officers regarding the ADA and Section 504 in general and how to accommodate mentally-ill individuals in particular. Detective Wise—who took the lead on interrogating Mr. Montgomery—admitted he is unfamiliar with the ADA and Section 504; does not know what those two statutes require police officers to do; could not recall receiving ADA or Section 504-related training; and does not even know what accommodating an individual with a disability means. Ex. 1, Wise Dep. 50:16–52:7. Sergeant Rice, Detective Wise's superior, similarly testified that he does not know how the ADA applies to MPD officers' work and has never discussed the ADA, or how to interact with persons with disabilities, with his detectives. Ex. 9, Rice Dep. 73:20–22, 74:1–3; *accord* Ex. 1, Wise Dep. 51:3–5 (Detective Wise testifying his superiors have never discussed the ADA with him). Sergeant Rice was unsure if the ADA applies to interrogations, Ex. 9, Rice Dep. 75:14–19; Detective Nasr suggested it does not, Ex. 2, Nasr Dep. 174:15–18.[24] Lieutenant Robert Alder also could not recall receiving any ADA training and had never heard of Section 504. Ex. 10, Alder Dep. 55:10–21.

Additionally, the detectives and sergeant have not received (or could not recall) training on whether and how to interrogate individuals with disabilities. Ex. 2, Nasr Dep. 26:12–20; Ex. 9, Rice Dep. 35:19–22. Similarly, Lieutenant Alder could not recall any training or guidance given to detectives interrogating individuals with disabilities. Ex. 10, Alder Dep. 27:15–28:7. In sum, these District employees "lacked a basic general awareness of mental illness and how to fulfil their obligation to accommodate it." Ex. 3 at 16.

---

[24] Of course, this Court has already held differently.

This complete failure to train MPD officers with respect to the disability rights statutes, in general, and how to interrogate mentally-ill individuals, in particular, had a predictable result—mentally-ill individuals were treated the same as everyone else. *E.g.*, Ex. 1, Wise Dep. 98:20–99:1 (Wise agreeing that "whether or not someone has a disability," he would "treat them the same as [he] would treat anyone else"); Ex. 10, Alder Dep. 57:4–20, (unable to recall a single instance where a detective treated a mentally-ill person differently due to that illness); *id.* 54:4–8 (unable to recall a single instance where a detective documented that an individual may be mentally ill).

These training failures further underscore the District's deliberate indifference. Courts routinely reject the argument, advanced again here by the District, that a "pattern of similar violations" is required to survive summary judgment on a deliberate indifference claim grounded in a failure to train—especially when a single violation of the law is coupled with additional evidence of inadequate training. At least at this stage, no "pattern" is required. *See, e.g.*, *Russo v. City of Cincinnati*, 953 F.2d 1036, 1047 (6th Cir. 1992); *Thomas v. Cumberland County*, 749 F. 3d 217, 225–26 (3d Cir. 2014); *Young v. City of Providence ex rel. Napolitano*, 404 F.3d 4, 8 (1st Cir. 2005); *Long v. Cty. of Los Angeles*, 442 F.3d 1178, 1188 (9th Cir. 2006); *Allen v. Muskogee, Okl.*, 119 F.3d 837, 844 (10th Cir. 1997). Here, the training was not just "inadequate"—for practical purposes, it was non-existent.

## IV.    The District's Vicarious Liability Argument Readily Fails.

The District ignores the comprehensive evidence showing that District was deliberately indifferent to Mr. Montgomery's rights under the ADA and Section 504. Instead, it launches a misguided attack on one piece of that evidence. The District argues that, even if Detectives Wise and Nasr were deliberately indifferent to his rights—something the District does not contest— "that would not be enough to justify awarding damages against *the District*," because the ADA

and Section 504 "do not permit vicarious liability for damages." Mot. Summ. J. at 16. This Court should reject this flawed argument—just as it did at the motion-to-dismiss stage.

### A.    This Court Should Not Revisit a Legal Issue It Already Has Decided.

This Court should not revisit a flawed argument it already has rejected. "[W]here issues have been resolved at a prior stage in the litigation, based upon principles of judicial economy, courts generally decline to revisit them." *Freeman v. MedStar Health Inc.*, 185 F. Supp. 3d 30, 34–35 (D.D.C. 2016). This principle "rests on the sensible premise that the *same* issue presented a second time in the *same case* in the *same court* should lead to the *same result*." *Berryman-Turner v. District of Columbia*, 233 F. Supp. 3d 26, 35 (D.D.C. 2017), *aff'd*, 720 F. App'x 1 (D.C. Cir. 2018). Courts should only revisit a prior judicial determination if "unusual circumstances" are present, "such as when there is an intervening change in the law or when the previous decision was clearly erroneous and would work a manifest injustice." *Id.*

Here, the Law of the Case is that the District may be held vicariously liable under the ADA and Section 504. In its motion to dismiss, the District argued that Plaintiff could not recover damages, because "the specific acts of the detectives" could not establish the District's deliberate indifference. Mot. to Dismiss at 16. This Court rejected that argument. It first noted that, "in this and other jurisdictions, courts frequently have permitted plaintiffs asserting intentional discrimination to rely on the specific action, or lack of action, taken by police officers or other public-entity personnel in failing to provide reasonable accommodation." Order re Mot. to Dismiss at 20 n.13. This Court also noted that courts in this district have based deliberate indifference on the action or inaction of "MPD officers or other District personnel." *Id.* at 19. Finally, this Court held: "This Court therefore rejects defendants' suggestion that plaintiff cannot rely on the 'specific acts' of Officers Wise and Nasr here." *Id.* at 20 n.13.

Undeterred, the District seeks to resurrect this failed argument on summary judgment, again arguing the deliberate indifference of Officers Wise and Nasr "would not be enough to justify awarding damages against *the District*." Summ. J. Mot. at 16. The District fails to identify any "unusual circumstances" that might justify revisiting this prior ruling. Indeed, its argument centers on the purported application of a Supreme Court decision, *Gebser v. Lago Vista Independent School District*, 524 U.S. 274 (1998), that is over 20 years old and concerned Title IX of the Education Amendments Act of 1972. Summ. J. Mot. at 17. A 20-year-old decision that concerns neither the ADA nor Section 504 is not "an intervening change in the law." And this Court's prior ruling—that the MPD detectives' specific acts could establish the District's deliberate indifference—is not "clearly erroneous," including because it aligns with other decisions in this district and the decisions of all circuit courts that have squarely ruled on this issue. *See* Section IV.B, *infra*. Of course, interpreting the ADA and Section 504 more broadly in order to carry out their purpose of prohibiting discrimination also would not work a manifest injustice—it would promote justice.

### B.   Vicarious Liability Applies Under Title II of the ADA and Section 504.

Even if this Court were inclined to revisit its prior decision, the District's argument readily fails—again. Every circuit court that has squarely considered vicarious liability under Title II of the ADA and Section 504 has rejected the District's position and concluded that public entities are liable for their employees' actions. *See Rosen v. Montgomery Cty. Maryland*, 121 F.3d 154, 157 n.3 (4th Cir. 1997) ("[W]e reject the . . . argument that there is no respondeat superior liability under the ADA . . . . Under the ADA and similar statutes, liability may be imposed on a principal for the statutory violations of its agent."); *T.O. v. Fort Bend Indep. Sch. Dist.*, 2 F.4th 407, 417 (5th Cir. 2021) ("[A] public entity may be held vicariously liable for the acts of its employees under either" the ADA or Section 504); *Duvall v. County of Kitsap,* 260

F.3d 1124, 1141 (9th Cir.2001) (*respondeat superior* applies in Title II claims); *see also Reed v. Columbia St. Mary's Hosp.*, 782 F.3d 331, 337 (7th Cir. 2015) (concluding the actions of hospital staff "permit an inference of intentional discrimination sufficient to support a claim for compensatory damages" under Section 504); *Henrietta D. v. Bloomberg*, 331 F.3d 261, 286 (2d Cir. 2003) (holding state defendants have "supervisory responsibilities" and citing Ninth Circuit precedent on vicarious liability).[25] Not surprisingly, district courts across the country have reached the same conclusion. *See, e.g.*, *Geness v. Pennsylvania*, 503 F. Supp. 3d 318, 339 (W.D. Pa. 2020) (although the Third Circuit has not examined the issue, "every district court judge in our Circuit confronted with this question has determined public entities are vicariously liable for the conduct of their employees under Title II of the Americans with Disabilities Act"); *Est. of Saylor v. Regal Cinemas, Inc.*, 54 F. Supp. 3d 409, 428 (D. Md. 2014) (affirming vicarious liability applies in case alleging that misconduct of specific police officers violated the ADA).

Even courts that have not expressly ruled on the application of vicarious liability under the ADA and Section 504 "frequently have permitted plaintiffs asserting intentional discrimination to rely on the specific action, or lack of action, taken by police officers or other public-entity personnel." Order re Mot. to Dismiss at 20 n.13 (citing *Gorman v. Bartch*, 152 F.3d 907 (8th Cir. 1998) and *J.H. ex rel. J.P. v. Bernalillo County*, 806 F.3d 1255 (10th Cir. 2015)). That is true in this district, as well. *See Pierce*, 128 F. Supp. 3d at 279 (finding deliberate indifference where "[t]he District's employees and contractors knew that [plaintiff] had a hearing disability, and yet they did not undertake an assessment of the accommodations that [plaintiff]

---

[25] The District cites *Liese v. Indian River Ct. Hosp. Dist.*, 701 F.3d 334 (11th Cir. 2012) to support its position, although it concedes that decision did not "conclusively resolv[e] whether vicarious liability is permitted." Summ. J. Mot. at 18. Indeed, in a prior decision, the Eleventh Circuit had determined that vicarious liability *did* apply under Title II of the ADA. *See T.W. ex rel. Wilson v. Sch. Bd. of Seminole Cty., Fla.*, 610 F.3d 588, 604 (11th Cir. 2010) (stating the ADA permits public entities "to be held vicariously liable for" an employee's actions).

might need in order to access prison services"); *Sacchetti*, 344 F. Supp. 3d at 277 (concluding MPD officers' making improper assumptions during an investigation and arrest "easily satisfies" the deliberate indifference standard in case against the District).

Undeterred, the District argues there can be no vicarious liability in light of *Gebser*. *Gebser* is not dispositive—as the Supreme Court itself has noted. *City & Cty. of San Francisco, Calif. v. Sheehan*, 575 U.S. 600, 610 (2015) (the Court has not decided whether a public entity "can be held vicariously liable [under Title II] for money damages for the purposeful or deliberately indifferent conduct of its employees"). And this Court should reject the District's statute-hopping argument that, simply because vicarious liability is unavailable under Title IX, it therefore must be unavailable under Title VI (a question the D.C. Circuit "has not yet addressed," Mot. Summ. J at 17), and thus also must be unavailable under the ADA and Section 504. It is telling that, fifteen years after *Gebser*, the District itself rejected this argument and argued that public entities *could* be held vicariously liable for the deliberate indifference of their employees or agents. *Hunter on behalf of A.H. v. D.C.*, 64 F. Supp. 3d 158, 170 (D.D.C. 2014).

The application of vicarious liability under the ADA and Section 504 has been affirmed for over 40 years, *see, e.g.*, *Patton v. Dumpson*, 498 F. Supp. 933, 942–43 (S.D.N.Y.1980), for well-established reasons the District ignores. Most basically, the ADA and Section 504 impose on public entities "an *affirmative obligation* to make benefits, services, and programs accessible to disabled people." *Pierce*, 128 F. Supp. 3d at 266. In fact, public entities like the District must ensure not only that their employees follow the law but also that third-party contractors to whom they delegate away responsibilities do so as well. *Henrietta*, 331 F.3d at 286 (citing 28 C.F.R. pt. 35, App. A, at 517 (2002)). The absence of vicarious liability would contravene this affirmative obligation, render the ADA and Section 504 toothless, and frustrate the ADA's directive "to

32

provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1).

Resisting this conclusion, the District suggests that, because punitive damages are unavailable under the ADA and Section 504, vicarious liability also must be unavailable— ignoring that "the regulatory scheme which implements § 504 relies heavily upon the idea of vicarious liability" but not punitive damages. *See Bonner v. Lewis*, 857 F.2d 559, 566 (9th Cir. 1988). The District also argues that, although vicarious liability applies under Title I of the ADA, it does not apply under Title II due to textual differences. In its view, because Title I defines "employers" to include an employer's "agent" but Title II does not define "public entity" to include a public entity's "agents," vicarious liability must apply under Title I but not Title II. Summ. J. Mot. at 19. But although Title II does not include "agents" in the definition of "public entity," it defines "public entities" in a similarly broad fashion to include any "instrumentality of a State or States or local government." 42 U.S.C. § 12131(1)(A)-(B). Both definitions are broad, suggesting vicarious liability applies under both Title I and Title II. *See A.K.B. By & Through Silva v. Indep. Sch. Dist. 194*, 2020 WL 1470971 at *12 (D. Minn. Mar. 26, 2020).

The District's crabbed interpretation of the ADA and Section 504 also is untenable in light of the broad obligations those statutes impose on public entities. For example, Title II regulations expressly prohibit public entities like the District from discriminating "directly or through contractual, licensing, or other arrangements," 28 C.F.R. § 35.130(b)(1). That is, under Title II, public entities are responsible for the actions of their agents—at least when those agents are contractors. *See Castle v. Eurofresh, Inc.*, 731 F.3d 901, 910 (9th Cir. 2013) (public entities "are obligated to ensure" their contractors comply with federal laws); *Henrietta*, 331 F.3d at 286 ("All governmental activities of public entities are covered, even if they are carried out by

contractors."); 28 C.F.R. pt. 35, App. A, at 517 (2002) ("For example, a State is obligated by title II to ensure that the services, programs, and activities of a State park inn operated under contract by a private entity are in compliance with title II's requirements."). The District's argument— that it is not liable for the misconduct of its individual employees even though it is liable for the misconduct of its contractors—is nonsensical and must be rejected.

Not surprisingly, the District's argument also is another flip-flop. Although the District now argues Title I cases do not support vicarious liability under Title II, it previously relied on a Title I case in order to argue that vicarious liability *did apply* under Title II.[26]

### C.    Even on the District's Own Terms, Summary Judgment is Inappropriate.

The District's argument fails even assuming vicarious liability does not apply under Title II and Section 504. Even absent vicarious liability, the District is still liable for damages under *Gebser* if an "official" within the District—as opposed to another type of employee—was deliberately indifferent to Mr. Montgomery's rights. *See Sunderland v. Bethesda Hosp., Inc.*, 686 F. App'x 807, 815 (11th Cir. 2017). An "official" is someone who "has authority to decide whether a [person] can access an accommodation and the decision is generally not reviewed by a higher authority." *Id.* An employee is more likely an "official" if there are no policies guiding the provision of accommodations, such that the employee has "complete discretion." *Id.* at 816.

Here, Sergeant Rice—an MPD supervisor—indisputably qualifies as an "official" under the *Gebser* standard. Although Detective Wise told Sergeant Rice (after the fact) that something was "off" with Mr. Montgomery's mental health, neither Sergeant Rice nor anyone else at MPD did anything in response. Ex. 9, Rice Dep. 145:16, 146:12–16.

---

[26] In the *Hunter* litigation, the District cited *DeVito v. Chicgao Park Dist.*, 83 F.3d 878 (7th Cir. 1996), to support its argument that a public entity may be held liable under Title II of the ADA for the actions of its employees and agents. Ex. 18 at 6 n.5. *Devito* was a Title I case.

Detectives Wise and Nasr also qualify as "officials" under *Gebser*, because they had "complete discretion" over whether to accommodate Mr. Montgomery in the interrogations. *See Sunderland*, 686 F. App'x at 816. The detective decides whether or not to stop an interrogation. Ex. 9, Rice Tr. 149:6–7 ("it's [the detective's] call to go forward with the interview"). At least according to MPD homicide detectives and their superiors, there are no MPD polices governing whether and when to grant an accommodation to mentally-ill interrogation suspects. *Id.* at 64:18–21, 123:10–13; Ex. 17, Parker Dep. 104:11–105:2, 112:5–15, 114:15–20, 125:7–11. Although the District's 30(b)(6) witness testified that the detective "should" inform a supervising officer of suspected mental illness after the fact, he conceded that "there's nothing the sergeant can do with the information" at that point. *Id*. at 96:19–22. And in practice, such consultations do not occur. Sergeant Rice, for example, testified that MPD detectives have never consulted him on accommodations in interrogations or even the broader topic of how to accommodate people with disabilities. Ex. 9, Rice Dep. 70:9–20, 74:1–3, 153:1–4. At the least, given these facts, a jury could conclude both Sergeant Rice and the MPD detectives are "officials."

## V.     The District's Proximate-Cause Argument is Baseless—and Dangerous.

The District also argues summary judgment is appropriate because, "even if the District violated the ADA or the Rehabilitation [Act], its violations did not cause Montgomery to be prosecuted or arrested." Summ. J. Mot. at 28. That is not the law.

The District's argument would render the ADA and Section 504—and decades of decisions interpreting those statutes—incomprehensible. As this Court has noted, the ADA and Section 504 apply to "police conduct" writ large, *see* Order re Mot. to Dismiss at 17–18, regardless of whether police have evidence amounting to probable cause. For instance, the two statutes (including their requirement that police officers provide reasonable accommodations to individuals with disabilities) apply to police investigations of criminal conduct—even if those

investigations never lead to an arrest. *Id.* at 16; *Sacchetti*, 344 F. Supp. 3d at 272; *Seremeth v. Board of County Commissioners of Frederick Cty,* 673 F.3d 333, 339 (4th Cir. 2012). The ADA and Section 504 apply during the process of making an arrest. *Sacchetti*, 344 F. Supp. 3d at 272. They apply while an arrestee is being transported from the place of arrest to the police station, *Gorman*, 152 F.3d at 912, and also when officers "handl[e] and transport[]" mentally-ill individuals to a mental health facility, *Hainze v. Richards*, 207 F.3d 795, 802 (5th Cir. 2000). Of course, they also apply during interrogations. Order re Mot. to Dismiss at 16.

In these cases, liability did not turn on the presence of absence of probable cause. Nor is there any indication in the statutory text that probable cause is at all relevant. To argue, as the District does here, that such ADA and Section 504 violations are not actionable unless the plaintiff also can prove the violation caused the plaintiff to be prosecuted or arrested—an extremely high bar that plaintiffs could meet in only the rarest of cases—is to ignore the statutory text, decades of case law, and the broad remedial purpose of the statutes. It also would render the statutes' well-established application to all manner of "police conduct" a dead letter.

The District has offered no support for this novel and dangerous argument, and this Court should reject it.[27] The extent to which the District's violation of Mr. Montgomery's ADA and Section 504 rights underpinned the District's subsequent decision to arrest and prosecute him

---

[27] The District suggests that Mr. Montgomery would have been arrested and prosecuted even absent evidence obtained in his interrogations, and so Plaintiff "cannot demonstrate that [Mr. Montgomery's] prosecution (and concomitant confinement) was 'by reason of' his disability." ECF 53 at 24. This misconstrues the "by reason of" requirement under 42 U.S.C. § 12132, which concerns only whether the discrimination—such as a failure to accommodate Mr. Montgomery during the interrogations—is linked to his disability. *See, e.g.*, *United Spinal Ass'n v. Bd. of Elections in City of New York*, 882 F. Supp. 2d 615, 626 (S.D.N.Y. 2012), *aff'd sub nom. Disabled in Action v. Bd. of Elections in City of New York*, 752 F.3d 189 (2d Cir. 2014) ("to demonstrate that individuals were deprived of an opportunity or benefit or discriminated against 'by reason of' their disabilities," a plaintiff must show defendant "failed to provide . . . reasonable accommodations").

may eventually inform the amount of damages to which Mr. Montgomery is entitled.[28] But such considerations are irrelevant at the summary judgment stage.

## **CONCLUSION**

For the reasons set for above, Plaintiff respectfully requests that the Court deny the District's Motion for Summary Judgment and set this case for trial.

Date: November 17, 2021                    Respectfully submitted,

   */s/ Kobie A. Flowers*
Kobie A. Flowers; Bar No. 991403
BROWN GOLDSTEIN & LEVY, LLP
1717 K Street, NW, Suite 900
Washington, DC 20006
kflowers@browngold.com
Tel: (202) 742-5969
Fax: (202) 742-5948

   */s/ Eve L. Hill*
Eve L. Hill; Bar No. 424896
Jean M. Zachariasiewicz; Bar No. 1019973
BROWN GOLDSTEIN & LEVY, LLP
120 E. Baltimore Street, Suite 2500
Baltimore, MD 21202
ehill@browngold.com
jmz@browngold.com
Tel: (410) 962-1030
Fax: (410) 385-0869

*Counsel for Plaintiff Brandon Montgomery*

---

[28] Prosecutors played lengthy portions of the interrogations at trial and provided jurors with transcripts of those interrogations. *See, e.g.*, Ex. 12, Aug. 8, 2017 Trial Tr. 101:16–25. They did so in order to support their argument that Mr. Montgomery must have committed the murder in part because he "sounds unhinged" at the time of the interrogations. *See id.* 100:17–21.

## CERTIFICATE OF SERVICE

I certify that a copy of this Opposition was served on all counsel of record via ECF.

Dated: November 17, 2021

 _/s/ Jean M. Zachariasiewicz_____
Jean M. Zachariasiewicz