**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**BRANDON MONTGOMERY, as personal representative for the estate of Gary Montgomery,**

  **Plaintiff,**

    v.

**DISTRICT OF COLUMBIA,**

  **Defendant.**

---

Civil Action No. 18-1928 (JDB)

## MEMORANDUM OPINION

Plaintiff Brandon Montgomery brings this lawsuit on behalf of the estate of Gary Montgomery.[1]  Am. Compl. and Jury Demand [ECF No. 48] ("Am. Compl.") ¶ 30.  Gary Montgomery, a mentally disabled man, was arrested in 2012 and charged with the murder of Deoni Jones.  Id. ¶ 1.  After five and a half years of incarceration pending trial, a jury found Montgomery not guilty.  Id.  Montgomery's amended complaint alleges that defendant District of Columbia violated his rights under Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12131–12134, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, by failing to accommodate his disability during the investigation.  Id. ¶¶ 127–55.  The District has moved for summary judgment on both claims.  Def. District of Columbia's Mot. for Summ. J. [ECF No. 53] ("Mot.") at 1.  For the reasons explained below, the Court will deny the District's motion.

---

[1] For convenience, the Court will describe the allegations in Brandon Montgomery's amended complaint as if they were brought by Gary Montgomery himself.

## Background

### I.   Facts

####   A.   Deoni Jones's Murder and Immediate Aftermath

On February 2, 2012, Deoni Jones was fatally stabbed while sitting at a bus stop in Washington, D.C.  Def.'s Reply in Supp. of its Statement of Undisputed Material Facts and Resp. to Pl.'s Statement of Materially Disputed Facts [ECF No. 60-2] ("District's Reply in Supp. of SUMF") ¶ 1.  Homicide Detectives Brian Wise and Hosam Nasr were among the officers who investigated Jones's murder.  Id. ¶ 2.  Wise and Nasr spoke with Attalah Gabriel, a bystander who left the bus stop shortly before Jones was murdered.  Id. ¶ 3.  Gabriel reported noticing a man staring at Jones who had "really big eyes like he was high."  Id. ¶ 4.  Video surveillance reveals that, shortly after Gabriel left the bus stop, Jones walked away as well and was followed by the man.  Id. ¶ 5.  Jones and the man, or someone who looked similar, returned to the bus stop a few minutes later, at which point the man stabbed Jones in the head.  Id.  After being presented with a photo array of nine individuals, Gabriel pointed to a photograph of Montgomery and said that he "look[ed] like" the man she saw at the bus stop.  Id. ¶ 4; Investigative Suppl. Report re: Attalah Gabriel [ECF No. 53-16].[2]

Sakeithia Taylor and Jermaine Jackson were stopped at a nearby traffic light while Jones was attacked.  District's Reply in Supp. of SUMF ¶ 6; Sakeithia Taylor Witness Statement [ECF No. 53-3] at 1.  Taylor and Jackson left their vehicle, and while Taylor tended to Jones, Jackson chased after Jones's murderer.  District's Reply in Supp. of SUMF ¶¶ 6–7.  Jackson caught up to

---

[2] The parties dispute whether Gabriel identified Montgomery as the man at the bus stop or whether Gabriel identified Montgomery merely as someone who resembled that man.  See District's Reply in Supp. of SUMF ¶ 4; see also Investigative Suppl. Report re: Attalah Gabriel (noting Gabriel said that "[t]he only thing differen[t between Montgomery and the man at the bus stop] is the hair may be a little longer in the picture and the eyes were bigger . . . because he was high.").

the murderer, punched him hard enough to make him fall to the ground, and kicked him multiple times.   Incident/Investigation Report re: Jermaine Jackson [ECF No. 53-4].[3]   The murderer managed to escape, and although Jackson chased him, Jackson could not keep up. Incident/Investigation Report re: Jermaine Jackson.   Jackson later described the killer as a "Black Male, 5'9-5'11, 150-160lbs, medium complexion, between 33-40 years old, wearing blue jeans, a black quilted jacket, and a gray hooded sweat shirt underneath the jacket with the hood pulled up." Id.  Jackson also said he believed the suspect may have had a beard and that he was not sure if he would be able to identify him.  Id.  Taylor told the police that the suspect was "black with big wide eyes" and "was wearing a black and white knit hat" as well as "a black jacket."  Sakeithia Taylor Witness Statement at 1.

As part of their investigation, police publicly released a video of a man crossing a street near where the murder took place.[4]  District's Reply in Supp. of SUMF ¶¶ 10–11.  Two tipsters identified Montgomery as the man in the video.  Id.; see Incident/Investigation Report re: Rosalind Tyums [ECF No. 53-5] at 1–2; Investigative Suppl. Report re: Arthur Medley [ECF No. 53-6] at 1.  A third tipster, Michael Harris, initially identified the man in the video as Mark Johnson. Incident/Investigation Report re: Michael Harris [ECF No. 53-7] at 1.  After Wise showed Harris a photograph of Montgomery, however, Harris said "you might be on to something but I don't think [Montgomery] walks that fast."  Id. at 2.  Later, on February 6, Harris spoke with Wise and identified Montgomery as the man in the video.  Id.  During that conversation, Harris also stated that "[Montgomery] is a little off.  Like sometimes I say 'What's up [Montgomery]' and he's fine

---

[3] The investigation report and Montgomery's amended complaint indicate that Jackson offered a recorded statement containing additional detail about Jackson's fight with the killer, Incident/Investigation Report re: Jermaine Jackson; Am. Compl. ¶ 86, including that Jackson "stomped [the killer] in the head at least three to four times, so hard that he knocked the man unconscious," Am. Compl. ¶ 38.

[4] This video footage is different than the footage of the murder discussed earlier.  District's Reply in Supp. of SUMF ¶ 10.

but sometimes I say what's up and he's like 'the FBI is watching me. I turned my TV off'. You never know what you're going to get with him." Id.

    B.  <u>Wise and Nasr's Investigation of Montgomery</u>

    Wise and Nasr first spoke with Montgomery on February 4. District's Reply in Supp. of SUMF ¶ 17. At that time, Montgomery was wearing a light brown jacket, khaki pants, and white tennis shoes.[5] Am. Compl. ¶¶ 68, 71; Video of Feb. 4, 2012 Interrogation [ECF No. 56-24].[6] Montgomery told the detectives that he had been wearing the same clothes for about four days, meaning they would have been the clothes he was wearing on the day Jones was murdered.[7] Am. Compl. ¶ 70; Feb. 4, 2012 Interrogation Tr. [ECF No. 56-15] at 10:3–6. Montgomery had some facial hair, but his face did not show obvious signs of bruising that he alleges would have been apparent had he been the man who fought with Jackson. Am. Compl. ¶¶ 38–43. In response to questions from Wise, Montgomery stated that he was "55 years young," 6'0"–6'2", and 157–58 pounds. Feb. 4, 2012 Interrogation Tr. at 6:3–7:2. The detectives and Montgomery also discussed Montgomery's significant limp, caused by falling off a ladder around a year prior to the interrogation. Id. at 7:10–8:13.

    Montgomery had a history of mental health issues and suffered from schizophrenia. District's Reply in Supp. of SUMF ¶ 22; Def.'s Resp. to Pl.'s Statement of Materially Disputed Facts [ECF No. 60-3] ("District's Resp. to Montgomery's Statement of Materially Disputed Facts") ¶ 38; Am. Compl. ¶ 104. Montgomery alleges he "was experiencing severe psychosis"

---

    [5] The record suggests that Montgomery may also have been wearing a blue jacket at the time of his interrogations. Aff. in Supp. of Arrest Warrant [ECF No. 53-1] at 3.

    [6] Montgomery filed two video excerpts as exhibits to his opposition to the District's summary judgment motion. Video of Feb. 4, 2012 Interrogation [ECF No. 56-24]; Video of Feb. 10, 2012 Interrogation [ECF No. 56-25]. These exhibits are placeholders; Montgomery shared the actual videos with the Court and the District on November 18, 2021 via email. See Notice Letter to the Ct. re Video Exs. [ECF No. 57] at 1.

    [7] Montgomery was homeless in February 2012. Pl.'s Opp'n to Def.'s Mot. for Summ. J. [ECF No. 56] at 1; Feb. 4, 2012 Interrogation Tr. at 8:16–18.

that was obvious at the time of his interrogation.  Am. Compl. ¶ 103; see Pl.'s Opp'n to Mot. [ECF

No. 56] ("Opp'n") at 11–18.  He points to the following exchange from that interrogation as

illustrative of his clear mental health needs:

> Wise:  Well,  tell  me  what  happened  at  the  bus  stop.  .  .  .
> Montgomery: In the process we're goin' (inaudible) this whole (inaudible) man,
> you know, I woulda been stop right there, you know, by the decency, you know.
> This, they know, this I did, you know, dead, honestly, you know.  Cause I'm come,
> you know, come across things you know, in that order before.  And um, the outcome
> pretty timely gets through man, I mean, dead, you know?  Uh, it – it wasn't too
> much I could do like around the . . . four, you know, the end a wherever it was that
> was gonna be because entirely, entirely off from the way of oral hydrates and that's
> come to (inaudible) and a man is, you know, a man's like is, like I said, victimized.
> You know the wages of sin is death and that's what I woulda got, you know.  And
> that's victimized, you know.  A smoker.  In the process of goin' – all are victimized
> when you're goin', you know, in the fall of entirely, you see.  And that would be,
> like I said, (inaudible).  I mean, I wouldn't be able to even talk to you, be what a
> victim is.  Depends on what type a victim but somethin's happened to somebody
> would be the definition of the term victim.  You know.  Uh, a bit or beginnin' of
> some type a thing or the whole failure, that you know, victimize, the whole
> precedence of someone.  And that woulda been, you know, uh, my outcome.  To
> be anything.  To be anything.  You know.  And was startin' to go that way but that's
> when this whole place, cause it's only the beginnin', what's here and then
> (inaudible) others, and once, like I said, a person sees, like – it's like a backstop on
> a baseball field.  Sees the whole impetus, you know, of uh, what the – what the
> world is – is (inaudible) trans – you know – transferrin' to anything, transmittin' –
> the person knows he dies on that, um, that date.  I mean, I talk to so many people
> (inaudible), you know, they just go right – right where it is they are.

Opp'n at 15–16 (quoting Feb. 4, 2012 Interrogation Tr. at 44:15–46:6).

In later depositions, Wise and Nasr acknowledged that it could be difficult to communicate

with Montgomery.  E.g., Brian Wise Dep. Tr. [ECF No. 56-3] ("Wise Dep. Tr.") at 205:20–22 ("I

think sometimes I wasn't able to make out what he – the point he was trying to get across.");

Hosam Nasr Dep. Tr. [ECF No. 56-4] ("Nasr Dep. Tr.") at 151:10–152:8 ("I remember at the

points in the interview . . . his answers might've become a little nonsensical, a little – it seemed

like maybe he was putting on an act or something.").  Wise and Nasr's supervisor, Sergeant Kevin

Rice, also testified that "at some point," Wise told Rice that he "thought something was off

mentally with Mr. Montgomery." Kevin Rice Dep. Tr. [ECF No. 56-11] ("Rice Dep. Tr.") at 146:9–12. During the February 4 interrogation, Wise asked Montgomery if he had "ever been diagnosed with mental" health issues, Feb. 4, 2012 Interrogation Tr. at 119:19–20, if he had ever seen a professional psychiatrist, id. at 120:2–4, and if he "believe[d] that he had any type of mental issues," id. at 120:10–11. Montgomery generally denied needing mental help, but his denials were not always emphatic. E.g., id. at 120:15–19 ("Montgomery: If I start talkin' [to] myself I'll go [to a psychiatrist.] Wise: If you did, but do you? Montgomery: I don't think I do right now, yeah."). When asked about how often Wise asked suspects if they had been diagnosed with mental health issues, Wise responded, "I wouldn't say it is a common practice." Wise Dep. Tr. at 217: 6–9. The District does not dispute that Wise and Nasr suspected Montgomery might have been mentally ill at the time of the February 4 interrogation or that Wise and Nasr did not offer Montgomery any accommodations. District's Resp. to Montgomery's Statement of Materially Disputed Facts ¶¶ 53–54, 56.

Montgomery made incriminating statements during the February 4 interrogation. District's Reply in Supp. of SUMF ¶ 18. He admitted to being the person in the video the police released to the public, Incident/Investigation Report re: Gary Montgomery [ECF No. 53-9], stated he "crushed" the woman at the bus stop, Feb. 4, 2012 Interrogation Tr. at 200:11, and described a knife he lost using adjectives that, arguably, could also apply to the knife used to kill Jones, compare Feb. 4, 2012 Interrogation Tr. at 105:9–12 ("[My knife] had like a white handle and grey . . . ."), with Photo of Murder Weapon [ECF No. 53-18] (depicting a silver knife). Montgomery disputes how incriminating his statements actually were, District's Reply in Supp. of SUMF ¶ 18,[8]

---

[8] For instance, Montgomery argues that his statement that he "crushed" Jones was a reference to sexual relations, not murder. District's Reply in Supp. of SUMF ¶ 18; see also Feb. 4, 2012 Interrogation Tr. at 200:11–201:2, 215:3–5 (containing Montgomery's statements that he "crushed" Jones with "a regular, regular pipe, know what I mean" and killed Jones by having "contact with her beneath my waist").

but more importantly for this motion's purposes, Montgomery alleges that Wise and Nasr "used coercive and deceptive interrogation techniques—which should not be used on the mentally ill— in order to elicit statements from him," District's Reply in Supp. of SUMF ¶ 18.  In particular, Montgomery alleges that Wise "exploited Mr. Montgomery's hyper-religiosity."  District's Resp. to Montgomery's Statement of Materially Disputed Facts ¶ 94.  For example, Wise had Montgomery read a religious passage aloud two times, Feb. 4, 2012 Interrogation Tr. at 19:15–21, 383:13–21, said that Montgomery had "a devil in" him because he was lying, id. at 47:1–17, 386:14–18, and told Montgomery that Wise was "a soldier of God" that he should not lie to, id. at 61:5–15.  The District does not dispute that Montgomery's "mental illness and psychotic symptoms made him more susceptible to coercive or deceptive interview tactics and more likely to acquiesce and agree to whatever the detectives said."  District's Resp. to Montgomery's Statement of Materially Disputed Facts ¶ 89.

After the interrogation, Wise and Nasr took Montgomery to the bus stop where Jones was killed, and Montgomery admitted to seeing her at the bus stop on the night of the murder. Incident/Investigation Report re: Gary Montgomery.  The government then sought a warrant for Montgomery's arrest.  District's Reply in Supp. of SUMF ¶ 15.  In support of the warrant application, the government submitted an affidavit that did not contain the incriminating statements Montgomery made during the interrogation and subsequent visit to the bus stop. Id. ¶ 20; see also Aff. in Supp. of Arrest Warrant [ECF No. 53-1].  A D.C. Superior Court judge approved the warrant on February 10.  District's Reply in Supp. of SUMF ¶ 16.

The same day, Montgomery was arrested and interrogated again.  District's Reply in Supp. of SUMF ¶ 16.  The majority of the first 20 pages of the transcript of Montgomery's February 10 interrogation appears to consist of Montgomery ranting to himself and insulting himself (or voices

in his head) using expletives and other harsh language.  Feb. 10, 2012 Interrogation Tr. [ECF No. 56-16] at 3:5–17:22.  Montgomery's rants stop when an officer enters the interview room and resume when he is alone again.  E.g., id. at 3:5–4:3, 44:3–20.  In this second interrogation, Wise asked Montgomery additional questions about Jones's murder, including how Montgomery felt about Jones's gender identity.  Id. at 46:6–48:7; see also Incident/Investigation Report re: Attalah Gabriel [ECF No. 53-2] at 2 (noting Jones was transgender).  Montgomery said that Jones's gender identity did not bother him.  Feb. 10, 2012 Interrogation Tr. at 48:2–7.

     C.  Post-Arrest Proceedings

After his arrest on February 10, 2012, various officials assessed Montgomery's mental and physical health as part of the intake process at the D.C. Jail.  District's Reply in Supp. of SUMF ¶ 22; see also Montgomery Intake Report [ECF No. 53-11].  Montgomery was asked, among other things, whether he had previously received or was currently receiving mental health services.  District's Reply in Supp. of SUMF ¶ 23; Montgomery Intake Report at 5–6.  The report indicates that Montgomery stated he was not currently receiving mental health services but had in the past.  Montgomery Intake Report at 5–6; see also id. at 8 (indicating that Montgomery's psychiatric profile was "abnormal" and that he had a "depressed affect").  Montgomery also spoke with a social worker, who reported that Montgomery had a history of treatment for schizoaffective disorder but that he was not currently suffering from any hallucinations or delusions.  District's Reply in Supp. of SUMF ¶ 24; Montgomery Intake Report at 2–3.

Montgomery was charged with second degree murder on February 11.  District's Reply in Supp. of SUMF ¶ 21; accord D.C. Docket No. 2012 CF1 002614 [ECF No. 53-10] ("D.C. Docket") at 1.  On February 23, Montgomery's preliminary hearing was held before the D.C. Superior Court.  District's Reply in Supp. of SUMF ¶ 25; accord D.C. Docket at 2.  At that hearing, Nasr testified

about the inculpatory statements Montgomery made during his interrogations, Preliminary Hr'g Tr. [ECF No. 53-12] at 4:5–14:2, but the government stated that, "in general, [it was] not relying on [Montgomery's] pre-arrest statement as the affidavit clearly does not," id. at 12:24–13:1; accord District's Reply in Supp. of SUMF ¶ 27.  After considering the evidence, the court concluded that it was "satisfied that there [was] probable cause to believe" Montgomery murdered Jones. Preliminary Hr'g Tr. at 67:10–17; accord District's Reply in Supp. of SUMF ¶ 28.  In support of its conclusion, the court referenced inculpatory statements Montgomery made during his interrogations, but the court also said these statements were not critical to the court's decision. Preliminary Hr'g Tr. at 68:10–17.

For the next five years, there was a dispute as to Montgomery's competency to stand trial, and he was confined at St. Elizabeth's Hospital.  District's Reply in Supp. of SUMF ¶ 30. Montgomery argues that his extended incarceration "exacerbated his mental illness and impeded his functional life skills."  District's Resp. to Montgomery's Statement of Materially Disputed Facts ¶ 103.  Montgomery's amended complaint also alleges that the District ignored DNA evidence indicating someone else killed Jones, Am. Compl. ¶¶ 10–12, and failed to disclose several key pieces of exculpatory evidence until shortly before trial, id. ¶¶ 75–86.  This exculpatory evidence included: Jackson's recorded statement indicating that Jones's killer could run very quickly, was wearing different clothes than Montgomery, and would have had visible bruises at the time of Montgomery's interrogations, id. ¶¶ 32–41, 65–66, 68, 85–86; video footage depicting a man matching Jackson's description of the murderer running from the bus stop around the time Jones was killed, id. ¶¶ 52–56, 72–73, 85; and evidence implicating Mark Johnson as the murderer, id. ¶¶ 75–81.  According to Montgomery, "[t]he [District] never looked beyond the 'ready-made' suspect, despite compelling evidence that [he] was not the person responsible for Ms. Jones'

murder." Id. ¶ 12.  Montgomery was ultimately tried and acquitted.  District's Reply in Supp. of SUMF ¶ 30.

## II.  Procedural History

Montgomery filed suit against the District, Wise, Nasr, and unnamed officers in August 2018.  Compl. and Jury Demand [ECF No. 1] at 39.  The complaint alleged that Montgomery was the victim of a civil conspiracy (Count I), malicious prosecution (Counts II and V), unconstitutional coercion (Count III), and unconstitutional suppression of material exculpatory evidence (Count IV).  Id. ¶¶ 132–57.  Montgomery also claimed that the District failed to adequately supervise and train its officers (Counts VI and VII) and violated Montgomery's rights under the ADA and Section 504 of the Rehabilitation Act (Counts VIII and IX).  Id. ¶¶ 158–199.

Defendants moved to dismiss portions of Montgomery's complaint in October 2018.  See generally Mem. of P. & A. in Supp. of Mot. for Partial Dismissal of Compl. [ECF No. 10] ("Mem. in Supp. of Mot. to Dismiss").  They argued that Montgomery's claim regarding unconstitutional suppression of material exculpatory evidence should be dismissed because Montgomery was acquitted at trial and there is no right to the presentation of exculpatory evidence before a grand jury or at a pretrial detainment hearing.  Id. at 5–6.  Defendants also asserted that Montgomery's failure-to-train claim should be dismissed because Montgomery failed to establish that the District's unconstitutional customs, practices, and policies resulted in violations of his constitutional rights.  Id. at 8–11.  Finally, defendants argued that Montgomery's ADA and Rehabilitation Act claims should be dismissed because Title II of the ADA does not require accommodating mental disabilities during a police investigation.  Id. at 11–14.

The Court granted defendants' motion in part in August 2019.  Montgomery v. Dist. of Columbia ("Montgomery I"), Civ. A. No. 18-1928 (JDB), 2019 WL 3557369, at *1 (D.D.C. Aug.

5, 2019).  The Court dismissed Montgomery's suppression of exculpatory evidence claim since Montgomery had not demonstrated that there is a clearly established right to receive exculpatory evidence prior to a preliminary detention hearing.  Id. at *5.  The Court also dismissed Montgomery's failure-to-train claim against the District because the complaint did not contain sufficient material to establish that the District was deliberately indifferent to the consequences of not training its officers to avoid the misconduct Wise and Nasr allegedly committed.  Id. at *7 ("The complaint contains only generalized allegations that Officers Wise and Nasr are guilty of engaging in illegal conduct . . . coupled with the bald assertion that the District 'failed to adequately . . . train . . . [its] employees.'" (alteration in original) (quoting Compl. [ECF No. 1] ¶ 168)).

The Court reached a different conclusion with respect to Montgomery's ADA and Rehabilitation Act claims.  After carefully reviewing the ADA's statutory language, Montgomery I, 2019 WL 3557369, at *8, relevant case law, id., and the ADA's purpose, id. at *9, the Court concluded that Title II of the ADA—and thus, Section 504 of the Rehabilitation Act as well—can apply in the arrest and interrogation contexts, id.  The Court also held that Montgomery had adequately alleged intentional discrimination under those statutes.  Id.  To demonstrate intentional discrimination under Title II and Section 504, Montgomery needed to establish that the District was deliberately indifferent to the violation of his federally protected rights, and "[c]ourts in this district have found that standard satisfied where [Metropolitan Police Department ('MPD')] officers or other District personnel were allegedly aware that a suspect or arrestee had a disability, but nevertheless failed to assess whether accommodations were necessary, or to provide those accommodations."  Id.; see also id. at *9 n.13 (noting that a plaintiff need not rely on a public entity's policies and practices to establish deliberate indifference because "courts frequently have permitted plaintiffs asserting intentional discrimination to rely on the specific action, or lack of

11

action, taken by police officers or other public-entity personnel in failing to provide reasonable accommodation"). Montgomery met this standard by alleging that Wise and Nasr not only failed to assess whether he needed an accommodation, but also willfully took advantage of his disability to elicit incriminating statements. Id. at *9.

In May 2021, Montgomery sought leave to dismiss the allegations against the individual officer defendants and file an amended complaint. Mot. to Dismiss Individual Defs. & Consent Mot. to Amend [ECF No. 46]. The Court granted this request, Order, May 27, 2021 [ECF No. 47], and Montgomery filed the amended complaint against the District on May 27, 2021, see generally Am. Compl. The amended complaint contains two claims: that the District violated Montgomery's rights under Title II of the ADA and Section 504 of the Rehabilitation Act by failing to accommodate his disability during his two interrogations. Am. Compl. ¶¶ 127–55. The District moved for summary judgment on September 27, 2021. Mot. at 2.

## Legal Standards

To prevail on a motion for summary judgment, the movant "must show that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law." Citizens for Resp. & Ethics in Wash. v. U.S. Postal Serv., Civ. A. No. 20-2927 (JDB), 2021 WL 3662843, at *3 (D.D.C. Aug. 17, 2021); accord Fed. R. Civ. P. 56(a). "A fact is 'material' if a dispute over it might affect the outcome of a suit under governing law . . . ." Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006) (citation omitted). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

When determining if there is a genuine dispute sufficient to preclude summary judgment, the Court must accept the nonmovant's evidence as true and draw all justifiable inferences in his

favor.  Anderson, 477 U.S. at 255; see also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (noting that the party seeking summary judgment "always bears the initial responsibility of" demonstrating the absence of a genuine dispute of material fact).  But a party opposing a motion for summary judgment "may not rest upon . . . mere allegations or denials [and instead] must set forth specific facts showing that there is a genuine issue for trial."  Anderson, 477 U.S. at 248 (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288 (1968)).  The nonmoving party "must establish more than the 'mere existence of a scintilla of evidence' in support of its position," Smith v. Ergo Sols., LLC, Civ. A. No. 14-382 (JDB), 2019 WL 147718, at *6 (D.D.C. Jan. 9, 2019) (quoting Anderson, 477 U.S. at 252), and if the nonmovant's evidence is "merely colorable, or is not significantly probative, summary judgment may be granted," Anderson, 477 U.S. at 249–50 (citations omitted).

## Analysis

The District raises four arguments in support of its motion.  First, the District asks the Court to reconsider its ruling that the ADA and Rehabilitation Act can apply to police investigations. Mem. of P. & A. in Supp. of Mot. [ECF No. 53] ("Mem. in Supp. of Mot.") at 7.  Second, the District claims that even if those statutes do apply to Montgomery's interrogations, the District did not violate them because Montgomery did not require an accommodation, and, even if he did, the mental health screening Montgomery received as part of the intake process at the D.C. Jail was sufficient.  Id. at 8–10.  Third, the District argues that Montgomery has failed to show that the District, as opposed to Wise and Nasr, intentionally discriminated against him under the ADA and Rehabilitation Act.  Id. at 11–21.  Finally, the District contends that, because there was ample evidence that Montgomery murdered Jones even without considering the inculpatory statements he made during his interrogations, the District's alleged violation of Montgomery's rights did not

cause him any injury.  Id. at 21–26.   The Court rejects each of the District's arguments for the reasons discussed below.

I.      **Title II and Section 504 Apply to Police Interrogations**

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  Section 504 of the Rehabilitation Act similarly provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or . . . conducted by any Executive agency or by the United States Postal Service."  29 U.S.C. § 794(a). "The ADA is 'directly patterned on the Rehabilitation Act,'" and the two statues are often analyzed interchangeably.  Montgomery I, 2019 WL 3557369, at *7 (quoting Adams v. Rice, 531 F.3d 936, 948 (D.C. Cir. 2008)); accord Arthur v. Dist. of Columbia Hous. Auth., No. 18-cv-2037 (DLF), 2020 WL 1821111, at *10 (D.D.C. Apr. 11, 2020).

In the memorandum in support of its partial motion to dismiss, the District argued that "because police interrogation of a suspect does not provide any benefit to Montgomery, neither Title II nor § 504 applies to the police interrogation here."  Mem. in Supp. of Mot. to Dismiss at 12.  In the memorandum in support of its summary judgment motion, "[t]he District incorporates" these arguments and cursorily asks the Court to reconsider its prior holding.  Mem. in Supp. of Mot. at 7.   The District does not point to any change in facts or law that would justify reconsideration, and the only new case the District cites in support of its request is a Fourth Circuit

case from over 20 years ago.  See id. (citing Rosen v. Montgomery Cnty., 121 F.3d 154, 157–58 (4th Cir. 1997) (questioning whether the ADA applies to arrests)).

But as the Court explained in its prior opinion, "[e]very court of appeals to have considered the question has found that Title II applies to police conduct."  Montgomery I, 2019 WL 3557369, at *8 (collecting cases); see also Seremeth v. Bd. of Cnty. Comm'rs Frederick Cnty., 673 F.3d 333, 337–38 (4th Cir. 2012) (explicitly narrowing Rosen's holding and concluding that "the ADA applies to police interrogations").  Part of the reason for this consensus is that "the statutory language of Title II establishes two separate circumstances under which a qualified individual with a disability might have a claim against a public entity."  Montgomery I, 2019 WL 3557369, at *8.  The individual can be "excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132 (emphasis added).  The statute "is framed in the alternative," and the Court need not conclude that an interrogation constitutes a service, program, or activity that benefits a suspect to conclude that interrogations must be conducted in a non-discriminatory manner.  Haberle v. Troxell, 885 F.3d 170, 180 (3d Cir. 2018).[9]

In short, other than pointing to a case it could have cited in its original motion and that has been undermined by later precedent, the District offers no explanation for why the Court should overturn its prior ruling.  The Court will accordingly deny the District's request for reconsideration and adhere to its prior conclusion that "a plaintiff may plausibly state a claim 'under Title II of the

_____

[9] The Court notes that there is substantial support for the view that arrests and similar police activities do fit within Title II's definition of a public service, program, or activity.  E.g., Seremeth, 673 F.3d at 338–39; see also Haberle, 885 F.3d at 180 ("Persuasive precedent indicates that the ADA's reference to 'the services, programs, and activities of a public entity' should likewise be interpreted broadly 'to encompass virtually everything that a public entity does.'" (citations omitted) (cleaned up)); cf. Pa. Dep't of Corrs. v. Yeskey, 524 U.S. 206, 210–11 (1998) (rejecting argument that Title II does not apply to state prisoners "because state prisons do not provide prisoners with 'benefits' of 'programs, services, or activities' as those terms are ordinarily understood").  But the Court did not resolve this question in its prior Memorandum Opinion and need not do so now.

ADA against the MPD for failure to accommodate [a plaintiff's] disabilities,' including an obvious 'mental illness,' during and after arrest."[10] Montgomery I, 2019 WL 3557369, at *8 (alteration in original) (quoting Sacchetti v. Gallaudet Univ. ("Sacchetti I"), 181 F. Supp. 3d 107, 128–30 (D.D.C. 2016)).

## II.    A Reasonable Jury Could Find that Montgomery's Interrogations Violated Title II and Section 504

To state a claim under Title II and Section 504, "a claimant must allege sufficient facts to establish that (1) he is a qualified individual with a disability[;] (2) a public entity excluded him from participation in or denied him the benefits of the entity's services, programs, or activities, or subjected him to discrimination[;] and (3) the public entity discriminated against him by reason of the disability."[11]  Montgomery I, 2019 WL 3557369, at *8 (footnote omitted) (citing Pierce v. Dist. of Columbia, 128 F. Supp. 3d 250, 267 (D.D.C. 2015)); accord Am. Council of the Blind v. Paulson, 525 F.3d 1256, 1266 (D.C. Cir. 2008) (articulating a similar test under the Rehabilitation Act).  Title II and Section 504 "define a state agency's failure to make reasonable accommodations as a form of disability-based discrimination."  Patten v. Dist. of Columbia, 9 F.4th 921, 928 (D.C. Cir. 2021).

The District makes two arguments in support of its claim that Montgomery's interrogations did not violate Title II and Section 504.  The District briefly argues that Montgomery did not need any accommodation because he "faced no obstacle that prevented him from accessing the government program or benefit at issue, to wit police interviews during a homicide investigation." Mem. in Supp. of Mot. at 9–10.  The District also argues at length that the mental screening

---

[10] The Court recognizes that the terms "mental illness" and "mental disability" are overlapping but not identical.

[11] Because the Rehabilitation Act provides that a qualified individual shall not be discriminated against "solely by reason of her or his disability, 29 U.S.C. § 794(a), Section 504 claims must satisfy a slightly more strenuous causation standard than Title II claims, see Alston v. Dist. of Columbia, 561 F. Supp. 2d 29, 38–39 (D.D.C. 2008).

Montgomery received as part of the intake process at the D.C. Jail satisfied any duty the District had to accommodate Montgomery's disability.  Id. at 8–11.  Viewing the record currently before the Court in the light most favorable to Montgomery, the Court concludes that summary judgment is not appropriate on either ground at this time.

First, there is enough evidence for a reasonable jury to conclude that Montgomery's mental health needs required the District to offer him a reasonable accommodation.  The District does not dispute that Montgomery had a mental disability: schizophrenia.  District's Resp. to Montgomery's Statement of Materially Disputed Facts ¶ 38.  The District was therefore obligated to reasonably accommodate Montgomery's mental disability if it prevented him from "meaningful[ly] access[ing]" his interrogations.  Alexander v. Choate, 469 U.S. 287, 301–02 (1985); see also Sacchetti v. Gallaudet Univ. ("Sacchetti II"), 344 F. Supp. 3d 233, 273–74 (D.D.C. 2018) (discussing Title II's implementing regulations' requirement that public entities "make reasonable modifications . . . necessary to avoid discrimination" and stating that "an accommodation is 'necessary' when it is required to provide 'increased access to a public service'" (citations omitted)).[12]

The District argues that Montgomery's mental disability did not prevent him from meaningfully accessing his interrogation because, "[w]hile some of Montgomery's responses during the interviews were non sequiturs, most of [the] time he was capable of understanding what was being asked and responding to direct questions."  Mem. in Supp. of Mot. at 10.  In particular, the District points to the beginning of Montgomery's first interrogation where he was able to answer basic questions about topics such as his name, age, and social security number.  Id. (citing

---

[12] Title II's requirement that public entities make "reasonable modifications" is interchangeable with the more familiar "reasonable accommodation" standard.  See Chenari v. George Wash. Univ., 847 F.3d 740, 747 (D.C. Cir. 2017); Hunter ex rel. A.H. v. Dist. of Columbia, 64 F. Supp. 3d 158, 167 n.6 (D.D.C. 2014).

Feb. 4, 2012 Interrogation Tr. [ECF No. 53-19] at 4:1–7:22).[13]   The District also claims that "because Montgomery was not facing any type of mental health crisis during the February 4 or February 10, 2012 interviews, MPD was under no obligation to accommodate his mental illness." Id. at 7.

The fact that Montgomery was able to directly answer certain questions does support finding that he did not require an accommodation.  But there is plainly evidence in the record pointing to an opposite conclusion.  Many pages of the transcripts of Montgomery's interrogations consist of Montgomery angrily ranting at himself or voices in his head.  E.g., Feb. 4, 2012 Interrogation Tr. at 221:21–223:2; Feb. 10, 2012 Interrogation Tr. at 3:5–17:22.  A jury could conclude that several of Montgomery's answers were not simply non-responsive, but instead deeply convoluted and erratic.  E.g., Feb. 4, 2012 Interrogation Tr. at 31:2–32:6, 44:15–46:6, 223:14–225:16.  Indeed, Wise and Nasr themselves suspected Montgomery could be mentally ill because of the answers he gave in his interrogations.  E.g., Wise Dep. Tr. at 214:10–15, 216:13–217:13, 218:14–17; Nasr Dep. Tr. at 151:4–152:8, 164:6–18; District's Resp. to Montgomery's Statement of Materially Disputed Facts ¶ 53.  A tipster also informed Wise between Montgomery's first and second interrogations that Montgomery was "a little off."  Incident/Investigation Report re: Michael Harris at 2.

In addition, Montgomery has submitted two expert reports in his favor.  The first of these reports is from Jesus (Jesse) Trevino and Joseph Smarro, founders and chief executives of SolutionPoint+, LLC, "a law enforcement training company that provides policy evaluation, mental/behavioral health training, and organizational counseling."  Am. Expert Op. Report [ECF

---

[13] The District and Montgomery attached different excerpts of the February 4 interrogation as exhibits to their briefs.  The Court has been citing the excerpts that Montgomery attached as an exhibit to his opposition because it includes roughly ten times as many pages as the District's exhibit.  But Montgomery's exhibit does not include all material from pages four to seven, so one must review the District's exhibit to review the entirety of that portion.

No. 56-5] ("Trevino and Smarro Expert Report") at 2.  The second report is from Kenneth Stefano, "owner and President of Kenneth Stefano & Associates, a multidisciplinary psychoeducational testing, psychotherapy, and educational consulting practice."  Am. Expert Op. Report [ECF No. 56-8] ("Stefano Expert Report") at 2.  Both reports support finding that Montgomery needed an accommodation due to the severity of his mental disability.  See Trevino and Smarro Expert Report at 7–8 ("Mr. Montgomery was responding to internal stimuli, experiencing hallucinations, responding incongruently to questions, had flights of ideas, was consistently agreeable with the detectives without context, and exhibited bizarre socially unacceptable behavior."); Stefano Expert Report at 2 ("Mr. Gary Montgomery . . . was not provided with appropriate and necessary accommodations for his mental disability by the . . . detectives who interrogated him.").  And although the Court does not endorse the District's view that it must accommodate mental disabilities only when they trigger a "mental health crisis,"[14] see Mem. in Supp. of Mot. at 7, Montgomery's experts concluded that, in fact, he "was obviously experiencing a mental health crisis," Trevino and Smarro Expert Report at 2.[15]  Construing the evidence in its entirety and viewing it in Montgomery's favor, the Court concludes that a reasonable jury could find that

---

[14] As discussed above, the District must offer an accommodation when an individual's disability prevents them from meaningfully accessing the program at issue.  See Alexander, 469 U.S. at 301–02; see also Sacchetti II, 344 F. Supp. 3d at 273–74 (noting the meaningful access standard and similar formulations).  The District has cited no authority suggesting this standard is met with regards to mental disabilities only when the disability is so severe it creates a crisis.

[15] The District disputes this claim by pointing to a portion of Trevino's deposition transcript where he described a mental health crisis as "a distressing event that causes instability or danger and is destructive in society." Jesse Trevino Dep. Tr. [ECF No. 53-14] ("Trevino Dep. Tr.") at 152:3–9.  According to the District, "nothing in the record suggests Montgomery was dangerous, or destructive during the interviews."  Mem. in Supp. of Mot. at 11.  But there is evidence that Montgomery's mental disability was severe enough to be destructive to him, see Trevino and Smarro Expert Report at 8 (concluding that Montgomery "exhibited bizarre socially unacceptable behavior"); see also Trevino Dep. Tr. at 152:9–12 ("[A mental health crisis] could be deemed destructive by the person's family, friends, or themselves, or people in [the] immediate area."), and Trevino and Smarro's expert report repeatedly states that Montgomery fit the definition of an individual experiencing a mental health crisis, e.g., Trevino and Smarro Expert Report at 2, 7–9.  Regardless, Montgomery does not need to establish he was experiencing a mental health crisis to establish he was entitled to an accommodation.

Montgomery required an accommodation and that this need was obvious.  Cf. Pierce, 128 F. Supp. 3d at 270 (noting that a request for an accommodation is not necessary where the need is obvious).

The District puts more emphasis on its other argument—that the mental screening Montgomery received as part of the intake process at the D.C. Jail after his interrogations satisfied any duty the District had to offer an accommodation.  Mem. in Supp. of Mot. at 8–11.  In support, the District points to the Trevino and Smarro expert report and Trevino deposition.  Id.  In their report, Trevino and Smarro list five ways Wise and Nasr could have reasonably accommodated Montgomery's disability: (1) stopping the interrogation and calling for an officer trained in crisis intervention, (2) calling for an officer trained in crisis intervention after the interrogation, (3) documenting Montgomery's symptoms and notifying decision-makers during the interrogation or arrest process, (4) notifying the local mental health authority and calling for a mobile crisis team, or (5) notifying the jail during the booking process of Montgomery's symptoms.  Trevino and Smarro Expert Report at 15–16.  During his deposition, Trevino was also asked whether "if [the officers] had done any one of these things, it would've satisfied their duty to accommodate Montgomery," and he answered, "[i]n my opinion, yes.  Jesse Trevino Dep. Tr. [ECF No. 56-6] ("Trevino Dep. Tr.") at 144:8–11.  According to the District, this testimony requires the Court to enter summary judgment because, by screening Montgomery's mental and physical health prior to his intake at the D.C. Jail, the District substantively performed Trevino and Smarro's fifth proposed accommodation, and therefore "the District appropriately accommodated Montgomery's mental illness according to [his] own experts."  Mem. in Supp. of Mot. at 9.  The Court disagrees for two reasons.

First, contrary to the District's suggestion, the provision of accommodations to Montgomery after his interrogation does not absolve the District of its responsibility to provide

accommodations during the interrogation.  As the court explained in <u>Proctor v. Prince George's Hospital Center</u>, 32 F. Supp. 2d 820 (D. Md. 1998), when determining whether a defendant has adequately accommodated the limitations caused by a plaintiff's disability, "case law . . . does not evaluate the provision of accommodations as a whole.  Rather courts have focused on specific instances during the interaction between the disabled individual and the public accommodation or public entity."  32 F. Supp. 2d at 827–28 (collecting cases).  For instance, in <u>Updike v. Multnomah County</u>, 870 F.3d 939 (9th Cir. 2017), the Ninth Circuit separately analyzed a disabled arrestee's requests for accommodations under Title II and Section 504 at several different stages of the criminal intake process including booking, 870 F.3d at 954–55, a medical evaluation, <u>id.</u> at 955–56, and interactions with pretrial services, <u>id.</u> at 956; <u>see also</u> <u>Young v. Sunbury Police Dep't</u>, 160 F. Supp. 3d 802, 811 (M.D. Pa. 2016) (separately examining whether Title II and Section 504 were violated when a plaintiff with disabilities was arrested and when he was interrogated).

The District does not seriously respond to these indications that the provision of an after-the-fact accommodation does not necessarily satisfy a public entity's obligations under Title II and Section 504.  Instead, the District repeatedly points to the statements of Montgomery's experts and argues that because they stated that the District could offer effective accommodations after the interrogation, no accommodation during the interrogation was required.  <u>See</u> Reply in Supp. of Mot. [ECF No. 60] ("Reply") at 3–4; <u>see also</u> <u>id.</u> at 5 ("Plainly, Montgomery did not require an accommodation during the police interviews because [his] experts opined that Montgomery could have been fully accommodated in accordance with the ADA and the Rehabilitation Act after the interviews were over.").  But the Court will not reshape the requirements of Title II and Section 504 on the basis of Montgomery's experts' testimony.  While Trevino and Smarro's expertise is useful for answering factual questions such as what accommodations a police department can

reasonably offer to a person with a mental disability during an interrogation, their testimony does not set the legal requirements imposed by the ADA and Rehabilitation Act.[16]

Those statutes required the District to accommodate Montgomery's disability by providing him with a reasonable accommodation that would enable him to meaningfully access his interview. The District never explains how the mental health questions Montgomery was asked after his interrogation remedied the problems Montgomery alleges occurred during the interrogation. And although it is true that the District was not required to provide Montgomery with his preferred accommodation, see Bonnette v. D.C. Ct. of Appeals, 796 F. Supp. 2d 164, 183 (D.D.C. 2011), "[i]t is not sufficient to merely provide a qualified individual with any accommodation; the accommodation needs to address the limitation arising from the individual's disability," Di Lella v. Univ. of D.C. David A. Clarke Sch. of L., 570 F. Supp. 2d 1, 8 (D.D.C. 2008). Hence, even though the District claims it is merely relying on the testimony of Montgomery's own experts, the Court cannot conclude on this record that the District satisfied its obligations under Title II and Section 504 simply by assessing Montgomery's mental health after his interrogations.

Second, it is far from clear that Montgomery's experts would agree that the District provided a sufficient accommodation. The District ignores many pieces of evidence contradicting its view of the record. For instance, during his deposition, Trevino was explicitly questioned about whether he was "asked in this case to render an opinion [on] whether any of [Trevino and Smarro's proposed] accommodations is legally sufficient on its own to satisfy the ADA." Trevino Dep. Tr. at 167:12–15. He answered "[n]o, that question was never proposed," and he framed the listed accommodations "more [as] recommendations that could be done to have helped the situation specifically. But not in and of themselves." Id. at 167:16–19 (emphasis added).

---

[16] It is also worth mentioning that Trevino testified during his deposition that "I'm not a lawyer and I'm not going to, you know, sit here and talk about the Americans Disability Act." Trevino Dep. Tr. at 140:17–19.

This view of Trevino's and Smarro's listed accommodations—i.e., as recommendations but not necessarily independently sufficient accommodations—finds some support in the text of their report. In that report, prior to listing the potential accommodations discussed above, Trevino and Smarro first opined that Wise and Nasr should have followed GO-OPS-308.4, a general order on the processing of persons who may suffer mental illness. Trevino and Smarro Expert Report at 14. The report then states that "MPD should have also had better and more robust policies that would have required that Detectives Wise and Nasr accommodate Mr. Montgomery's disability in several other ways. Below are [potential accommodations] that are also common policy and practice in major police departments across the country . . . ." Id. at 15 (emphasis added). When viewing this evidence in the light most favorable to Montgomery, a reasonable jury could find that Trevino's and Smarro's listed accommodations were not meant to be assessed independently of their recommendation that Wise and Nasr adhere to GO-OPS-308.4.

And there is evidence suggesting that Wise and Nasr's interrogations did not, in fact, adhere to GO-OPS-308.4. That order defines mental illness as "when a subject displays an inability to think rationally, exercise adequate control over behavior or impulses (e.g. aggressive, suicidal, homicidal, sexual), and/or take reasonable care of his/her welfare with regard to basic provisions for clothing, food, shelter, or safety." GO-OPS-308.4 [56-10] at 1.[17] The order also states that

> Members shall be thoroughly aware of the criteria under which they may take a
> person into custody for emergency treatment at a mental health care facility. When
> coming into contact with a suspected mentally ill person, members of the force
> should determine if there is reason to believe . . . that the person . . . [i]s likely to
> injure himself/herself, if not immediately detained, as manifested by evidence of

---

[17] Trevino and Smarro analyzed the version of GO-OPS-308.4 that was in place when Wise and Nasr interrogated Montgomery. See Trevino and Smarro Expert Report at 14; GO-OPS-308.4 at 7. The District attaches an updated version of the order that took effect in 2015. GO-OPS-308.4 (Updated) [ECF No. 53-20] at 1. For purposes of this decision, the Court's references to GO-OPS-308.4 refer to the prior version that was effective when Montgomery was interrogated.

> attempts at, or threats of suicide or serious bodily harm, <u>or evidence of any inability</u> <u>to provide for his/her basic human needs, including food, clothing, shelter, essential</u> <u>medical care, or personal safety</u>.

GO-OPS-308.4 at 3 (emphasis added).

According to Trevino and Smarro, to follow this order, Wise and Nasr first needed to read and be familiar with it.  Trevino and Smarro Expert Report at 14.  Trevino and Smarro also concluded, based on their review of Wise's and Nasr's depositions, that Wise "was not familiar with, does not understand, and/or refuses to follow General Order GO-OPS-308.4," <u>id.</u> at 8, and that Nasr "does not understand GO-OPS-308.4," <u>id.</u> at 10.  Thus, it is not indisputably true that the District offered an accommodation that Trevino and Smarro would consider sufficient.  Indeed, Trevino and Smarro's report explicitly states that "MPD Homicide Detectives failed to provide any accommodations for Mr. Montgomery's apparent disability."  <u>Id.</u> at 5; <u>see also</u> Trevino Dep. Tr. 167:20–168:5 ("Q Okay.  Did the detective here provide[] any of the accommodations you listed in your report?  A None.  Q Based on what you saw in this case and your knowledge, did they provide any accommodations at all to Mr. Montgomery?  A No.").[18]

Moreover, the District's focus on Trevino's (admittedly somewhat contradictory) deposition testimony and expert report obscures another important fact counseling against summary judgment—Montgomery submitted testimony from another expert directly rebutting the

---

[18] Trevino and Smarro also opined that GO-OPS-308.4 required Wise and Nasr to take several actions such as calling for an officer trained in crisis intervention during the first interrogation to have Montgomery evaluated and referred to community-based-treatment resources.  Trevino and Smarro Expert Report at 14–15.  Wise and Nasr clearly did not take most of the actions Trevino and Smarro listed as necessary to adhere to GO-OPS-308.4, but one of the steps Trevino and Smarro stated that the officers should have taken was, again, "notif[ying] the jail during the booking process of Mr. Montgomery's symptoms of mental illness for accommodation or evaluation," <u>id.</u> at 15.  As mentioned above, the District argues it effectively satisfied this step when it assessed Montgomery's mental state during intake at the D.C. Jail.  But Trevino and Smarro did not frame the steps they claimed were necessary to adhere to GO-OPS-308.4 in a clear disjunctive form.  <u>See id.</u> at 14–15 (using "<u>and/or</u>").  And since Trevino and Smarro also opined that Wise and Nasr failed to read and be familiar with the general order, the Court cannot conclude that the evidence, when viewed in the light most favorable to Montgomery, indicates either that Montgomery's interrogations adhered to GO-OPS-308.4 or that the District afforded Montgomery an accommodation his experts would consider sufficient.

District's view of the record.  According to Stefano's expert report, Montgomery "was not provided with appropriate and necessary accommodations for his mental disability by the [MPD] detectives who interrogated him."  Stefano Expert Report at 2; see also id. at 7 ("By not taking his mental illness into account, and by not providing him with reasonable and appropriate accommodations during his February 2012 interrogations, Mr. Montgomery was subject to discrimination.").  The District never responds to Stefano's allegations or explains why—even if the District's understanding of Trevino's testimony were correct—Stefano's contradictory assessment would not render summary judgment inappropriate.[19]

In sum, viewing the record in its entirety, a reasonable jury could find both that Montgomery obviously required an accommodation to meaningfully access his interrogation and that the District failed to offer an effective accommodation.  Accordingly, the Court cannot find, on the basis of the record now before it, that the District satisfied its obligations under Title II and Section 504 as a matter of law.

## III.   A Reasonable Jury Could Find That the District Is Liable for the Violation of Montgomery's Rights Under Title II and Section 504

To recover compensatory damages for violations of Title II or Section 504, a plaintiff must establish that the defendant was deliberately indifferent to his rights.[20]  Pierce, 128 F. Supp. 3d at 278–79.  The District argues that Montgomery cannot satisfy this standard because Title II and

---

[19] The Court acknowledges that Stefano was retained as a damages expert and denied having expertise in interrogation or police practices.  Kenneth Stefano Dep. Tr. [ECF No. 56-7] at 62:8–17.  At this stage, however, the Court is not assessing the weight of the evidence and is instead determining what issues are genuinely disputed.

[20] Montgomery does not respond to the District's argument that he lacks standing to pursue injunctive relief.  See Mem. in Supp. of Mot. at 13 ("Given that Gary Montgomery is deceased, there is no chance that he will again suffer harm for the alleged violation of his rights under the ADA and, accordingly, his estate is not entitled to injunctive relief."); see also Plumley v. Landmark Chevrolet, Inc., 122 F.3d 308, 312 (5th Cir. 1997) (holding that a plaintiff lacks standing to pursue injunctive or declaratory relief on behalf of deceased victim); Pope v. Ward, No. 95-7129, 1996 WL 460023, at *2 (10th Cir. Aug. 14, 1996) ("[C]laims for injunctive and declaratory relief were mooted by [victim's] death.").  The Court will thus treat Montgomery's claims for injunctive and declaratory relief as waived.  See Hoffman v. Dist. of Columbia, 681 F. Supp. 2d 86, 94 (D.D.C. 2010).

Section 504 do not provide for vicarious liability, Mem. in Supp. of Mot. at 14–18, and Montgomery is unable to allege that the District itself, as opposed to Wise and Nasr, was deliberately indifferent to the violation of his statutory rights, id. at 18–21.  Montgomery responds by first arguing that the Court has already decided that vicarious liability is available under Title II and Section 504 and that the law-of-the-case doctrine counsels against reconsidering this ruling. Opp'n at 29–30.  Montgomery also argues that, if the Court reconsidered the issue, it should still conclude that vicarious liability is available under Title II of the ADA and Section 504.  Id. at 30–34.  Finally, Montgomery claims that a reasonable jury could find that the District is directly liable for the violation of Montgomery's statutory rights given the facts of his case.  Id. at 24–28, 34–35. The Court will address each of these arguments in turn.

### A. The Law-of-the-Case Doctrine Does Not Preclude the Court from Deciding Whether Vicarious Liability Is Available Under Title II and Section 504

"[T]he phrase, 'law of the case,' . . . merely expresses the practice of courts generally to refuse to reopen what has been decided . . . ."  Messenger v. Anderson, 225 U.S. 436, 444 (1912). The doctrine "rests on the sensible premise that 'the same issue presented a second time in the same case in the same court should lead to the same result.'"  Berryman-Turner v. Dist. of Columbia, 233 F. Supp. 3d 26, 35 (D.D.C. 2017) (citation omitted), aff'd, 720 F. App'x 1 (D.C. Cir. 2018).  Although the law-of-the-case doctrine does not limit a district court's power to reconsider a prior decision, see Messenger, 225 U.S. at 444; Nurriddin v. Bolden, 40 F. Supp. 3d 104, 117–18 (D.D.C. 2014), the doctrine does counsel that a court should exercise its power to reconsider past decisions only in "'extraordinary circumstances' such as when there is an intervening change in the law or when the previous decision was 'clearly erroneous and would work a manifest injustice," Berryman-Turner, 233 F. Supp. 3d at 35 (citations omitted). "Application of the law-of-the-case doctrine is [thus] a two-step process: A court must first

26

determine whether the threshold requirements are met and then ask whether there are prudential reasons to ignore the applicable law-of-the-case." Kimberlin v. Quinlan, 199 F.3d 496, 500 (D.C. Cir. 1999).

In this case, the Court is not convinced that the threshold requirements are satisfied—the Court's prior opinion did not clearly decide whether vicarious liability is available under Title II and Section 504. That opinion rejected the District's argument that Title II and Section 504 do not apply to police conduct. Montgomery I, 2019 WL 3557369, at *8–9. While making that broader argument, the District made the isolated statement that it could not be held liable under the relevant statutes on the basis of "the specific acts of the detectives," see Mem. in Supp. of Mot. to Dismiss at 14, but the District never discussed the availability of vicarious liability under the relevant statutes explicitly or at any length, see id. at 11–14. The Court nevertheless rejected the District's argument in a footnote, explaining that "in this and other jurisdictions, courts frequently have permitted plaintiffs asserting intentional discrimination to rely on the specific action, or lack of action, taken by police officers or other public-entity personnel in failing to provide reasonable accommodation." Montgomery I, 2019 WL 3557369, at *9 n.13. While the Court's conclusion that Montgomery can rely on the specific actions of Wise and Nasr when stating a claim against the district could be read to refer to vicarious liability, that is not the only interpretation.[21] Therefore, Montgomery has not demonstrated that the Court clearly decided whether vicarious liability is available as is required for the law-of-the-case doctrine to apply.

Even if the doctrine did apply, however, the Court would still conclude that the issue is worth revisiting. Since the Court issued its opinion in 2019, several courts have concluded that vicarious liability is not available under Title II and Section 504. E.g., Ingram v. Kubik, 30 F.4th

---

[21] Indeed, Montgomery argues that even if vicarious liability is largely unavailable, the District can still be held directly liable on the basis of its employees' actions given the particular facts of his case. Opp'n at 34–35.

1241, 1256–59 (11th Cir. 2022); <u>Jones v. City of Detroit</u>, 20 F.4th 1117, 1118 (6th Cir. 2021); <u>Arthur v. Dist. of Columbia Hous. Auth.</u>, No. 18-cv-2037 (DLF), 2020 WL 1821111, at *10–11 (D.D.C. Apr. 11, 2020); <u>Lake v. Bd. of Cnty. Comm'rs</u>, Case No. 3:18-cv-143, 2020 WL 1164778, *4–6 (S.D. Ohio Mar. 11, 2020); <u>Cotton v. Douglas Cnty.</u>, No. 4:18CV3138, 2020 WL 11039199, at *8–9 (D. Neb. Jan. 2, 2020).  There have also been recent cases reaching the opposite conclusion. <u>E.g.</u>, <u>T.O. v. Fort Bend Indep. Sch. Dist.</u>, 2 F.4th 407, 417 (5th Cir. 2021); <u>A.V. ex rel. Hanson v. Douglas Cnty. Sch. Dist. RE-1</u>, Civ. A. No. 21-cv-0704-WJM-SKC, 2022 WL 504138, at *9 (D. Colo. Feb. 18, 2022).  But the numerous opinions concluding that vicarious liability is unavailable in this context convince the Court that there are sufficient prudential reasons not to follow the law-of-the-case doctrine here, particularly when the issue was not fully briefed in the first instance.

### B.   Vicarious Liability Is Not Available Under Title II and Section 504

"Whether Title II of the ADA and the Rehabilitation Act [allow for] vicarious liability 'is an open question.'"  <u>Arthur</u>, 2020 WL 1821111, at *11 (quoting <u>Gray v. Cummings</u>, 917 F.3d 1, 17 (1st Cir. 2019)).  "The D.C. Circuit has yet to address the issue, and there is a division of authority among the circuit courts."  <u>Id.</u>; <u>compare</u> <u>Jones</u>, 20 F.4th at 1118 (noting Sixth Circuit's conclusion that "[v]icarious liability is not available for claims under Title II of the Americans with Disabilities Act"), <u>with</u> <u>T.O.</u>, 2 F.4th at 416–17 (noting Fifth Circuit's conclusion that "a public entity may be held vicariously liable for the acts of its employees under either" Title II or Section 504).  The Supreme Court also recently noted that the question remains unresolved.  <u>City & Cnty of S.F. v. Sheehan</u>, 575 U.S. 600, 610 (2015) ("[T]he parties agree that [a public] entity can be held vicariously liable for money damages [under Title II] for the purposeful or deliberately indifferent conduct of its employees. . . .  But we have never decided whether that is correct, and we decline to do so here, in the absence of adversarial briefing.").

Montgomery urges the Court to hold that Title II and Section 504 allow for vicarious liability. Opp'n at 30–34. He claims that vicarious liability under these statutes "has been affirmed for over 40 years," id. at 32 (citing Patton v. Dumpson, 498 F. Supp. 933, 942–43 (S.D.N.Y. 1980)), and an opposite conclusion would render these statutes "toothless," id. Montgomery also notes that, as recently as 2014, "the District itself . . . argued that public entities could be held vicariously liable for the deliberate indifference of their employees or agents." Id. (citing Hunter ex rel. A.H. v. Dist. of Columbia, 64 F. Supp. 3d 158, 170 (D.D.C. 2014) ("The District concedes that a public entity can be held liable under the ADA for the deliberate indifference of its employees or agents.")).[22] Despite these arguments, the Court concludes that vicarious liability is not available for two reasons.

First, the Court is bound by compelling, though not directly on-point, precedent. While the Supreme Court has not explicitly held that vicarious liability is unavailable under Title II and Section 504, Sheehan, 575 U.S. at 610, related Supreme Court precedent, namely Gebser v. Lago Vista Independent School District, 524 U.S. 274 (1998), indicates that such a conclusion is required.

In Gebser, the Supreme Court considered the availability of vicarious liability under Title IX of the Education Amendments of 1972. See 524 U.S. at 277. The Court rejected a broad theory of vicarious liability and instead held that "damages may not be recovered [for an employee's misconduct] unless an official . . . who at a minimum has authority to institute corrective measures on the district's behalf has actual notice of, and is deliberately indifferent to, the [employee's] misconduct." Id. The Court first noted that "the private right of action under Title IX is judicially implied"; consequently, the Court had "a measure of latitude to shape a sensible remedial scheme."

_____

[22] The District has acknowledged it no longer adheres to the view it articulated in Hunter. Mem. in Supp. of Mot. at 16 n.2.

Id. at 284.  The Court reasoned that allowing for vicarious liability under Title IX would not be sensible in part because, at the time of Title IX's enactment, most civil rights laws did not permit recovery of money damages, meaning it was unlikely Congress would have implicitly authorized "unlimited recovery in damages against a funding recipient where the recipient is unaware of discrimination in its programs." Id. at 285–86.  The Court also noted that Title IX "condition[ed] an offer of federal funding on a promise by the recipient not to discriminate, in what amounts essentially to a contract between the Government and the recipient of funds." Id. at 286.  The Court's "central concern," therefore, was ensuring the entity receiving federal funds would have notice of its liability.  See id. at 287.  Title IX's express remedial scheme is also "predicated upon notice to an 'appropriate person' and an opportunity to rectify any violation." Id. at 290 (citation omitted).  The Court thus concluded "that the implied damages remedy should be fashioned along the same lines," id., meaning a plaintiff seeking damages cannot rely on a broad theory of vicarious liability under Title IX.

Although Gebser's focus was on Title IX of the Education Amendments, its conclusion deserves great weight in determining the availability of vicarious liability under Title II of the ADA and Section 504 of the Rehabilitation Act.  Title II incorporates "[t]he remedies, procedures, and rights set forth in [the Rehabilitation Act,]" 42 U.S.C. § 12133, and the Rehabilitation Act incorporates "[t]he remedies, procedures, and rights set forth in [Title VI] of the Civil Rights Act of 1964," 29 U.S.C. § 794a(a)(1); see also Hooper v. City of St. Paul, Case No. 17-CV-3442 (PJS/DTS), 2019 WL 4015443, at *12 (D. Minn. Aug. 26, 2019) (noting the borrowing between statutes).  Therefore, "[t]he remedies available for violations of Title II of the ADA and § 505 of the Rehabilitation Act are 'coextensive' with those for Title VI [and the statutes] operate like one 'matryoshka doll' within another." Jones, 20 F.4th at 1119 (citations omitted).  Title IX was also

"modeled after Title VI of the Civil Rights Act of 1964," and the two statutes are considered "parallel."  Gebser, 524 U.S. at 286; accord Fitzgerald v. Barnstable Sch. Comm., 555 U.S. 246, 258 (2009) ("[Congress] passed Title IX with the explicit understanding that it would be interpreted as Title VI was.").  "For obvious reasons, then, courts have consistently relied on Title IX cases when applying Title VI (and vice versa), and on both Title IX and Title VI cases when applying Title II of the ADA and the [Rehabilitation Act] (and vice versa)."  Hooper, 2019 WL 4015443 at *12 & n.20 (collecting cases).

Not all of the considerations on which the Court relied in Gebser to interpret Title IX apply equally to Title VI, Title II, or Section 504.  For instance, while private causes of action are implied under all four statutes, see Barnes v. Gorman, 536 U.S. 181, 184–85 (2002) (Title II and Section 504); Cannon v. Univ. of Chi., 441 U.S. 677, 703 (1979) (Title IX and Title VI), Title II differs from the rest in that it was not enacted pursuant to the Spending Clause, Jones, 20 F.4th at 1122. But the Supreme Court has previously rejected the theory that the ADA should be interpreted differently from the Rehabilitation Act and Title VI and Title IX because of this distinction. Barnes, 536 U.S. at 189 n.3; Kubik, 30 F.4th at 1259.  Hence, as have several other courts, the Court concludes that Gebser and the statutory borrowing between Title IX, Title VI, Title II, and

Section 504 compel the conclusion that vicarious liability is not available under Title II or Section 504.  E.g., Kubik, 30 F.4th at 1258; Jones, 20 F.4th at 1122; Arthur, 2020 WL 1821111, at *11.[23]

The second reason for the Court's conclusion is that Title II's language independently suggests that the statute does not allow for vicarious liability.  Title II prohibits public entities from discriminating against qualified individuals on the basis of their disabilities, 42 U.S.C. § 12132, and the statute defines a "public entity" to include "any State or local government"; "any department agency, special purpose district, or other instrumentality of a State or States or local government"; and "the National Railroad Passenger Corporation, and any commuter authority," 42 U.S.C. § 12131(1).[24]  Title I of the ADA, on the other hand, prohibits covered entities from discriminating against qualified individuals on the basis of their disabilities, 42 U.S.C. § 12112(a), and defines "covered entity" to include "employer[s]," 42 U.S.C. § 12111(2).  "Employer" is then defined to include "a person engaged in an industry affecting commerce [who meets certain restrictions] . . . and any agent of such person." 42 U.S.C. § 12111(5)(A) (emphasis added).  The D.C. Circuit has noted that the "obvious purpose" of an analogous provision in Title VII of the Civil Rights Act of 1964 "was to incorporate respondeat superior liability into the statute."  Gary

---

[23] As should be evident from this analysis, the Court disagrees with the opinions Montgomery cites that reach the opposite conclusion.  Many of these cases were decided before Gebser was issued in 1998, e.g., Rosen v. Montgomery Cnty., 121 F.3d 154, 157 n.3 (4th Cir. 1997); Patton v. Dumpson, 498 F. Supp. 933, 942–43 (S.D.N.Y. 1980), or otherwise fail to grapple with Gebser, see, e.g., Duvall v. Cnty. of Kitsap, 260 F.3d 1124, 1141 (9th Cir. 2001) (concluding that Title II and Section 504 allow for liability in part because of a case from 1988).  The Court similarly rejects the view that the relevant statutes' references to each other's remedies, procedures, and rights does not mean that the availability of vicarious liability under one statute dictates its availability under all statutes.  See Jones, 20 F.4th at 1125–26 (Moore, J., dissenting) (arguing that vicarious liability is a theory of liability and not, strictly speaking, a remedy, procedure, or right).  Courts have routinely understood the borrowing between the relevant statutes to indicate Congress's intent for the statutes to be interpreted consistently.  E.g., Duvall, 260 F.3d at 1141 (applying Ninth Circuit's conclusion that Section 504 allows for vicarious liability to Title II since Title II incorporates Section 504's rights, remedies, and procedures); Hooper, 2019 WL 4015443, at *12 & n.20 (collecting cases).

[24] Section 504 likewise prohibits programs or activities receiving federal financial aid from discriminating against qualified individuals on the basis of their disabilities, 29 U.S.C. § 794(a), and defines a "program or activity" using similar language to that found in Title II, see, e.g., 29 U.S.C. § 794(b)(1)(A) (defining a program or activity to include "a department, agency, special purpose district, or other instrumentality of a State or of a local government").  Section 504's definition of "program or activity" does include some language that does not parallel Title II's definition of a "public entity," but the differences are not relevant here.  See Hooper, 2019 WL 4015443, at *10.

v. Long, 59 F.3d 1391, 1399 (D.C. Cir. 1995) (quoting Miller v. Maxwell's Int'l, Inc., 991 F.2d

583, 587 (9th Cir. 1993)); accord EEOC v. AIC Sec. Investigations, Ltd., 55 F.3d 1276, 1281 (7th

Cir. 1995).  Clearly, Congress knew how to create vicarious liability in a civil rights statute but

pointedly declined to do so in Title II, strongly suggesting that Congress did not intend to make

vicarious liability available under that title.[25]

At least one court has reached the opposite conclusion, albeit in dicta.  See A.K.B. ex rel.

Silva v. Indep. Sch. Dist. 194, Case No. 19-cv-2421 (SRN/KMM), 2020 WL 1470971, at *13 (D.

Minn. Mar. 26, 2020).   In Silva, the court considered Title II's definition of "public entity" and

noted that it includes the phrase "instrumentality of a State or States or local government."  Id. at

*11 (citation omitted).  To the Silva court, the term "instrumentality" should be interpreted broadly

to include all employees and agents.  Id.  In support, the court pointed to Black's Law Dictionary,

id., which defines "instrumentality" as "[a] thing used to achieve an end or purpose" and "[a]

means or agency through which a function of another entity is accomplished, such as a branch of

a governing body," Instrumentality, Black's Law Dictionary (11th ed. 2019).  The Court further

remarked that because Title II's definition of "public entity" also includes the term "department

agency," "instrumentality" must be interpreted to include employees to give the two terms

independent meaning.  Silva, 2020 WL 1470971, at *11.

Silva's understanding of Title II's definition is contrary to the understanding in Hooper.

While Silva relied on the canon against surplusage to interpret "instrumentality" broadly, 2020

WL 1470971, at *11, Hooper relied on the ejusdem generis canon to interpret the same term

---

[25] This difference between the language of Title I and Title II further distinguishes the cases Montgomery cites, many of which wrongly rely on interpretations of Title I to conclude that vicarious liability is available under Title II.  E.g., T.O., 2 F.4th at 417 & n.41 (citing Delano-Pyle v. Victoria Cnty., 302 F.3d 567, 574–75 (5th Cir. 2002), for the proposition that Title II provides for vicarious liability even though Delano-Pyle reached this conclusion on the basis of Title I's language).

narrowly, 2019 WL 4015543, at *10 n.14 ("When read in context . . . 'other instrumentality' clearly refers to a smaller unit of, or another entity working on behalf of, a state or local government, and not to every person employed by a state or local government."). In the Court's view, Hooper's statutory analysis is more persuasive. The context surrounding "instrumentality" indicates that the term is meant to refer to smaller subdivisions of a state or local government—such as, perhaps, a governmental committee—and not to public agents or employees, or at least not to agents beyond those who would otherwise qualify as officials whose actions impose direct liability on public entities under Gebser. More importantly, however, the Court is convinced that the comparison between Title I and Title II's language resolves any remaining ambiguity and indicates that Congress did not intend for Title II to allow for vicarious liability. Arthur, 2020 WL 1821111, at *11; Hooper, 2019 WL 4015443, at *9–10 & n.14.

In sum, because of both Gebser and Title II's text, the Court concludes that Title II and Section 504 do not provide for vicarious liability.[26] Consequently, to withstand the District's summary judgment motion, Montgomery must demonstrate that a reasonable jury could hold the District directly liable for the alleged violations of his statutory rights.

_____

[26] The Court reaches this conclusion even though Title II's regulations prohibit the District from discriminating directly or through contractual agreements. 28 C.F.R. § 35.130(b)(1); see also 28 C.F.R. pt. 35, App'x B, §35.102 (2011) ("[T]itle II applies to anything a public entity does. . . . All governmental activities of public entities are covered, even if they are carried out by contractors. For example, a State is obligated by [T]itle II to ensure that the services, programs, and activities of a State park inn operated under contract by a private entity are in compliance with [T]itle II's requirements."). Contrary to Montgomery's suggestion, Opp'n at 33–34, these regulations do not indicate that Title II provides for vicarious liability. Instead, they merely explain that the District's liability with respect to contractors is the same as its liability with respect to its own employees. In other words, the regulations make it clear that the District cannot avoid liability by outsourcing public activities to contractors or other private entities without any regard for whether those third parties adhere to the ADA. Stating that the District can be held liable for its own knowledge of or deliberate indifference to statutory violations, even if those violations are caused by the acts of an agent, is not the same as stating that the District can be held liable for violations committed by agents in the absence of knowledge or deliberate indifference on the part of the District.

C. A Reasonable Jury Could Nonetheless Conclude that the District Is Directly Liable for the Violation of Montgomery's Statutory Rights

To recover compensatory damages from the District on a theory of direct liability, Montgomery must demonstrate that the District was, at the very least, deliberately indifferent to the violation of his statutory rights. Pierce, 128 F. Supp. 3d at 278 ("A plaintiff may recover compensatory damages for violations of Title II of the ADA or Section 504 of the Rehabilitation Act if he proves that the defendant's discriminatory actions were intentional. . . . [M]any courts have authorized plaintiffs to establish intentional conduct by establishing that the defendant acted with 'deliberate indifference' to the plaintiff's rights." (citations and footnote omitted)); accord Arthur, 2020 WL 1821111, at *10. Deliberate indifference is defined in this context as "knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that likelihood." Pierce, 128 F. Supp. 3d at 278 (quoting Duvall v. Cnty. of Kitsap, 260 F.3d 1124, 1139 (9th Cir. 2001)). "The 'knowledge' element is satisfied where the public entity has notice of the plaintiff's accommodation need, and the 'failure to act' element is satisfied by conduct that is 'more than negligent, and involves an element of deliberateness.'" Id.

Montgomery advances two theories upon which he asserts a reasonable jury could find that the District was deliberately indifferent to the violations of his federal rights. First, he claims that the District failed to train its officers on accommodating individuals with mental disabilities despite the obvious risk that this failure to train would lead to violations of federal rights. Opp'n at 27–28. Second, Montgomery argues that Detectives Wise and Nasr and Sergeant Rice qualify as appropriate officials whose actions create direct liability for the District under Gebser. Id. at 34–35. For the reasons explained below, although his second theory fails, Montgomery's first theory is sufficient to withstand the District's summary judgment motion.

i.  Failure-to-train theory[27]

Montgomery's contention that the District's failure to train its officers to respect his statutory rights under Title II and Section 504 establishes the District's deliberate indifference to the violations of those rights is governed by the same standards as his prior claim that the District's failure to train its officers to respect his constitutional rights demonstrated deliberate indifference. See Mem. in Supp. of Mot. at 19–21 (citing Section 1983 cases); Opp'n at 28 (same); see also City of Canton v. Harris, 489 U.S. 378, 388 (1989) ("[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."); Pierce, 128 F. Supp. 3d at 278–79 (adopting deliberate indifference standard for disability discrimination cases under Title II and Section 504).  "A pattern of similar . . . violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." Connick v. Thompson, 563 U.S. 51, 62 (2011) (quoting Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 409 (1997)).  In a "narrow range of circumstances," however, "evidence of a single violation of federal rights, accompanied by a showing that the municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation," suffices to establish deliberate indifference.  Bryan Cnty., 520 U.S. at 409; accord Montgomery I, 2019 WL 3557369, at *6.

---

[27] The Court notes that there is some disagreement as to the permissible scope of failure-to-train claims under the ADA.  Some courts have concluded that a public entity's failure to train its employees is itself an independent violation of the ADA, meaning that a plaintiff may proceed on the failure-to-train theory even if he has not suffered any other violation of his statutory rights.  See, e.g., Schorr v. Borough of Lemoyne, 243 F. Supp. 2d 232, 238–39 (M.D. Pa. 2003), abrogated by Haberle, 885 F.3d at 179 n.7.  Other courts have disagreed.  E.g., J.H. ex rel. J.P. v. Bernalillo Cnty., 806 F.3d 1255, 1262 (10th Cir. 2015); Haberle, 885 F.3d at 179 n.7 ("A municipality's failure to train its police is not actionable unless and until that failure leads directly to a denial of a needed accommodation or improper discrimination.  It is the denial that gives rise to the claim.").  The Court need not resolve this issue because Montgomery alleges that the District violated his rights when it failed to offer him accommodations during his interrogations.  See Opp'n at 19–24.  Montgomery relies on the failure-to-train theory as a way of establishing the District's deliberate indifference, not a violation of his statutory rights.  See id. at 24–28.

Montgomery does not allege that a pattern of similar violations put the District on notice of its need to train officers regarding the statutory rights of suspects with mental disabilities during police interrogations and investigations.  See Opp'n at 28 ("At least at this stage, no 'pattern' is required."); see also Montgomery I, 2019 WL 3557369, at *6 (noting that Montgomery failed to establish a pattern of similar violations with respect to his constitutional claims).  Instead, he contends that the District's "complete failure to train MPD officers with respect to the disability rights statutes, in general, and how to interrogate mentally-ill individuals, in particular, had a predictable result—mentally-ill individuals were" not afforded the reasonable accommodations to which they are entitled under Title II and Section 504.  Opp'n at 28.  The District responds that Montgomery's theory fails for two reasons.  First, the District suggests that its enactment of GO-OPS-308.4, the general order on the processing of individuals with mental illnesses, demonstrates that the District was not deliberately indifferent to the needs of people with mental disabilities.  See Mem. in Supp. of Mot. at 18–19.  Second, the District argues that it is not patently obvious that the police will violate the rights of individuals with mental disabilities unless the police receive specialized training.  Reply at 13–15.[28]  In the context of the District's summary judgment motion, and viewing the evidence in the light most favorable to Montgomery, the Court disagrees with both contentions.

The fact that the District enacted a general order to regulate investigations and interrogations of individuals with mental disabilities does not warrant summary judgment.  "Were the law otherwise, the mere placing of an acceptable policy on the books would insulate [public entities] from liability."  Keating v. Helder, Civ. No. 08-5243, 2011 WL 3703264, at *5 (W.D.

---

[28] The Court does not interpret the District's motion as raising the causation question whether Montgomery can establish that his injuries would not have occurred had the District offered training on accommodating mental disabilities.  Cf. Canton, 489 U.S. at 391; see also Bryan Cnty., 520 U.S. at 409–10 (noting that the causation question is related to the question of whether a lack of training creates an obvious risk of violations of rights).

Ark. Aug. 23, 2011); accord Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 275–77 (2d Cir. 2009) (concluding that a reasonable jury could find a hospital was deliberately indifferent to the risk of Section 504 violations notwithstanding the hospital's enactment of a policy for accommodating disabilities).  The depositions of Detectives Wise and Nasr and Sergeant Rice contain several statements supporting the view that the District failed to train its officers on GO-OPS-308.4 specifically and their duty to accommodate individuals with mental disabilities under Title II and Section 504 generally.  E.g., Wise Dep. Tr. at 50:16–52:7, 98:20–99:1, 99:8–100:3, 101:22–102:7, 213:6–17; Nasr Dep. Tr. at 26:12–20, 174:15–18; Rice Dep. Tr. at 35:16–22 ("Q. In your time at MPD, did you receive any training or guidance on interrogating people with disabilities?  A. With disabilities, no.  Q. Any training on interrogating people with mental illness? A. No."), 64:18–21, 73:2–75:19, 123:10–13; see also District's Resp. to Montgomery's Statement of Materially Disputed Facts ¶¶ 69–73 (not disputing that MPD officers and supervisors testified to not receiving training on the ADA and not knowing how to accommodate individuals with disabilities).  After reviewing these depositions, Trevino and Smarro concluded that it was "clear" that officers Wise, Nasr, and Rice "were not thoroughly aware of" GO-OPS-308.4, Trevino and Smarro Expert Report at 7, and that they "did not know of, understand, or follow the policies of the MPD, especially those involving mental health consumers," id. at 3.[29]

The District also does not dispute that "MPD supervisors do not provide guidance to detectives as to how they should interrogate or interview mentally-ill individuals, and MPD supervisors and detectives have not received training on this topic."  District's Resp. to Montgomery's Statement of Materially Disputed Facts ¶ 73.  This fact suggests that Wise's,

---

[29] Trevino and Smarro further noted that they "have worked with several police departments across the country, having trained thousands of officers.  The level of apathy towards persons suffering from mental illness present in the aforementioned depositions . . . is like nothing we have encountered before."  Id. at 14.

Nasr's, and Rice's lack of familiarity with their legal obligations under Title II and Section 504 stems, at least in part, from the District's failure to offer training instead of merely from these officers' individual negligence.  The District has further declined to dispute that MPD detectives and their supervisors do not offer accommodations to non-suicidal, mentally-ill individuals.  See id.  ¶ 74.  In light of this evidence indicating that the District failed to train its officers on GO-OPS-308.4 specifically or how to interrogate and interact with individuals with mental disabilities generally, the Court cannot conclude that the mere enactment of GO-OPS-308.4 precludes a reasonable jury from finding the District was deliberately indifferent to the risk that officers would violate the Title II and Section 504 rights of individuals with mental disabilities.  Sacchetti II, 344 F. Supp. at 278 ("The Court must also reject the District's argument that [the mere enactment of policies regarding disabled individuals precludes a finding of deliberate indifference.]  [T]he existence of such policies may prove to be irrelevant, given that the District has not asserted that they were followed in this case or that they comport with the ADA.").[30]

The Court also concludes that the evidence would permit a reasonable jury to find that the District's failure to train its officers on interrogating individuals with mental disabilities presents "an obvious potential" for violations of federal rights.  Bryan Cnty., 520 U.S. at 409.  When determining whether a situation presents such an obvious potential, courts have focused on the frequency with which public employees encounter the situation and their ability to properly handle the situation without specialized training.  See, e.g., id. ("The likelihood that [a] situation will recur

---

[30] Montgomery also claims that "MPD construes its own policy" to apply only when a suspect presents a suicide risk.  Opp'n at 26 n.23.  In support, he points to the testimony of Senior Sergeant Robert Parker, the District's designated representative, Opp'n at 25–26, who testified that officers would accommodate the mentally ill only when "that person is exhibiting signs of suicide," Robert Parker Dep. Tr. [ECF No. 56-19] at 97:13–99:1.  Montgomery argues that there is "for all practical purposes, no relevant policy" governing police officers' interrogations of individuals with mental disabilities and that it is therefore not true that Montgomery "advances only a 'failure-to-train' theory of deliberate indifference."  Opp'n at 26 n.23.  Because the Court concludes that a reasonable jury could find that the District was deliberately indifferent even if GO-OPS-308.4 did apply to Montgomery's interrogation, the Court need not resolve this disagreement—which may be more semantic than substantive—at this time.

and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights could justify a finding that policymakers' decision not to train the officer reflected 'deliberate indifference' . . . ."); Shadrick v. Hopkins Cnty., 805 F.3d 724, 739–40 (6th Cir. 2015). There is evidence in the record supporting the conclusion that officers both frequently interrogate individuals with disabilities and are likely to violate those individuals' statutory rights without specialized training.

Regarding the frequency with which officers interrogate people with mental disabilities, Montgomery has cited evidence that millions of adults in the United States suffer from mental illness.   Opp'n at 1 & n.1; see also Mental Illness, Nat'l Inst. of Mental Health, https://www.nimh.nih.gov/health/statistics/mental-illness (last updated Jan. 2022) ("In 2020, there were an estimated 14.2 million adults aged 18 or older in the United States with [serious mental illness].  This number represented 5.6% of all U.S. adults.").  Montgomery has also cited evidence indicating that people with mental illnesses and disabilities disproportionately interact with police and the criminal justice system as a whole.  Opp'n at 1 & nn.2–3; see also Dorris A. Fuller et al., Overlooked in the Undercounted: The Role of Mental Illness in Fatal Law Enforcement Encounters, Treatment Advocacy Ctr., at 1 (Dec. 2015), https://www.treatmentadvocacycenter.org/storage/documents/overlooked-in-the-undercounted.pdf ("[I]ndividuals with severe mental illness generate no less than 1 in 10 calls for police service and occupy at least 1 in 5 of America's prison and jail beds.  An estimated 1 in 3 individuals transported to hospital emergency rooms in psychiatric crisis are taken there by police." (footnotes omitted)).

Montgomery's claims find some support in Trevino's and Smarro's expert report, where they state that they have trained many police departments and officers across the country in topics

related to mental health.  Trevino and Smarro Expert Report at 3–4, 14; see also id. at 13 (discussing society's effective criminalization of mental illness).  And the very existence of the District's general order governing officers' processing of individuals with mental illnesses provides some additional support for the conclusion that officers frequently investigate—and therefore interrogate—suspects entitled to an accommodation due to their mental state.  Cf. id. at 15 (referencing mental health policies in major police departments across the country); Estate of Walter ex rel. Klodnicki v. Corr. Healthcare Cos., Inc., 232 F. Supp. 3d 1157, 1165 (D. Colo. 2017) ("It is beyond reasonable dispute that American jails and prisons routinely house mentally ill inmates . . . .").

To be sure, Montgomery's evidence is neither conclusive nor uncontradicted.  See Rice Dep. Tr. at 65:8–67:21 (containing Sergeant Rice's testimony that while he cannot diagnose someone as mentally disabled, he encountered "some" people who were mentally disabled while he was a patrol sergeant, but only one person with a mental disability during his time in the homicide branch).  But the District has not challenged Montgomery's evidence or made any direct argument for a contrary conclusion.  Consequently, the Court concludes that the evidence, when viewed in Montgomery's favor, is sufficient for a reasonable jury to conclude that officers frequently interrogate individuals with mental disabilities.

The District similarly fails to discuss officers' ability to avoid violating individuals' statutory rights in the absence of specialized training.  In cases rejecting failure-to-train claims, courts have often noted that the relevant public employees received analogous training that would have prepared them to handle the relevant situation.  E.g., Connick, 563 U.S. at 64–66 ("In light of this regime of legal training and professional responsibility, recurring constitutional violations are not the 'obvious consequence' of failing to provide prosecutors with formal in-house training

about how to obey the law." (citation omitted)); <u>Medvedeva v. City of Kirkland</u>, No. C14-7RSL, 2015 WL 1849532, at *6 (W.D. Wash. Apr. 22, 2015) (holding that not requiring officers to undergo crisis intervention or mental illness training did not constitute deliberate indifference in part because the officers "received training in various areas relevant to crisis intervention and mental illness").  The District offered no evidence regarding analogous training its officers had received that would have prepared them to respect Montgomery's rights under Title II and Section 504.  <u>Cf.</u> District's Resp. to Montgomery's Statement of Materially Disputed Facts ¶¶ 69–74 (undisputed statements of fact suggesting MPD officers are not trained on the statutory rights of individuals with disabilities).

Nor is accommodating a suspect's mental illness during an interrogation the type of issue that an officer should be expected to handle properly without any training.  Courts often consider the complexity of the situation facing the public employee when determining whether the situation demands specialized training.  <u>See, e.g.</u>, <u>Connick</u>, 563 U.S. at 64 ("There is no reason to assume that police academy applicants are familiar with the constitutional constraints on the use of deadly force.  And, in the absence of training, there is no way for novice officers to obtain the legal knowledge they require."); <u>Montgomery I</u>, 2019 WL 3557369, at *7 ("Presumably police officers know, without any additional specific training, not to . . . fabricate evidence.").  Here, the officers' depositions amply demonstrate that identifying when a suspect needs an accommodation due to a mental disability can be extremely difficult.  <u>E.g.</u>, Nasr Dep. Tr. at 164:19–21 ("[W]e're not going to be able to diagnose the guy.  I'm not a mental doctor.  I'm not a psychiatrist.").  And even if the suspect's mental disability is obvious, there is no reason to assume that an officer knows how to comply with the sensitive and nuanced obligations imposed upon him by the ADA and Rehabilitation Act.  <u>See</u> Wise Dep. Tr. at 51:9–52:7 (containing Wise's testimony that he does not

know how Title II or Section 504 apply to his work as an MPD officer); id. at 98:3–99:1 (containing Wise's testimony that he would treat a disabled individual as he would everyone else).

Instead of submitting evidence on these points, the District cites a variety of cases in support of its conclusory claim that "[s]imply stated, it is not patently obvious" that officers will violate the rights of individuals with mental disabilities in the absence of specialized training.[31] Reply at 15. But the District's cases are easily distinguishable. As an initial matter, several of these cases do not involve allegations related to the need to train public employees to accommodate individuals with mental disabilities and are thus of extremely limited relevance. E.g., Dean v. Wexford Health Services, Inc., 18 F.4th 214, 237 (7th Cir. 2021) (not obvious that collegial review process would delay needed medical care for inmates); Bermudez-Arenas v. City of McMinnville, 3:16–CV–2164-PK, 2017 WL 2293361, *8–9 (D. Or. Mar. 6, 2017) (not obvious that failure to train officers in Spanish would lead to constitutional violations).

The most relevant case the District cites in support of its motion is Medvedeva v. City of Kirkland, see Reply at 15, where the court rejected a plaintiff's claim that a city's failure to require that its officers undergo mandatory crisis intervention or mental illness training constituted deliberate indifference, 2015 WL 1849532, at *6. As noted above, however, the Medvedeva court rejected plaintiff's claim in part because the officers received training in other related areas, including "Development Disabilities and Mental Illness." Id. The District has offered no similar evidence here. Moreover, it is not uncommon for deliberate indifference claims alleging

_____

[31] The District actually attempted to narrow the relevant question by framing it as whether it is "patently obvious that mentally ill suspects will provide inculpatory statements unless their disabilities are in some way accommodated." Reply at 15. According to Supreme Court precedent, however, the question is whether it is obvious that the lack of training will result in violations of federal rights. See Connick, 563 U.S. at 63–64; Bryan Cnty., 520 U.S. at 409. Accepting the allegations in Montgomery's amended complaint as true, his federal rights were violated when he was not granted a reasonable accommodation that would have enabled him to meaningfully access his interrogations. See Alexander, 469 U.S. at 301–02. The fact that this violation allegedly caused Montgomery to make inculpatory statements is relevant to the question of damages but not to the existence of the violation itself.

inadequate training of police officers regarding interactions with mentally ill individuals to survive motions to dismiss or for summary judgment.  See, e.g., Allen v. Muskogee, 119 F.3d 837, 841–45 (10th Cir. 1997) (reversing district court's grant of summary judgment in favor of city defendant on plaintiff's claim that city's failure to adequately train officers on interacting with mentally ill individuals armed with firearms constituted deliberate indifference); Russo v. City of Cincinnati, 953 F.2d 1036, 1047–48 (6th Cir. 1992) (same regarding claim that training "with respect to the use of force on mentally disturbed persons was constitutionally inadequate"); Garcia v. Yuba Cnty. Sheriff's Dep't, 559 F. Supp. 3d 1122, 1229–31 (E.D. Cal. 2021) (denying motion to dismiss claim that city's failure to train officers on interacting with people in a mental health crisis constituted deliberate indifference and collecting similar cases); Estate of Walter ex rel. Klodnicki, 232 F. Supp. 3d at 1165 ("[F]ailure to train prison staff, and particularly medical staff, on appropriate treatment of [mentally ill] inmates is 'so likely to result in the violation of constitutional rights' that policymakers need no actual notice of repeated violations.").[32]  Hence, for all these reasons, the Court concludes that Montgomery has submitted sufficient evidence in support of his statutory

---

[32] Failure-to-train claims are inherently fact sensitive, and the Court does not mean to suggest that the cases cited above are dispositive or controlling.  Cf. Reply at 14–15 (attempting to distinguish many of the cases Montgomery cites on their facts).  Instead, the Court merely concludes that in this case, in large part due to the District's failure to submit evidence on the frequency with which officers interrogate individuals with mental disabilities and officers' ability to avoid violating individuals' rights, the District has not shown that it is entitled to judgment as a matter of law on this claim.

discrimination claims and failure-to-train theory of deliberate indifference to survive summary judgment at this time.[33]

### ii.   Appropriate officials theory

Montgomery's next argument is that Detectives Wise and Nasr and Sergeant Rice qualify as appropriate officials whose violations of Montgomery's rights created direct liability for the District under Gebser.  See Opp'n at 34–35.  As explained previously, while Gebser held that vicarious liability is not available under Title IX, it also explained that an entity may still be liable for damages when "an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the [entity's] behalf has actual knowledge of discrimination . . . and fails adequately to respond."  524 U.S. at 290.  The District argues that Montgomery's theory is invalid and that the Court "should summarily reject [Montgomery's] efforts to do an end [run] around his failure to adduce" sufficient evidence in support of his failure-to-train theory.  Reply at 16.  But this theory comes from Gebser itself—the very case that the District strenuously argues governs its potential liability.  See Mem. in Supp. of Mot. at 15–18.

---

[33] Permitting Montgomery's Title II and Section 504 claims to proceed on a failure-to-train theory of deliberate indifference does not contradict the Court's prior decision granting dismissal of Montgomery's failure-to-train claims brought under Section 1983.  And, to its credit, the District never claims that it does.  That decision dismissed several constitutional claims such as "that the District failed to train its officers not to conduct constitutionally inadequate investigations, engage in discrimination against mentally ill suspects, . . . and use unconstitutional and discriminatory interrogation techniques."  Montgomery I, 2019 WL 3557369, at *6 (cleaned up) (quoting Compl. ¶ 169).  An officer's duty to not discriminate against an individual with a mental disability is much narrower and more straightforward under the Constitution than it is under the ADA and Rehabilitation Act.  See Bd. of Trs. of Univ. of Ala. v. Garrett, 531 U.S. 356, 367 (2001) ("States are not required by the Fourteenth Amendment to make special accommodations for the disabled, so long as their actions toward such individuals are rational.").  Admittedly, the allegations in support of Montgomery's constitutional failure-to-train claims made a few passing references to the District's duty to accommodate individuals with disabilities.  E.g., Compl. ¶¶ 166–67.  But Montgomery's complaint, id. ¶ 170, the District's motion to dismiss, Mem. in Supp. of Mot. to Dismiss at 8–11, and this Court's opinion both focused almost exclusively on Montgomery's constitutional allegations, see Montgomery I, 2019 WL 3557369, at *5–7 ("[P]laintiff has failed to state a Monell claim against the District based on an unconstitutional policy . . . .").  Indeed, the Court expressly permitted Montgomery's discrimination claims under Title II and Section 504 to proceed under the deliberate indifference standard, Montgomery I, 2019 WL 3557369, at *9, which allows for failure-to-train claims, see Canton, 489 U.S. at 388; Partridge v. Smith, Civ. A. No. 17-cv-02941-CMA-STV, 2020 WL 897653, at *12 (D. Colo. Feb. 25, 2020).

The appropriate-official theory has also been accepted in many other civil rights cases, including cases under Title II and Section 504.  E.g., Stafford v. George Wash. Univ., Case No. 18-cv-2789 (CRC), 2022 WL 35627, at *10 (D.D.C. Jan. 4, 2022) (Title VI); Biondo v. Kaledia Health, 935 F.3d 68, 73–74 (2d Cir. 2019) (Section 504); Ravenna v. Vill. of Skokie, 388 F. Supp. 3d 999, 1008–09 (N.D. Ill. 2019) (Title II).  Nevertheless, while the theory is not inherently invalid, the facts of this case do not support its application.

Even if Detectives Wise and Nasr could qualify as appropriate officials, their knowledge of their own alleged violations of Montgomery's rights is not sufficient to hold the District liable. The Supreme Court in Gebser held that "[w]here a [public entity's] liability rests on actual notice principles . . . the knowledge of the wrongdoer himself is not pertinent to the analysis."  524 U.S. at 291.  Several subsequent cases have applied this rule, holding that an alleged wrongdoer's knowledge of his own wrongdoing is not sufficient to create direct liability for a public entity even if that wrongdoer may otherwise qualify as an appropriate official.  See, e.g., Stafford, 2022 WL 35627, at *17; M.S. ex rel. Hall v. Susquehanna Twp. Sch. Dist., 969 F.3d 120, 126–28 (3d Cir. 2020); Salazar v. S. San Antonio Indep. Sch. Dist., 953 F.3d 273, 277–78, 284–85 (5th Cir. 2017); Shah v. Univ. of Toledo, Case No. 3:21 CV 581, 2021 WL 5140969, at *5 (N.D. Ohio Nov. 4, 2021).  In accordance with these cases, this Court holds that Montgomery cannot establish the District's liability on the basis of Wise's and Nasr's knowledge of their own alleged bad acts.

And Montgomery's claim regarding Sergeant Rice also fails because Montgomery does not sufficiently allege that Rice had knowledge of the discrimination Montgomery allegedly suffered.  Montgomery claims that "Detective Wise told Sergeant Rice (after the fact) that something was 'off' with Mr. Montgomery's mental health."  Opp'n at 34; see also Rice Dep. Tr. at 146:9–12 ("[B]ut you do think that at some point Detective Wise told you that he thought

something was off mentally with Mr. Montgomery, correct?  A. Yes.").  The record contains

conflicting evidence as to whether Wise actually did share this opinion with Rice, Wise Dep. Tr.

at 213:20–22 (denying that he "let Sergeant Rice know that [he] thought [Montgomery] might

have mental illness"), but assuming he did, it is not sufficient to hold the District liable.

Montgomery does not specify when this alleged conversation took place or how much information

Wise told Rice about the interrogation, including whether Wise took any actions that may have

violated Montgomery's rights.   In short, to succeed upon the appropriate official theory,

Montgomery needed to produce sufficient evidence that Rice possessed "actual knowledge of

discrimination . . . and fail[ed] adequately to respond." Gerber, 524 U.S. at 290.  The fact that

Rice knew—at some point in time—that an officer interrogated an individual the officer suspected

could be mentally ill does not mean Rice had actual knowledge of discrimination.  See Blue v.

Dist. of Columbia, 811 F.3d 14, 21 (D.C. Cir. 2015) (concluding that plaintiff failed to meet actual

knowledge standard because Supreme Court precedent requires that the harassment be known, and

plaintiff failed to allege that anyone knew the harassment was occurring); Stafford, 2022 WL

35627, at *18 ("No reasonable jury could find that such general allegations. . .

[provided] actual notice of the nature of the [alleged discrimination.]").[34]

## IV.   A Reasonable Jury Could Find that the Violations of Montgomery's Rights Caused Him Injury

Finally, the District argues that even assuming that Montgomery's statutory rights were

violated and the District is liable, Montgomery cannot establish that these violations caused him

any injury. See Reply at 21.  The District claims that Montgomery cannot show causation or injury

---

[34] It is not entirely clear how much information must be conveyed to the appropriate official for that official to have actual knowledge of alleged discrimination.  See Folkes v. N.Y. Coll. of Osteopathic Med. of N.Y. Inst. of Tech., 214 F. Supp. 2d 273, 283–85 (E.D.N.Y. 2002) (summarizing different standards courts have imposed).  The allegations regarding Rice's knowledge are clearly insufficient, however.

because it would have prosecuted him for Jones's murder regardless of the alleged discrimination he suffered.  Mem. in Supp. of Mot. at 22.  In support of this argument, the District asserts that it had sufficient probable cause to arrest and prosecute Montgomery even without the inculpatory statements he made during his interrogations.  Id.  The District also reiterates its argument, rejected above, that it could have satisfied its statutory obligations by providing Montgomery with reasonable accommodations after his interrogations.  Id. at 25–26.  Therefore, the argument goes, the District could have accommodated Montgomery's disability and his prosecution would still have continued.  Id. at 26 ("None of these accommodations would have altered the other evidence against Montgomery.").  In opposition, Montgomery argues that, while "[t]he extent to which the District's violation[s] . . . underpinned the District's subsequent decision to arrest and prosecute [Montgomery] may eventually inform the amount of damages to which [he] is entitled," whether the District had probable cause to prosecute him without considering the inculpatory statements he made during his interrogation is "irrelevant at the summary judgment stage."  Opp'n at 36–37.

Montgomery is correct that the success of his Title II and Section 504 claims does not depend upon his ability to show that his prosecution lacked probable cause without his inculpatory statements.  Courts have permitted disability discrimination claims involving police conduct under two theories.  See Gohier v. Enright, 186 F.3d 1216, 1220 (10th Cir. 1999).  "The first is that police wrongly arrested someone with a disability because they misperceived the effects of that disability as criminal activity."  Id.  The second theory is that, "while police properly investigated and arrested a person with a disability for a crime unrelated to that disability, they failed to reasonably accommodate that person's disability in the course of the investigation or arrest, causing the person to suffer greater injury or indignity in that process than other arrestees."  Id. at 1220–21; accord Sacchetti I, 181 F. Supp. 3d at 128–30.  This case falls in the second category.  See Am.

Compl. ¶¶ 135, 140–41.   Hence, Montgomery need not establish that his prosecution was motivated by discriminatory animus or was otherwise illegal.  The fact that the District may have probable cause to suspect that an individual with a disability committed a crime does not give the District a blank check to violate that suspect's rights under Title II and Section 504.

But to the extent Montgomery suggests that he need not prove that the alleged violations of his rights caused him harm in order to recover compensatory damages, he is incorrect.[35]  "[T]he mere violation of the ADA alone does not establish injury.  Rather, the plaintiff is obligated to show . . . that the defendant's violation of the ADA proximately caused her actual injury before she can recover."  DeLeon v. City of Alvin Police Dep't, Civ. A. No. H–09–1022, 2010 WL 4942648, at *3 (S.D. Tex. Nov. 30, 2010) (citing Armstrong v. Turner Indus., Inc., 141 F.3d 554, 562 (5th Cir. 1998)).  The failure to make this showing can support a grant of summary judgment in favor of the defendant.  See Baker v. Univ. of Tex. Health Sci. Ctr. Hous., Civ. A. No. H-08-1908, 2011 WL 1549263, at *6 (S.D. Tex. Apr. 21, 2011); Fed. R. Civ. P. 56(a), (g).

And not all types of injuries are compensable under Title II and Section 504.  In a very recent opinion, the Supreme Court held that a plaintiff suing under the implied rights of action in the Rehabilitation Act and Patient Protection and Affordable Care Act cannot recover compensatory damages for emotional distress.  See Cummings v. Premier Rehab Keller, P.L.L.C., 142 S. Ct. 1562, 1576 (2022).  The Court's analysis centered on the fact that both of those statutes were passed pursuant to Congress's Spending Clause powers and that "the 'legitimacy of

---

[35] Neither party has discussed the issue of whether nominal damages are available in this case, and the Court similarly will not address it here.  Cf. Carey v. Piphus, 435 U.S. 247, 266 (1978) ("Common-law courts traditionally have vindicated deprivations of certain 'absolute' rights that are not shown to have caused actual injury through the award of a nominal sum of money."); Paulone v. City of Frederick, 787 F. Supp. 2d 360, 390 (D. Md. 2011) ("Although the Fourth Circuit has not specifically considered whether nominal damages are available in a claim under the ADA, at least one other circuit has held that nominal damages are available under that statute.") (citing Flowers v. S. Reg'l Physician Servs., Inc., 247 F.3d 229, 239 (5th Cir. 2011)).

Congress' power' to enact Spending Clause legislation rests . . . on 'whether the recipient [of federal funds] voluntarily and knowingly accepts the terms of that contract.'" Id. at 1570 (cleaned up) (quoting Barnes 536 U.S. at 186). A court "may presume that a funding recipient is aware that, for breaching its Spending Clause 'contract' with the Federal Government, it will be subject to the usual contract remedies in private suits." Id. at 1571. But because emotional distress damages are not usually available in contract cases, id. at 1571–76, a recipient of federal funds would not have had sufficient notice that it would face liability for emotional distress damages when it "'engaged in the process of deciding whether [to] accept' federal dollars," id. at 1570–71 (alteration in original) (quoting Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy, 548 U.S. 291, 296 (2006)). Accordingly, the plaintiff could not recover for the "humiliation, frustration, and emotional distress" she suffered as a result of the defendant's alleged discrimination. Id. at 1569 (citation omitted).

Although the statutes allegedly violated in Cummings were the Rehabilitation Act and the Patient Protection and Affordable Care Act, 142 S. Ct. at 1569, the Supreme Court's reasoning applies to other statutes as well, see id. at 1569–70. As mentioned above, Title II of the ADA incorporates the "remedies, procedures, and rights set forth in" the Rehabilitation Act, 42 U.S.C. § 12133; hence, if a certain category of damages is not available under Section 504, it is not available under Title II either. To survive the District's summary judgment motion, then, Montgomery must be able to identify damages he suffered as a result of the District's alleged discrimination, and those damages must also fit within categories of damages that would be traditionally recoverable in a breach of contract case.

Montgomery meets both requirements. Broadly speaking, Montgomery's alleged harms fall into two categories. First, in accordance with the theory of discrimination discussed in Gohier,

186 F.3d at 1220–21, Montgomery alleges that the "failure to reasonably accommodate [his] disability led to him suffering greater injury or indignity than other arrestees," Am. Compl. ¶ 141. Second, Montgomery alleges that "[a]s a direct and proximate result of the [District's violations of his rights, he] was damaged, including but not limited to[,] being charged and confined for five and a half (5.5) years." Am. Compl. ¶ 142. Both of these alleged categories of harms are sufficient for Montgomery to survive summary judgment at this time.

The Court will begin with Montgomery's allegation that, even if his prosecution was inevitable, the District's violations of his statutory rights "led to him suffering greater injury or indignity than other arrestees." Am. Compl. ¶ 141. At the outset, it is important to note that the total value of Montgomery's damages claims under this theory is likely very small. He is not entitled to compensation for the harm that a non-disabled arrestee suffers during the criminal justice process. See Giever v. City of Las Cruces City Comm'n, No. Civ. 08-155 LH/LAM, 2010 WL 11626776, at *17–18 (D.N.M. Jan. 12, 2010). Cummings also limits the potentially available damages by explicitly holding that emotional distress damages are not recoverable. See 142 S. Ct. at 1576. Nevertheless, courts have held that a plaintiff may be entitled to damages when they demonstrate that a defendant's failure to accommodate their disability caused them to suffer harm in addition to the harm a non-disabled arrestee suffers. See, e.g., Young, 160 F. Supp. 3d at 810–12; A.V. ex rel. Hanson, 2022 WL 504138, at *7–10; Lavenant v. City of Palm Springs, Case No. EDCV 17-2267-KK, 2018 WL 3807944, at *5–6 (C.D. Cal. Aug. 8, 2018).

The District's main argument in opposition to Montgomery's claim for damages under this theory is that, regardless of the theory's viability, Montgomery waived any claim he may have had by not more forcefully advancing the theory in his opposition to the District's summary judgment motion. See Reply at 20. But as the District acknowledges, id. at 17, 19–20, Montgomery's

amended complaint makes it clear that he is seeking damages for harms beyond his mere wrongful prosecution and confinement, Am. Compl. ¶¶ 141–42, and his opposition brief reiterates his claim for these separate damages by citing the fact that prosecutors played portions of his interrogation transcripts in court in order to claim that Montgomery sounded unhinged, Opp'n at 37 n.28.[36] Montgomery certainly could have more explicitly argued for his entitlement to this category of damages in his opposition brief instead of focusing on the legitimate problems with the District's probable cause theory.  But the Court does not agree that, in these circumstances, Montgomery has waived his claim to damages distinct from those arising from his allegedly wrongful prosecution and confinement.

The facts of this case present at least three subcategories of harms Montgomery may have suffered due to his disability and the District's failure to offer an accommodation that are above and beyond the harms suffered by non-disabled arrestees and potentially compensable even if a jury finds that his prosecution and confinement were inevitable: loss of opportunity, emotional distress, and injury to reputation.[37]  For the reasons explained below, the Court concludes that while Montgomery cannot recover either emotional distress or reputation damages in light of Cummings, he may be able to recover some small amount of damages to compensate him for the opportunity he lost when he was denied the ability to meaningfully access and participate in his interrogations.

---

[36] Montgomery may have referenced this incident to, at least in part, argue he is entitled to emotional distress damages due to the District's failure to accommodate his disability.  See Opp'n at 37 n.28.  This form of damages is, of course, no longer available.  Cummings, 142 S. Ct. at 1576.  But the fact that Montgomery referenced this incident in his opposition brief supports the Court's conclusion that he did not waive his claim that the District's failure to accommodate his disability "led to him suffering greater injury or indignity than other arrestees."  Am. Compl. ¶ 141.

[37] Montgomery does not group his alleged damages in this way, and these harms may not be exhaustive, but the Court considers the formulation useful for resolving the District's summary judgment motion.

Beginning with loss of opportunity, Montgomery argues that, due to his disability and the District's failure to offer him an accommodation, he was denied the ability to engage in his interrogations.  See Opp'n at 10–11; Am. Compl. ¶ 153.  That loss of opportunity is itself an injury that could support an award of at least some, though certainly not a large amount of, damages in this case.  For instance, in Robertson v. Las Animas County Sheriff's Department, 500 F.3d 1185 (10th Cir. 2007), a plaintiff filed a Title II claim after he was detained upon suspicion of criminal activity and then prevented from accessing his probable cause hearing because the defendants failed to offer an accommodation for his deafness.  500 F.3d at 1189–90.  The charges against the plaintiff were later dismissed, id., and, much as the District does here, defendants argued that plaintiff "was not injured as a result of any lack of accommodation," id. at 1199.  The Tenth Circuit rejected that argument because it took "too narrow a view of [the plaintiff's] 'injury.'"  Id. "Though the charges against [the plaintiff] were dismissed, he was denied the ability to participate in his probable cause hearing to the same extent as non-disabled individuals."  Id.; accord Ulibarri v. City & Cnty. of Denver, 742 F. Supp. 2d 1192, 1216–17 (D. Colo. 2010) (denying motion for summary judgment on claim that plaintiff who pled guilty and was not seeking to overturn his conviction was "denied the opportunity to participate in his arraignment to the same extent as non-disabled individuals"); cf. Bahl v. Cnty. of Ramsey, 695 F.3d 778, 788 (8th Cir. 2012) ("[A] custodial interrogation with an [accommodation] would have afforded [a disabled plaintiff] certain benefits, including the right to ask questions . . . .").  Hence, even if Montgomery's prosecution were inevitable, the loss of opportunity he suffered due to his alleged inability to meaningfully access his interrogations permits him to survive summary judgment.[38]

---

[38] It may be that this lost opportunity damaged Montgomery only modestly, if at all.  But quantifying the value of this loss of opportunity is a task more appropriately performed by a jury after trial than by a court on summary judgment.

Cummings does not require a different conclusion.  Using the contract analogy applied in that case, 142 S. Ct. at 1570–71, here, the District agreed to receive federal funds in exchange for promising to refrain from discriminating against qualified individuals with disabilities.  See 29 U.S.C. § 794(a) (Section 504); see also 42 U.S.C. § 12132 (articulating similar prohibition under Title II).  Montgomery, as a third-party beneficiary, see Barnes, 536 U.S. at 187, alleges that the District failed to uphold that promise, which resulted in him losing the benefit of the bargain—i.e., being able to participate fully in his interrogations.  A damages remedy for this type of alleged harm would be entirely appropriate in a traditional contract case.  See Restatement (Second) of Contracts § 347 cmt. A (Am. L. Inst. 1981) ("Contract damages are ordinarily based on the injured party's expectation interest and are intended to give him the benefit of his bargain by awarding him a sum of money that will, to the extent possible, put him in as good a position as he would have been in had the contract been performed."); see also Richard A. Lord, 24 Williston on Contracts § 64:1 & nn.8–10 (4th ed. 2022) (collecting cases noting the availability of benefit-of-the-bargain damages in contract cases).[39]

But Cummings does prevent Montgomery from recovering damages for emotional distress or harm to his reputation.  Cummings explicitly precludes recovery for emotional distress damages, 142 S. Ct. at 1576, and, this Court concludes that Cummings's reasoning also forbids recovery for reputation damages.  The key question is whether "the usual contract remedies in private suits" include recovery for reputation damages.  Id. at 1571.  In Cummings, the plaintiff argued that traditional contract remedies do include emotional distress damages since they are generally available in special cases, id. at 1572, but the Supreme Court rejected Cummings's argument for two "independent[]" reasons, id.  First, even accepting the argument that emotional distress

---

[39] Again, the Court will not usurp the role of the jury and attempt to quantify such damages in the summary judgment setting.

damages are available in special cases, emotional distress damages would still not be sufficiently common for recipients of federal funds to have clear notice of their potential liability for these harms. Id. at 1572–74. Second, the Supreme Court was not convinced there was "a universal rule—or even a widely followed one—regarding the availability of emotional distress damages." Id. at 1576.

Both of these independently sufficient rationales apply to reputation damages. "As a general 'rule,' reputation damages are not recoverable for a breach of contract claim." Klayman v. Jud. Watch, Inc., 255 F. Supp. 3d 161, 168 (D.D.C. 2017) (collecting cases); accord O'Leary v. Sterling Extruder Corp., 533 F. Supp. 1205, 1209–10 (E.D. Wis. 1982) (collecting cases where claims for reputation damages failed and concluding that "courts seem to be in general agreement that damages for injury to reputation are not properly awardable in a breach of contract suit"). Even in states where reputation damages are not categorically prohibited for breach of contract, they are rare enough to question whether recipients of federal funds would have had clear notice that they were accepting potential liability for such damages. See, e.g., Saxton Commc'n Grp., Ltd. v. Valassis Inserts, Inc., No. 93 CIV. 0388 (MBM), 1995 WL 679256, at *2 (S.D.N.Y. Nov. 15, 1995) ("New York law generally does not allow contract damages for injury to reputation. . . . It does so only in exceptional cases . . . . (citation omitted)); Herrera v. Union No. 39 Sch. Dist., 917 A.2d 923, 933–34 (Vt. 2006) (remanding to determine if reputation damages were available in breach of contract case because, while "[i]t may be that in practically all cases of wrongful discharge, damages resulting from harm to a plaintiff's reputation are [unrecoverable]," such damages are appropriate in rare instances).

Moreover, there appear to be jurisdictions where reputation damages are categorically prohibited in breach of contract cases in the absence of a separate tort. See, e.g., Signature Indus.

Servs., LLC v. Int'l Paper Co., 638 S.W.3d 179, 189 n.5 (Tex. 2022) (citing Hollywood Fantasy Corp. v. Gabor, 151 F.3d 204, 214 (5th Cir. 1998), for the proposition that "[u]nder Texas law, the loss of goodwill or business reputation is not recoverable in a breach of contract action")); Isle of Wight Cnty. v. Nogiec, 704 S.E.2d 83, 86–87 (Va. 2011) (declining invitation to permit recovery for reputation and emotional distress damages in breach of contract case); LifeNet Health v. LifeCell Corp., Civ. A. No. 2:15cv461, 2016 WL 11672048, at *4 (E.D. Va. Sept. 2, 2016) ("In Virginia, damages to reputation are not redressable in breach of contract actions.").  Hence, in accordance with Cummings, Montgomery cannot recover for any harm to his reputation due to the general rule against recovery of reputation damages in breach of contract cases, even though there may be some exceptional cases where such damages would be recoverable.

In sum, even if it is assumed that providing Montgomery with a reasonable accommodation would not have prevented his prosecution and confinement, Montgomery's allegations are sufficient to survive summary judgment.  Cummings precludes any recovery of emotional distress or reputation damages, but the District's failure to accommodate his disability allegedly harmed Montgomery in a different way—by depriving him of the opportunity to meaningfully access and fully participate in his interrogations.  This loss of opportunity is the type of injury that would normally be recoverable in a breach of contract case, and while this loss of opportunity may have caused Montgomery only slight harm, the harm is not necessarily non-existent.

The Court now turns to Montgomery's second broad alleged category of harm: that he would not have been wrongly prosecuted and confined at St. Elizabeth's but for the alleged discrimination he suffered during his interrogations.  The damages associated with this harm are likely much larger than the damages associated with Montgomery's other category of harm, but in order for Montgomery's claim for these damages to survive the District's summary judgment

motion, the Court must conclude both that these damages are available under <u>Cummings</u> and that a reasonable jury could find that his prosecution and confinement would not have occurred had the District accommodated his disability during his interrogations.

Dealing with the <u>Cummings</u> issue first, under <u>Cummings</u>'s contract-law analogy, the damages associated with Montgomery's prosecution and confinement, like emotional distress and reputation damages, are best understood as consequential damages.  <u>See</u> Richard A. Lord, 24 Williston on Contracts § 64:16 (4th ed. 2022) ("Consequential damages are those damages that do not flow directly and immediately from the breach, but only from some of the consequences or results of the breach.").  But unlike the rarely recovered emotional distress and reputation damages, the harms Montgomery allegedly suffered due to his prosecution and confinement do not fit within discrete categories of consequential damages that are generally—and, in some states, categorically—prohibited in breach of contract cases.  And while consequential damages are less frequently awarded in contract cases than are expectation damages, the Court does not consider recovery for consequential damages to be so unusual as to question consequential damages' availability writ large in anti-discrimination cases.[40]  The Court therefore declines to extend <u>Cummings</u> beyond the narrow categories of emotional distress and reputation damages to all damages in anti-discrimination suits that would be classified as consequential damages if the case

---

[40] <u>Cf.</u> <u>Rice v. Cmty. Health Ass'n</u>, 203 F.3d 283, 288 (4th Cir. 2000) (contrasting the "universally rejected claims for damages to reputation in breach of contract actions" with "a true consequential damage claim" that West Virginia courts would be "generally hospitable to"); Richard A. Lord, 24 Williston on Contracts § 64:16 (4th ed. 2022) (noting limitations on recovering consequential damages but collecting several cases where consequential damages were awarded); <u>compare</u> Timothy Murray, 11 Corbin on Contracts § 59.1 (2021) ("It is well established that, as a general rule, no damages will be awarded for the mental distress or emotional trauma that may be caused by a breach of traditional contract . . . ."), <u>with</u> <u>id.</u> § 56.6 (discussing the availability of, and limitations on, consequential damages generally).

were for breach of contract.[41]   If Montgomery can demonstrate the District's failure to accommodate his disability caused his prosecution and confinement, he can recover damages for these harms.

Which brings the Court to the causation question the District strenuously raises in its briefs: has Montgomery produced sufficient evidence for a reasonable jury to conclude that his prosecution and confinement would not have occurred had the District reasonably accommodated his disability?  Whether one event can be described as the cause of another is an intensely fact-sensitive question and "ordinarily is one for the jury."  Colonial Parking, Inc. v. Morley, 391 F.2d 989, 990 (D.C. Cir. 1968); accord Seed Co. Ltd. v. Westerman, Hattori, Daniels & Adrian, LLP, 961 F.31 1190, 1197 (D.C. Cir. 2020) (applying D.C. law).  The District has submitted substantial evidence supporting its position that it would have prosecuted Montgomery even without considering the inculpatory statements he made during his interrogations.  Most notably, the affidavit filed in support of Montgomery's arrest did not mention his statements, and while the prosecution informed the court of those statements at the preliminary hearing, it also said that it was not relying on them to establish probable cause.  Mem. in Supp. of Mot. at 22; see also Aff. in Supp. of Arrest Warrant; Preliminary Hearing at 12:9–13:2.

But the fact that the District could have prosecuted Montgomery had his interrogations not occurred does not mean that the District would have prosecuted him had he been able to

---

[41] Cummings's conclusion that emotional distress damages are not available in certain anti-discrimination lawsuits applies regardless of the facts of the particular case.  See 142 S. Ct. at 1568, 1570–72.  Barnes also discussed the availability of punitive damages categorically.  See 536 U.S. at 183.  The Court does not read these cases as instructing courts to question whether the particular facts of a plaintiff's injury would have been foreseeable to the public entity at the time it agreed to receive federal funding.  Such an analysis would be necessary in an actual contract case involving consequential damages, see Klayman, 255 F. Supp. 3d at 168, but that analysis is not appropriate here, see Barnes, 536 U.S. at 186 ("[W]e have been careful not to imply that all contract-law rules apply to Spending Clause legislation . . . .").  Montgomery's claim is not for breach of contract, see id. at 188 n.2, and whether his injuries were sufficiently foreseeable is better analyzed under the proximate cause standard traditionally applied in tort cases and discussed below.

meaningfully access and participate in his interrogations. Arguably the heart of Montgomery's amended complaint is that "[t]he [District] never looked beyond the 'ready-made' suspect, despite compelling evidence that [he] was not the person responsible for Ms. Jones' murder." Am. Compl. ¶ 12. Montgomery supports this claim by alleging that the District ignored many pieces of exonerating evidence in its possession, including DNA evidence, video footage, and eyewitness testimony. See id. ¶¶ 10–12, 74 (DNA from crime scene not matching Montgomery or Jones); id. ¶¶ 35–41, 59–71 (eyewitness testimony indicating that the murderer was wearing different clothes than Montgomery, was able to run faster than Montgomery's limp would allow, and would have had significant bruises at the time of Montgomery's interrogations); id. ¶¶ 46–48 (video footage showing Montgomery leaving crime scene before the murder ), id. ¶¶ 52–57, 73 (video footage depicting alleged killer fleeing crime scene). The District does not challenge the accuracy of Montgomery's description of this evidence, and when viewed in his favor, it supports the conclusion that—had the District not become convinced during Montgomery's interrogations that he was the murderer—it would not have moved forward with Montgomery's prosecution. Indeed, that appears to be the conclusion of one of Montgomery's experts. See Stefano Expert Report at 10 ("Mr. Montgomery was denied . . . accommodations during his police interrogations. As a result, he provided inculpatory statements that resulted in him being charged with murder."); accord Kenneth Stefano Dep. Tr. [ECF No. 56-7] at 57:12–58:15.

During the course of this litigation, the District has argued that an interrogation's goal is to obtain incriminating, not exculpatory, evidence. Mem. in Supp. of Mot. to Dismiss at 13. But according to one of the District's own summary judgment exhibits, "[t]here are a number of possible outcomes of a successful interrogation other than obtaining a confession. Some of these are: (1) The subject is innocent . . . . Throughout an interrogation the investigator's goal is always

to learn the truth."  Reid Technique Mem. [ECF No. 60-1] at 3; <u>see also</u> <u>id.</u> ("[T]he objective of an interrogation is to elicit the truth from a subject, not a confession.").    Applying that understanding to this case, and accepting Montgomery's allegations as true, a "successful" interrogation of Montgomery could have pointed the District away from Montgomery as a suspect and toward the District's other evidence.    Whether offering Montgomery a reasonable accommodation—such as conducting his interrogations in the presence of an officer trained in crisis intervention, <u>see</u> Trevino and Smarro Expert Report at 14–15—would have resulted in a "successful" interrogation is, admittedly, speculative.  But the claim is not so implausible as to warrant the entry of summary judgment at this time.  Cf. <u>Bahl</u>, 695 F.3d at 788–89 (concluding that a post-arrest interrogation was a covered "'service' or 'activity'" under the ADA because providing the interrogation with an accommodation would have enabled disabled arrestee to "tell his side of the story, which arguably could have affected the charging decision").[42]

### Conclusion

For the foregoing reasons, the Court will deny the District's motion for summary judgment. Ultimately, Montgomery must prevail on many issues beyond those discussed in this Memorandum Opinion to establish an entitlement to recover.  But viewing the record currently before the Court in the light most favorable to Montgomery, the Court concludes that the District

---

[42] Although the District's summary judgment motion claims that the violations of Montgomery's rights did not proximately cause his prosecution, <u>e.g.</u>, Mem. in Supp. of Mot. at 21, the District argues only that its failure to offer Montgomery an accommodation was not a "but-for" case of his prosecution, <u>see id.</u> at 21–26 (arguing only that Montgomery's prosecution would have happened even if he had been granted an accommodation during his interrogations). For the reasons discussed above, the Court concludes that the District's "but-for" causation argument is not sufficient to merit judgment as a matter of law.  The Court does not interpret the District's motion as raising the related proximate causation question of whether these damages are too unforeseeable to permit Montgomery to recover even if "but-for" causation is established.  The Court will not resolve that foreseeability issue now, but it notes that Montgomery must demonstrate that a reasonable jury could resolve the issue in his favor to succeed at trial.  <u>See</u> <u>Lexmark Int'l, Inc. v. Static Control Components, Inc.</u>, 572 U.S. 118, 133 (2014) ("[T]he proximate-cause requirement generally bars suits for alleged harm that is 'too remote' from the defendant's unlawful conduct."); <u>Atlanta Channel, Inc. v. Solomon</u>, Civ. A. No. 15-1823 (RC), 2020 WL 4219757, at *8 (D.D.C. July 23, 2020) (applying D.C. law and noting "[q]uestions of proximate cause are nearly always left to the jury to decide").

has not demonstrated its entitlement to judgment as a matter of law on Montgomery's claims.  A

separate Order will issue on this date.


_____/s/_____
JOHN D. BATES
United States District Judge

Dated:  <u>May 23, 2022</u>