# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **BRANDON MONTGOMERY, as personal representative for the estate of Gary Montgomery,**<br><br>　　　**Plaintiff,**<br><br>　　　　**v.**<br><br>**DISTRICT OF COLUMBIA,**<br><br>　　　**Defendant.** | **Civil Action No. 18-1928 (JDB)** |

## <u>MEMORANDUM OPINION</u>

Before the Court is a motion by defendant District of Columbia (the "District") seeking partial reconsideration of the Court's May 23, 2022 Memorandum Opinion. This case arises out of the District's prosecution of Gary Montgomery ("Montgomery"), a mentally disabled man, for murder, of which he was ultimately acquitted. This § 1983 lawsuit was brought by plaintiff Brandon Montgomery in his capacity as a personal representative for Montgomery's estate.[1] It alleges, among other things, that the District violated Montgomery's rights under Title II of the Americans with Disabilities Act ("ADA") when it failed to accommodate him during his post-arrest interrogation in which he gave inculpatory statements while he was suffering a mental health episode due to his schizophrenia. In a previous Opinion, the Court denied the District's motion for summary judgment on this claim. The District now asks the Court to reconsider its conclusion that a reasonable jury could find that had the District accommodated Montgomery during the interrogation, he would not have been prosecuted and confined. For the reasons explained below, the Court will deny the motion.

---

[1] When this Opinion refers to "Montgomery," it is either referring to Gary Montgomery or his estate, depending on the context.

## Background

### I.   Factual Background[2]

On February 2, 2012, Deoni Jones was fatally stabbed at a bus stop in Washington, D.C. Def.'s Reply in Supp. of Statement of Undisputed Material Facts & Resp. to Pl.'s Statement of Materially Disputed Facts [ECF No. 60-2] ("Reply ISO SUF") ¶ 1.   Metropolitan Police Department ("MPD") Detectives Brian Wise and Hosam Nasr investigated the murder.   Id. ¶ 2. Attalah Gabriel, a bystander who left the bus stop shortly before Jones was murdered, reported that she had noticed a man staring at Jones while Gabriel sat at the bus stop.   Id. ¶¶ 3–4.   Video surveillance reveals that, shortly after Gabriel left the bus stop, Jones did as well, and the man Gabriel had identified followed Jones.   Id. ¶ 5.   A few minutes later, Jones and the man (or someone who looked similar) returned to the bus stop, at which point the man stabbed Jones in the head. Id.   Gabriel was later presented with a nine-person photo array, pointed to Montgomery's photo, and said that he "look[ed] like" the man at the bus stop.   Id. ¶ 4.

Sakeithia Taylor and Jermaine Jackson, who were in a car stopped at a nearby traffic light, exited their vehicle upon witnessing the man attack Jones.   Reply ISO SUF ¶¶ 6–7; Ex. 4 to District's Mot. for Summ. J. ("Mot. for Summ. J.") [ECF No. 53-4] ("Jackson Incident/Investigation Report").   Taylor tended to Jones while Jackson chased the perpetrator, eventually caught up to him, punched him hard enough that the perpetrator fell to the ground, and kicked the perpetrator multiple times, including in the head.   Jackson Incident/Investigation Report; Ex. 13 to Pl.'s Opp'n to Def.'s Mot. for Recons. ("Opp'n") [ECF No. 68-13] ("Jackson Interview") 25:19–21.   The perpetrator managed to escape, and Jackson chased after him but could

---

[2] The Court assumes familiarity with the extensive factual history detailed in its previous Opinion, see Montgomery v. Dist. of Columbia ("Montgomery II"), Civ. A. No. 18-1928 (JDB), 2022 WL 1618741, at *1–6 (D.D.C. May 23, 2022), and will accordingly only recite the facts necessary to resolve the instant motion.

not catch up with him.  Jackson Incident/Investigation Report.  Jackson later described the killer as a "Black Male, 5'9-5'11, 150-160lbs, medium complexion, between 33-40 years old, wearing blue jeans, a black quilted jacket, and a gray hooded sweat shirt underneath the jacket with the hood pulled up," and as possibly having a beard.  Id.  Taylor described the perpetrator as a Black man "with big wide eyes" and "wearing a black and white knit hat" and "a black jacket."  Ex. 3 to Mot. for Summ. J. [ECF No. 53-3] ("Taylor Witness Statement") at 1.

MPD publicly released a video of a man crossing the street near the bus stop near the time of the murder, and two tipsters identified Montgomery as the man in the video.  Reply ISO SUF ¶¶ 10–11.  A third tipster, Michael Harris, initially identified the man as a different man named Mark Johnson.  Ex. 7 to Mot. for Summ. J. [ECF No. 53-7] ("Harris Incident/Investigation Report") at 1.  Wise then showed Harris a photo of Montgomery, to which Harris responded, "[Y]ou might be on to something[,] but I don't think [Montgomery] walks that fast."  Id. at 2.  A few days later, Harris called the detectives to tell them that he believed Montgomery was the man in the video.  Id.

Wise and Nasr first interrogated Montgomery on February 4, two days after the murder.  Reply ISO SUF ¶ 17.  Montgomery was wearing a brown jacket, white shoes, and tan pants at that time, which he told detectives he had been wearing for the past four days (which would have included the day Jones was murdered).[3]  Ex. 12 to Mot. for Summ. J. [ECF No. 53-12] ("Preliminary Hr'g Tr.") 47:14–49:16; Ex. 1 to Opp'n [ECF No. 68-1] ("Wise Dep. Tr.") 246:2–5; Ex. 3 to Opp'n [ECF No. 68-3] ("Montgomery Statement") 10:3–6.  Montgomery did not present obvious signs of bruising on his face.  Wise Dep. Tr. 238:1–4.  Montgomery stated he was "55 years young," 6'0" to 6'2", 157 to 158 pounds, and that he had a significant limp caused by

---

[3] Montgomery was homeless in February 2012.  Pl.'s Opp'n to Def.'s Mot. for Summ. J. [ECF No. 56] at 1.

falling off a ladder one year prior to the interrogation.  Ex. 19 to Mot. for Summ. J. [ECF No. 53-19] ("Montgomery Statement II") 6:3–7:2, 7:10–22.

Montgomery had a history of mental health issues, including schizophrenia.  Reply ISO SUF ¶¶ 22, 24.  Wise and Nasr found it difficult to communicate with Montgomery during the February 4 interrogation and found that many of his answers were nonsensical or incoherent.  See Ex. 8 to Mot. for Summ. J. [ECF No. 53-8] ("Wise Dep. Tr. II") 207:14–17; Ex. 2 to Opp'n to Mot. for Summ. J. [ECF No. 56-4] ("Nasr Dep. Tr. II") 151:4–152:8.  The District does not dispute that Wise and Nasr suspected Montgomery might have been mentally ill at the time of the February 4 interrogation and that they did not offer Montgomery any accommodation.  Def.'s Resp. to Pl.'s Statement of Materially Disputed Facts [ECF No. 60-3] ("Resp. to SDF") ¶¶ 53–54, 56.  Montgomery made the following inculpatory statements during that interrogation:

- Montgomery identified himself as a man crossing the street near where the murder occurred, putting himself at the scene of the crime.  Montgomery Statement 10:12–21; Wise Dep. Tr. 231:14–232:10.

- Montgomery said he was at the bus stop on the night of the murder.  Montgomery Statement 10:22–11:4; Wise Dep. Tr. 231:14–232:10; Ex. 2 to Opp'n [ECF No. 68-2] ("Nasr Dep. Tr.") 153:7–9.

- Montgomery described how the victim looked and was dressed as well as the victim's physical characteristics.  Nasr Dep. Tr. 153:10–154:1.

- Montgomery gave statements that the detectives interpreted to mean the victim rejected his sexual advances while they were together at the bus stop.  Id. 157:7–162:13.

- Montgomery said he "crushed" the "pretty lady," which detectives interpreted to mean he had murdered Jones.  Montgomery Statement 200:7–16; <u>see</u> Nasr Dep. Tr. 154:12–22.

- When the detectives asked Montgomery to act out what he did to the "pretty lady," he made a motion that detectives interpreted as further confirmation that he was guilty of murder.  Wise Dep. Tr. 226:4–228:15.

- Montgomery gave a description of a knife he previously owned that was similar to the description of the murder weapon.  Reply ISO SUF ¶ 18.

- The detectives interpreted Montgomery's mental illness as evidence of his guilt because he gave erratic answers.  <u>See</u> Nasr Dep. Tr. II 151:8–152:20; Nasr Dep. Tr. 153:1–154:22.

The District does not dispute that Montgomery's "mental illness and psychotic symptoms made him more susceptible to coercive or deceptive interview tactics and more likely to acquiesce and agree to whatever the detectives said."  Resp. to SDF ¶ 89.  The detectives then took Montgomery to the bus stop, and he admitted to seeing the victim there the night of her murder.  Ex. 9 to Mot. for Summ. J. [ECF No. 53-9] ("Montgomery Incident/Investigation Report").

Following this interview, the District sought a warrant for Montgomery's arrest.  Reply ISO SUF ¶ 15.  The affidavit the District submitted in support of the warrant did not include the inculpatory statements Montgomery made during the interrogation and later at the bus stop.  <u>Id.</u> ¶ 20; <u>see also</u> Ex. 1 to Mot. for Summ. J. [ECF No. 53-1] ("Aff. in Supp. of Arrest Warrant").  A D.C. Superior Court judge approved the application for the warrant on February 10, 2012.  Reply ISO SUF ¶ 16.  The next day, Montgomery was charged with second-degree murder.  <u>Id.</u> ¶ 21.

On February 23, the Superior Court held a preliminary hearing to establish probable cause for the murder charge.   Reply ISO SUF ¶ 25.   During the hearing, Nasr testified about Montgomery's inculpatory statements, and the court referenced those inculpatory statements in support of its finding of probable cause for the murder charge; however, the court also said that these statements were not critical to its decision.  Preliminary Hr'g Tr. 10:25–13:2, 68:10–17.

Over the next five years, Montgomery was confined at a mental institution, and there was ongoing dispute about whether he was competent to stand trial.  Reply ISO SUF ¶ 30.  During this period, several pieces of exculpatory evidence and other circumstances came to light that called Montgomery's guilt or the integrity of the investigation into question:

- After the interrogation, Wise took a sample of Montgomery's DNA and compared it to that found at the crime scene, and the samples did not match.  Wise Dep Tr. 254:13–18.  The detectives did not put the DNA sample from the crime scene on the DNA database known as CODIS to see if it matched any known individuals.  Id. 254:19–21. It is common practice to run DNA in CODIS.  Ex. 4 to Opp'n [ECF No. 68-4] ("Parker Dep. Tr.") 45:17–47:3; Ex. 12 to Opp'n [ECF No. 68-12] ("Rice Dep. Tr.") 158:16–160:1.

- The only two witnesses who observed the murder itself—Taylor and Jackson—were not shown any photo arrays to identify the perpetrator.  Wise Dep. Tr. 239:9–16.  The only eye-witness identification was from Gabriel, who had left the bus stop before the murder.  It is common practice to show eye witnesses a photo array to aid in identifying the suspect.  See Rice Dep. Tr. 58:7–11.

- MPD did not fully investigate Mark Johnson, a suspect initially identified by one tipster as the man in the publicly released video.  Johnson was near the crime scene on the

night of Jones's murder.  Wise Dep. Tr. 248:17–249:5.  The detectives interviewed

Johnson, and he offered an alibi, but detectives never tried to confirm the truth of the

alibi.  Id. 249:6–250:5; Nasr Dep. Tr. 192:7–22.

In late 2016, Montgomery was found competent to stand trial in Superior Court.  See

Montgomery v. Dist. of Columbia ("Montgomery I"), Civ. A. No. 18-1928 (JDB), 2019 WL

3557369, at *3 (D.D.C. Aug. 5, 2019).  During the two-week trial in July 2017, the District

introduced into evidence Montgomery's inculpatory statements from the interrogation.  Resp. to

SDF ¶¶ 98–101.  The District also played hours of video from the interrogation.  Id. ¶ 101; see also

Ex. 8 to Opp'n [ECF No. 68-8] ("Aug. 8, 2017 Trial Tr.") 4:24–5:20.  At the close of trial,

Montgomery was acquitted by the jury.  Reply ISO SUF ¶ 30.

## II.  Procedural Background

Brandon Montgomery, in his capacity as the personal representative of Gary

Montgomery's estate, filed this suit against the District, Wise, Nasr, and unnamed officers in

August 2018.  See Compl. & Jury Demand [ECF No. 1].  After the Court granted the District's

motion to dismiss two of the counts in that complaint, see Montgomery I, 2019 WL 3557369, at

*10, Montgomery filed an amended complaint, Am. Compl. & Jury Demand [ECF No. 48]

("Compl.").  The amended complaint claims that the District violated Montgomery's rights under

Title II of the ADA and Section 504 of the Rehabilitation Act by failing to accommodate his

disability during two interrogations.  Id. ¶¶ 127–55.

The District moved for summary judgment on both claims in September 2021.  See Mot.

for Summ. J. [ECF No. 53].  The Court denied the motion.  See Montgomery II, 2022 WL 1618741,

at *29.  Relevant here, the Court held that Montgomery "produced sufficient evidence for a

reasonable jury to conclude that his prosecution and confinement would not have occurred had the

District reasonably accommodated his disability," which is required to show the requisite proximate cause of his injury.  Id. at *28.  The Court first observed that proximate cause is typically a "fact-sensitive question" that is best left for the jury.  Id.  It then acknowledged that the arrest warrant supporting Montgomery's arrest "did not mention his [inculpatory] statements" and that the Superior Court did "not rely[] on them to establish probable cause" for the murder charge.  Id.  Nevertheless, it noted that "the fact that the District could have prosecuted Montgomery had his interrogations not occurred does not mean that the District would have prosecuted him had he been able to meaningfully access and participate in his interrogations."  Id.  The Court took notice of the pieces of exonerating evidence the District "ignored" and concluded that "when viewed in [Montgomery's] favor, [the evidence] supports the conclusion that—had the District not become convinced during [his] interrogations that he was the murderer—it would not have moved forward with [his] prosecution."  Id.  Ultimately, the Court held that

> [w]hether offering Montgomery a reasonable accommodation—such as conducting his interrogations in the presence of an officer trained in crisis intervention—would have resulted in a "successful" interrogation is, admittedly, speculative.  But the claim is not so implausible as to warrant the entry of summary judgment at this time.

Id. (citation omitted).

The District filed a motion for partial reconsideration of the Court's holding on proximate cause in August 2022.  See Def.'s Mot. for Recons. of the Court's May 23, 2022 Mem. Op. & Order [ECF No. 66] ("Mot.").  Montgomery filed an opposition to the motion, see Opp'n [ECF No. 68], and the District replied in support of its motion, see Reply in Supp. of Mot. [ECF No. 69] ("Reply").  The motion is now ripe for decision.

**Legal Standard**

"[A]ny order or other decision . . . that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties . . . may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities."  Fed. R. Civ. P. 54(b).  Reconsideration of such a decision "is available under the standard 'as justice requires.'"  Mahoney v. U.S. Capitol Police Bd., 566 F. Supp. 3d 22, 25 (D.D.C. 2022) (quoting Judicial Watch v. Dep't of Army, 466 F. Supp. 2d 112, 123 (D.D.C. 2006)).  A court's discretion to grant reconsideration under Rule 54(b) is "subject to the caveat that where litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again."  Singh v. George Wash. Univ., 383 F. Supp. 2d 99, 101 (D.D.C. 2005) (internal quotation marks omitted); accord Mahoney, 566 F. Supp. 3d at 25 ("The 'as justice requires' standard is hardly a free pass . . . .").

When deciding whether justice requires granting a motion for reconsideration, a court considers whether it "'has patently misunderstood a party,' 'has made a decision outside the adversarial issues presented to the Court by the parties,' 'has made an error not of reasoning but of apprehension,'" or whether there has been "a controlling or significant change in the law or facts . . . since the submission of the issue to the Court."  Cobell v. Norton, 224 F.R.D. 266, 272 (D.D.C. 2004) (citation omitted); accord United States v. Sutton, Crim. No. 21-0598 (PLF), 2021 WL 5999407, at *2 (D.D.C. Dec. 20, 2021).  "[A]rguments that could have been, but were not, raised previously and arguments that the court has already rejected are not appropriately raised in a motion for reconsideration."  United States v. Sullivan, Crim. A. No. 21-78 (EGS), 2022 WL 3027007, at *2 (D.D.C. Aug. 1, 2022) (quoting United States v. Booker, 613 F. Supp. 2d 32, 34 (D.D.C. 2009)); accord Terrell v. Mr. Cooper Grp., Inc., Civ. A. No. 20-0496 (CKK), 2021 WL

2778542, at *3 (D.D.C. July 2, 2021) ("A Rule 54(b) motion 'cannot be used to reargue facts and theories upon which a court has already ruled or to present theories or arguments that could have been advanced earlier.'" (citation omitted)).  "In order to promote finality, predictability and economy of judicial resources, 'as a rule a court should be loathe to revisit its own prior decisions in the absence of extraordinary circumstances such as where the initial decision was clearly erroneous and would work a manifest injustice.'"  Pueschel v. Nat'l Air Traffic Controllers' Ass'n, 606 F. Supp. 2d 82, 85 (D.D.C. 2009) (cleaned up) (quoting Lederman v. United States, 539 F. Supp. 2d 1, 2 (D.D.C. 2008)).

## Analysis

The District argues that the Court erred in holding that Montgomery's evidentiary showing on proximate cause was sufficient to defeat the District's summary judgment motion.  First, it argues that the Court "incorrectly relied on the allegations in Plaintiff's Amended Complaint, not upon record evidence proffered by Plaintiff in his Opposition to summary judgment."  Mot. at 4–5.  Second, it argues that "plaintiff failed to adduce evidence that the failure to accommodate was the but for cause of Montgomery's prosecution."  Id. at 7 (capitalization omitted).  Montgomery disagrees, primarily arguing that he has carried his evidentiary burden at this stage to show proximate cause because (1) "MPD detectives and prosecutors believed the interrogations yielded material evidence, and they relied on that evidence at a probable cause hearing and at trial," Opp'n at 3 (capitalization omitted), and (2) "the district's unlawful actions denied [him] the chance to clear his name," id. at 9 (capitalization omitted).

### I.   The Appropriate Legal Standard

The District first contends that "[i]n holding that a reasonable jury could find that Montgomery's prosecution and detention were proximately caused by the failure to accommodate,

the Court incorrectly relied on the allegations in Plaintiff's Amended Complaint, not upon record evidence proffered by Plaintiff in his Opposition to summary judgment." Mot. at 4–5. In this respect, the District primarily takes issue with this section of the Court's opinion:

> [b]ut the fact that the District <u>could</u> have prosecuted Montgomery had his interrogations not occurred does not mean that the District <u>would</u> have prosecuted him had he been able to meaningfully access and participate in his interrogations. Arguably the heart of Montgomery's amended complaint is that "[t]he [District] never looked beyond the 'ready-made' suspect, despite compelling evidence that [he] was not the person responsible for Ms. Jones' murder." Am. Compl. ¶ 12. Montgomery supports this claim by alleging that the District ignored many pieces of exonerating evidence in its possession, including DNA evidence, video footage, and eyewitness testimony. <u>See id.</u> ¶¶ 10–12, 74 (DNA from crime scene not matching Montgomery or Jones); <u>id.</u> ¶¶ 35–41, 59–71 (eyewitness testimony indicating that the murderer was wearing different clothes than Montgomery, was able to run faster than Montgomery's limp would allow, and would have had significant bruises at the time of Montgomery's interrogations); <u>id.</u> ¶¶ 46–48 (video footage showing Montgomery leaving crime scene before the murder), <u>id.</u> ¶¶ 52–57, 73 (video footage depicting alleged killer fleeing crime scene). The District does not challenge the accuracy of Montgomery's description of this evidence, and when viewed in his favor, it supports the conclusion that—had the District not become convinced during Montgomery's interrogations that he was the murderer—it would not have moved forward with Montgomery's prosecution.

<u>Montgomery II</u>, 2022 WL 1618741, at *28 (all but first alteration in original). The District notes that the Court's citation in this paragraph to the pleadings rather than to the record evidence is problematic because "allegations in a complaint . . . may not be relied upon" in resolving a motion for summary judgment. Mot. at 5.

The District's concern is well-taken. The Court acknowledges that reliance on the allegations in the complaint is inappropriate in resolving a summary judgment motion. However, as set forth below, all of the allegations the Court cited are borne out as facts in the record:

| Allegation | Factual Support in Record |
|---|---|
| "DNA testing was conducted on clothes MPD recovered from the crime scene—clothes MPD believed were left by the murderer—and Defendants obtained a full male DNA | After the interrogation, Wise took a sample of Montgomery's DNA and compared it to that found at the crime scene; the samples did not match. Wise Dep Tr. 254:13–18. |

| | |
|---|---|
| profile. This full male DNA profile did not match the decedent or Mr. Montgomery and the results excluded Mr. Montgomery as the murderer." Compl. ¶ 10; see also id. ¶ 74. | |
| "The Defendants, in 2012 and at no time thereafter made any attempts to compare the DNA profile obtained from the clothing to the DNA profile of another suspect who two callers/tipsters identified and which suspect Detective Brian Wise interviewed five days after the murder, who placed himself on the scene of the murder during that interview." Compl. ¶ 11. "Defendants also failed to enter the DNA profile from the clothing found at the murder scene into CODIS. The Defendants never looked beyond the 'ready-made' suspect, despite compelling evidence that Mr. Montgomery was not the person responsible for Ms. Jones' murder." Id. ¶ 12. | A tipster identified Mark Johnson as the man in the publicly released video, and Johnson was near the crime scene on the night of Jones's murder. Harris Incident/Investigation Report at 1; Wise Dep. Tr. 248:17–249:5. The detectives interviewed Johnson, and he offered an alibi, but detectives never tried to confirm the truth of the alibi. Id. 249:6–250:5; Nasr Dep. Tr. 192:7–22. The detectives did not put the DNA sample from the crime scene on the DNA database known as CODIS to see if it matched any known individuals. Wise Dep. Tr. 254:19–21. |
| "Seconds after the murder occurred, Mr. Jackson physically fought with the murderer . . . , but the killer eventually escaped running on foot . . . ." Compl. ¶ 35; see also id. ¶¶ 36, 38–41. | Jackson chased the perpetrator, eventually catching up to him, punching him hard enough that the perpetrator fell to the ground, and kicked the perpetrator multiple times, including in the head. Jackson Incident/Investigation Report; Jackson Interview 25:18–21. The perpetrator managed to escape, and Jackson could not catch up with him. Jackson Incident/Investigation Report. |
| "Mr. Jackson described the man who killed Ms. Parker as a 5'9"-5'11" or 6'0 roughly, 30-40 years old, wearing a gray hoodie under a black puffy jacket with raised quilted squares and he thought the killer had a full beard." Compl. ¶ 37. | Jackson later described the killer as a "Black Male, 5'9-5'11, 150-160lbs, medium complexion, between 33-40 years old, wearing blue jeans, a black quilted jacket, and a gray hooded sweat shirt underneath the jacket with the hood pulled up," and as possibly having a beard. Jackson Incident/Investigation Report. |
| "Mr. Montgomery walked with a prominent limp because he had a chronic right leg injury." Compl. ¶ 60; see also id. ¶ 59. | Montgomery stated he had a significant limp caused by falling off a ladder one year prior to the interrogation. Montgomery Statement II 7:10–22. |

| | |
|---|---|
| "The February 4, 2012 photos and video of Mr. Montgomery showed him wearing a light camel/brown colored jacket and khaki pants and white tennis shoes."  Compl. ¶ 68.  "The clothing Mr. Montgomery was wearing at the time of his arrest on February 4, 2012 was the same clothing he had on the night Ms. Jones was murdered."  Id. ¶ 69. | Montgomery was wearing a brown jacket, white shoes, and tan pants at that time, which he told detectives he had been wearing for the past four days (which would have included the day Jones was murdered).  Preliminary Hr'g Tr. 47:14–49:16; Wise Dep. Tr. 246:2–5; Montgomery Statement 10:3–6. |
| "Additional video footage collected by the MPD taken from a camera directly across from the bus stop showed Mr. Montgomery leave the bus stop before the murder of Ms. Jones and walk across a nearby street behind the bus stop, leaving the area entirely."  Compl. ¶ 46.  "[N]o video footage showed Mr. Montgomery return to the bus stop prior to the time Ms. Jones was murdered."  Id. ¶ 47. | Gabriel, a bystander who left the bus stop shortly before Jones was murdered, reported noticing a man who was staring at Jones.  Reply ISO SUF ¶¶ 3–4.  Video surveillance reveals that, shortly after Gabriel left the bus stop, Jones did as well, and the man followed her.  Id. ¶ 5.  A few minutes later, Jones and the man (or someone who looked similar) returned to the bus stop, at which point the man stabbed Jones in the head.  Id.  Gabriel was presented with a nine-person photo array, pointed to Montgomery's photo, and said that he "look[ed] like" the man at the bus stop.  Id. ¶ 4.  Three others identified Montgomery as the man in the publicly released video depicting a man crossing the street near the bus stop, id. ¶¶ 10–11; Harris Incident/Investigation Report at 2.  No one identified Montgomery as the man who killed Jones. |
| "The person who fled down the southeast side of East Capitol within five minutes of the murder of Ms. Jones was the killer.  This person was running at a very fast clip . . . ."  Compl. ¶ 53. | A portion of the video MPD did not release to the public showed the murderer fleeing the bus stop at a fast pace.  Wise Dep. Tr. 158:22–159:5. |

Thus, because the allegations cited by the Court in its Opinion are supported by evidence in the record, any error the Court made by referencing the complaint rather than the record is inconsequential.

13

The District also takes issue with the phrasing of the Court's conclusion: "[w]hether offering Montgomery a reasonable accommodation—such as conducting his interrogations in the presence of an officer trained in crisis intervention—would have resulted in a 'successful' interrogation is, admittedly, speculative.  But the claim is not so implausible as to warrant the entry of summary judgment at this time," Montgomery II, 2022 WL 1618741, at *28 (citation omitted).  Mot. at 5–6.  The District mainly disputes the Court's use of the words "speculative" and "implausible"—words commonly associated with the motion to dismiss standard rather than the summary judgment standard.  See id. at 6.  It then claims that "[t]o survive a motion for summary judgment based on insufficient damages, a plaintiff must show that damages exist and are not speculative," and cites several cases it claims supports that proposition.  Id. at 6 (collecting cases).

As an initial matter, the District improperly characterizes its motion for summary judgment as one "based on insufficient damages."  Mot. for Reconsideration at 6.  The issue here is not damages but rather proximate cause, which is a related yet distinct concept.  Hence, the paragraph in the District's brief devoted to damages, see id., is inapposite.  Further, the District's assertion that Montgomery's theory—that had he been accommodated, he would not have been prosecuted—is too speculative to survive summary judgment, see Mot. at 5–6, is incorrect.  The proximate cause inquiry is inherently speculative as it necessarily deals in counterfactuals—it requires the fact finder to draw inferences about what would have happened given a different set of circumstances.

It cannot be the case that every plaintiff bringing a claim like Montgomery's—or any claim requiring a showing of proximate cause—could never succeed because the finder of fact is prohibited from making any inferences based on the existing evidence.  So long as they are supported by a preponderance of the evidence in the record, a fact finder can certainly make

14

reasonable inferences in the plaintiff's favor.  Indeed, the District itself asks the Court to conclude that its own proposed inferential chain and subsequent conclusion would have been more likely than not—it argues that had Montgomery been accommodated, he still would have been prosecuted.  That conclusion is one that depends on speculation and deals in counterfactuals— something the District claims is impermissible at the summary judgment stage.  As discussed further below, there is sufficient circumstantial evidence in the record to support Montgomery's theory of proximate cause and, hence, to preclude summary judgment for the District.

## II.    Proximate Cause

The District also argues that Montgomery "failed to adduce evidence that the failure to accommodate was the but for cause of [his] prosecution."  Mot. at 7 (cleaned up).  Montgomery disagrees, arguing that he has met his evidentiary burden on proximate cause because he has shown that (1) the District believed his inculpatory statements were material to his guilt, and (2) the District's failure to accommodate during his interrogation denied him the opportunity to make exculpatory statements and resulted in the District ignoring another suspect as well as other evidence that pointed away from Montgomery.  See Opp'n at 3–14.

"[T]he mere violation of the ADA alone does not establish injury.  Rather, the plaintiff is obligated to show . . . that the defendant's violation of the ADA proximately caused her actual injury before she can recover."  DeLeon v. City of Alvin Police Dep't, Civ. A. No. H–09–1022, 2010 WL 4942648, at *3 (S.D. Tex. Nov. 30, 2010) (citing Armstrong v. Turner Indus., Inc., 141 F.3d 554, 562 (5th Cir. 1998)).  A defendant may be entitled to summary judgment if the plaintiff fails to make this showing.  See Baker v. Univ. of Tex. Health Sci. Ctr. Hous., Civ. A. No. H-08-1908, 2011 WL 1549263, at *6 (S.D. Tex. Apr. 21, 2011); Fed. R. Civ. P. 56(a), (g). Whether one event can be described as the cause of another is an intensely fact-sensitive question

15

and "ordinarily is one for the jury."  Colonial Parking, Inc. v. Morley, 391 F.2d 989, 990 (D.C. Cir. 1968); accord Seed Co. Ltd. v. Westerman, Hattori, Daniels & Adrian, LLP, 961 F.3d 1190, 1197 (D.C. Cir. 2020).

### A.  Probable Cause

The District's primary argument is that Montgomery cannot show that he would not have been prosecuted had he been accommodated during the interrogation because "even without considering any of the statements Montgomery made during the investigation, probable cause supported his arrest and prosecution."  Mot. at 7–8.  The District cites several out-of-circuit cases for the proposition that "probable cause supporting police action precludes finding that the police action at issue was proximately caused by a plaintiff's disability."  Id. at 7–8 & n.2 (collecting cases).  Upon review of these cases, that assertion is incorrect as applied in this context.

The first case the District cites in support of this proposition is Patrice v. Murphy, 43 F. Supp. 2d 1156 (W.D. Wash. 1999).  Mot. at 7–8.  The plaintiff in Patrice, a deaf woman, brought an ADA claim based on a discriminatory arrest.  See 43 F. Supp. 2d at 1157.  Police were called to her home for a domestic violence incident, she was not accommodated with an American Sign Language ("ASL") interpreter during her interaction with the responding officers but rather was told to write down her statement, and she was ultimately arrested for domestic violence.  See id. at 1157–58.  She claimed that "with the help of an ASL interpreter, she could have talked her way out of the seemingly damning evidence and avoided arrest."  Id. at 1162.  The court first found that plaintiff's claim did not fall within the scope of the ADA.  Id. at 1160.  Then, in dictum, it noted that the officers did adequately accommodate plaintiff's disability "through the use of written materials."  Id. at 1161.  It went on to observe that even if her claim was cognizable under the ADA, she had not demonstrated the requisite proximate cause because she "was arrested

because probable cause existed, . . . not because she is disabled." <u>Id.</u>  The court found that probable cause existed for her arrest because plaintiff (through her written statement) and her husband both stated that "(1) [plaintiff's husband] thought plaintiff was going to use the knife to kill him and (2) plaintiff was the initial aggressor." <u>Id.</u> at 1162.  Thus, the arresting officers "obtained information from plaintiff which, on its face, established and/or confirmed the existence of probable cause." <u>Id.</u> at 1162–63.

 <u>Patrice</u> is distinguishable from the case at bar in many material respects.  First, the court in <u>Patrice</u> held that the plaintiff's claim was not cognizable under the ADA and, even if it were, plaintiff was adequately accommodated.  That is very different from the instant case, where the Court, in denying the District's motion for summary judgment, held that Montgomery has met his burden at this stage of showing a cognizable ADA claim based on the detectives' failure to accommodate him during his interrogation.  <u>See</u> <u>Montgomery II</u>, 2022 WL 1618741, at *7–12.  Second, the <u>Patrice</u> court's reasoning on the proximate cause point is entirely dicta, as it had already held that the plaintiff did not allege a cognizable ADA claim.  Last—and most critically— the injury alleged in <u>Patrice</u> was her <u>arrest</u>, not her subsequent <u>prosecution and detention</u>, as in this case.  Thus, the independent existence of probable cause in <u>Patrice</u> is much more probative of the fact that the plaintiff there would have been arrested even if she had been provided her desired accommodation.  In the instant case, the relevant harm is the prosecution, not the arrest.  The existence of probable cause is only one factor in the decision to charge and subsequently continue to prosecute a defendant all the way through to trial—prosecutors often decline to pursue charges against individuals whose arrests were supported by probable cause.  As this Court noted in its Opinion denying summary judgment, "the fact that the District <u>could</u> have prosecuted Montgomery had his interrogations not occurred does not mean that the District <u>would</u> have

prosecuted him had he been able to meaningfully access and participate in his interrogations." Id. at *28.  Patrice thus has limited applicability to the current case.

The other cases the District cites on this point are unpersuasive for similar reasons.  In J.H. ex rel. J.P. v. Bernalillo County, 806 F.3d 1255 (10th Cir. 2015), the plaintiff claimed that an officer who arrested her minor child (J.P.) with a learning disability violated the ADA when he "discriminated against J.P. by (1) making the arrest based on actions that manifested J.P.'s disability and (2) failing to make reasonable accommodations during the arrest."  806 F.3d at 1260.  The court held that "[t]hese claims are invalid as a matter of law . . . . [because the arresting officer] could make the arrest based on probable cause, and there is no evidence indicating that he was aware of a need to accommodate J.P.'s alleged disability."  Id.  The officer arrested J.P. because he witnessed her "commit a battery by kicking her teacher."  Id.  Thus, her alleged learning disability had nothing to do with the circumstances that led to her arrest.  See id.  The court accordingly held that the plaintiff did not meet her burden to demonstrate that there was an ADA violation or a lack of reasonable accommodation, so it did not even reach the issue of proximate cause.  Hence, that case is very different from the case at bar for many of the same reasons that Patrice is distinguishable—any discussion of proximate cause in J.P. is dicta; the Court has already determined here that Montgomery has met his burden at this stage of showing that he was discriminated against and was not adequately accommodated during his interrogation; and, most critically, in J.P. the alleged injury is the arrest itself, unlike in this case, where the alleged injury is Montgomery's subsequent prosecution and detention.

In Bircoll v. Miami-Dade County, 410 F. Supp. 2d 1280, 1285 (S.D. Fla. 2006), the plaintiff, who is deaf, sued officers who arrested him for driving under the influence, alleging that they violated his rights under the ADA.  410 F. Supp. 2d at 1281.  "Plaintiff allege[d] that

throughout the arrest process, [the arresting officers] failed to establish effective communication because [they] did not provide Plaintiff with any auxiliary aids as are required by the ADA . . . ." Id. The arresting officers witnessed the plaintiff "commit several traffic infractions[,] . . . smelled the odor of alcohol on Plaintiff's breath[,] and saw that Plaintiff had red and watery eyes." Id. at 1282. "[T]he officer [then] asked Plaintiff to perform a roadside sobriety test. The officer and Plaintiff communicated verbally during the test though Plaintiff allege[d] that he could not understand the officer. At the conclusion of the test, the officer found that Plaintiff was too impaired to drive." Id. The court first held that "Plaintiff's arrest and the events arising from the arrest do not fall within the protections of the ADA." Id. at 1285. When discussing the plaintiff's claim under the relevant state discrimination law, which applies ADA principles, the court determined that plaintiff was not entitled to his requested accommodation. Id. Then, the court noted that "[t]he arrest was not based on Plaintiff's disability and there is no causal connection between Plaintiff's disability and the arrest," and that "[t]o have a cause of action for discrimination under the ADA, there must be a causal link between a plaintiff's disability and the wrongful arrest; i.e., no other probable cause for the arrest exists." Id. For the same reasons as discussed previously in relation to the other two cited cases, the analysis in Bircoll is not persuasive in this case, most importantly because the alleged harm in Bircoll was the arrest rather than subsequent prosecution and detention.

The same is true of Trujillo v. Rio Arriba County ex rel. Rio Arriba County Sheriff's Department, 319 F.R.D. 571 (D.N.M. 2016), another case cited by the District that focused on the arrest as the injury, not the subsequent prosecution. See 319 F.R.D. at 579.

The circumstances presented in the District's final case, Gorrell v. Delaware State Police, No. 98-649-SLR, 1999 WL 1893142 (D. Del. Oct. 20, 1999), are more similar to Montgomery's

but are nevertheless distinguishable.  The plaintiff in Gorrell, who was deaf, alleged an ADA violation based on the police officer's failure to provide him an interpreter during an interview that led to his arrest and ultimate conviction at trial.  Id. at *1.  Instead of providing the plaintiff with an ASL interpreter, "the officer conducted the interview by way of written questions and answers as well as sign language interpretation by plaintiff's wife and seven-year-old daughter."  Id.  The plaintiff argued that the state's failure to provide him with a copy of the written interview violated his ADA rights.  Id. at *2.  The court first observed that "it is questionable whether plaintiff, in fact, suffered any injury that would suffice to invoke the ADA's protections."  Id. at *4.  It then noted, "assuming arguendo that plaintiff, in fact, was injured," "[p]laintiff does not explain how having a copy of the written interview would have changed the outcome of the trial."  Id. at *5.  Specifically, the court reasoned that "[s]ince the notes were never introduced at trial and the officer never testified as to their content, it is difficult to discern how the officer's failure to provide plaintiff a copy of the written interview was detrimental to his case."  Id.  The court also held that "plaintiff was provided all the accommodation required under the ADA."  Id.

Gorrell's circumstances are distinguishable in critical ways.  Unlike in Gorrell, Montgomery alleges that his injury—prosecution and detention for murder—would not have occurred had he been accommodated during his interrogation in which he made inculpatory statements.  And, unlike in Gorrell, the District did rely heavily on Montgomery's inculpatory statements at trial, further bolstering the claim that his prosecution would not have occurred but-for those statements.  Further, and importantly, this Court has already held that there is a triable issue as to whether Montgomery was provided adequate ADA accommodations.

Hence, none of the cases the District cites in support are persuasive on this issue, and the Court rejects the District's proposition that "probable cause defeat[s] proximate cause," Reply at 7–8, as a matter of law.

**B. Montgomery's Evidence**

The District contends that "Plaintiff offered no evidence . . . that Montgomery's prosecution was caused by the District's failure to accommodate him during his interviews." Mot. at 8. That is not true. There are several pieces of evidence that support Montgomery's theory of proximate cause sufficient to create a triable issue.

     i.   <u>Interrogation</u>

First, there is evidence indicating that had Montgomery been accommodated during the interrogation, he would not have made inculpatory statements, would have made exonerating statements, or would have provided information that would have pointed away from him as the suspect. The expert report and testimony by Dr. Kenneth Stefano, a psychologist, supports this inference. He testified that Montgomery's mental health episode during the interrogation caused him to "respond[], often, in tangential and non-sensible ways that . . . the detectives interpreted through a particular lens of presumed guilt[]." Ex. 5 to Opp'n to Mot. for Summ. J. [ECF No. 56-7] ("Stefano Dep. Tr.") 57:12– 21; <u>see also</u> <u>id.</u> 57:22–58:12; Ex. 5 to Mot. [ECF No. 68-5] ("Stefano Dep. Tr. II") 101:20–102:6. He further testified that the officers "ignored [Montgomery's] statement that, what he meant by crushing the pretty lady was that he had intercourse with her," not that he murdered her. Stefano Dep. Tr. II 101:9–14. Dr. Stefano concluded that, in his expert opinion, Montgomery's inculpatory statements were a "result[]" of being denied accommodations. Ex. 6 to Opp'n to Mot. for Summ. J. [ECF No. 56-8] ("Stefano Expert Report") ¶ 30. Moreover, the fact that Montgomery was ultimately acquitted of the murder

charge supports the inference that he is factually innocent and thus would have provided exculpatory information if properly accommodated.

The District argues that "Dr. Stefano is a psychologist, not a prosecutor; he has no expertise in the exercise of prosecutorial discretion and cannot therefore provide expert testimony about how a prosecutor would react to different evidence." Mot. at 9–10. The Court agrees. But that is not the inference for which Dr. Stefano's opinion is relevant. Rather, it is relevant for the first link in the inferential chain—that, had Montgomery been accommodated for his disability, he likely would not have made inculpatory statements or would have made exculpatory statements or provided information that would tend to exonerate him. As a psychologist, Dr. Stefano's opinion as to what Montgomery would have done had his psychotic mental health crisis been accommodated is appropriate. Any disagreement the District has regarding the weight that Dr. Stefano's opinion should be accorded can be argued at trial, but it is not an appropriate basis for granting summary judgment to the District.

The District further urges that "Plaintiff must prove how Montgomery's responses—had he been accommodated—would have caused the prosecutor to change course." Mot. at 10. But that is exactly what the expert report and testimony purport to do. Dr. Stefano opines that Montgomery's mental illness caused him to answer questions in an evasive and erratic way, which detectives could reasonably perceive as a sign of guilt. See Stefano Dep. Tr. II 89:16–90:15. Moreover, he notes that the detectives failed to follow up on Montgomery's statement that he "crushed" the victim. Id. 101:9–14. If followed up on properly with accommodation, Montgomery might have been able to explain what he meant by that statement. And Dr. Stefano concluded that an adequate accommodation would have made Montgomery more likely to offer exculpatory information, Stefano Expert Report ¶ 29, which is further corroborated by the fact that

Montgomery was acquitted of murder and that there is physical evidence that points away from his guilt. Last—and critically—the District does not dispute that Montgomery's "mental illness and psychotic symptoms made him more susceptible to coercive or deceptive interview tactics and more likely to acquiesce and agree to whatever the detectives said." Resp. to SDF ¶ 89.

Hence, the Court declines to alter its conclusion that Montgomery has provided sufficient evidence at this stage to allow a reasonable fact finder to conclude that, had he been accommodated during the interrogation, he would have either not made inculpatory statements or would have made exculpatory statements or provided other exonerating information.

ii.   Prosecution

The second link in the inferential chain that Montgomery must prove to establish proximate cause is that, had he not given inculpatory statements during the interrogation, he would not have been prosecuted. The District claims Montgomery has also not met his burden of production as to this link in the chain: "no reasonable juror could conclude that the failure to accommodate Montgomery caused the prosecution." Mot. at 11. The Court disagrees.

Montgomery has furnished sufficient evidence from which a reasonable fact finder could infer that the District would not have chosen to pursue its case against him if it had not extracted the inculpatory statements from him during the interrogation. The unique facts of this case suggest that Montgomery's inculpatory statements did more than just tip the evidentiary burden scales in favor of continuing prosecution—they caused the detectives to fixate and remain hyper-focused on Montgomery as a suspect at the expense of investigating other viable suspects, such as Mark Johnson. A jury could reasonably infer that investigation into the existence of the other viable suspect, paired with the other weaknesses of the case against Montgomery, would have made the District less likely to take its case against Montgomery all the way to trial.

23

First, a reasonable jury could infer that, had detectives not extracted inculpatory statements from Montgomery, the prosecutors would have dropped the charges against him based on lack of evidence sometime in the litigation timeline before trial.  The most probative evidence on this point is the extent to which the District relied on Montgomery's inculpatory statements at trial. The District played hours of video of Montgomery's interrogation.  Resp. to SDF ¶¶ 98, 101; see also Aug. 8, 2017 Trial Tr. 4:24–5:20.  They used that video to introduce Montgomery's inculpatory statements as evidence of his guilt.  Ex. 10 to Opp'n [ECF No. 68-10] ("Aug. 14, 2017 Trial Tr.") 125:7–23, 172:5–24.  The District also argued that it should be able to use the video recording of the interrogation as evidence that Montgomery has a capacity for violence.  See Ex. 9 to Opp'n [ECF No. 68-9] ("Aug. 9, 2017 Trial Tr.") 106:20–107:3, 109:23–110:5, 116:1–10; see also Ex. 11 to Opp'n [ECF No. 68-11] ("July 31, 2017 Trial Tr.") 74:10–75:4, 76:19–78:1. Importantly, the District cited the inculpatory statements in its closing, urging the jury to

> [l]isten to those statements.  When you listen to those statements, when you watch the videotape, you will understand and you know that it was the defendant who killed her. . . .  You cannot ignore the questions from the detectives and you cannot ignore the answers by Mr. Montgomery. . . .  [D]uring examination and questioning by the police, he told them exactly that that was him. He told . . . the detective what happened.  He talked about the pretty lady and that she did not give him the time of day and that he crushed the pretty lady.

Aug. 14, 2017 Trial Tr. 127:17–19, 167:10–12, 172:4–11.  This excerpt supports a reasonable inference that the inculpatory statements made during the interrogation were central to the District's case and, accordingly, that when deciding whether to pursue the charges against Montgomery all the way to trial, it considered these statements a centerpiece of the case against him.  As discussed above, the fact that independent probable cause existed supporting the arrest and the charge is necessary but not sufficient to show that the District would have continued to prosecute him without the inculpatory statements.  Charges may be dropped even if probable cause

exists when the prosecutors do not believe the case is strong enough to win, largely because the government's evidentiary burden to establish probable cause is much lower than its evidentiary burden to prove guilt at a criminal trial.

Second, a reasonable jury could also infer from the record that Montgomery's inculpatory statements caused detectives to become so fixated on him as the primary suspect that they did not fully investigate other suspects and ignored other evidence that pointed away from Montgomery. In other words, had the detectives not extracted the inculpatory statements during Montgomery's first interview, it is likely that they would not have focused in on him as the murderer at the expense of a more fulsome investigation that could have uncovered other suspects and led to other arrests.

Montgomery has raised numerous facts that show that detectives were fixated on him despite strong exculpatory evidence and did not complete a well-rounded investigation as a result: (1) Montgomery's DNA was not a match for the DNA recovered at the crime scene; (2) there was another suspect identified by a tipster who was never fully investigated and whose DNA was not sampled; (3) MPD never uploaded the DNA from the crime scene to CODIS to look for matches on the database; (4) Montgomery did not match some of the eye witnesses' descriptions of the murderer; (5) Montgomery had no visible bruising or defensive wounds despite testimony that the perpetrator was beaten up the night of the murder; (6) Montgomery had a significant limp limiting his ability to walk, yet the murderer ran away from the crime scene at a fast pace; (7) the only two eyewitnesses to the murder were never presented with a photo array; and (8) MPD ended its investigation only ten days after its interrogation of Montgomery. All of these facts support the reasonable inference that, without the inculpatory statements obtained during an interrogation without accommodation, the MPD detectives would not have been so fixated on Montgomery given this other exculpatory evidence. They also support the inference that, had Montgomery not

given inculpatory statements, the detectives would have more fully investigated other leads, which might well have led to a different charging decision.  And this is all underpinned by the fact that Montgomery was ultimately acquitted of the crime, which, while not dispositive, is an important fact that makes his factual innocence significantly more likely.

Hence, the Court declines to alter its prior determination that Montgomery has adduced sufficient evidence at this stage supporting the inference that, had he been accommodated for his disability during his interrogation, he would not have been prosecuted, precluding the entry of summary judgment for the District on the issue of probable cause.

*       *       *

At bottom, the District's argument is premised on the notion that Montgomery's theory is supported by merely speculative inferences rather than by evidence in the record on which a reasonable fact finder could rely to draw such inferences.  The Court disagrees.  All proximate cause assessments are speculative to some degree.  Here, Montgomery moved beyond mere speculation by pointing to sufficient facts in the record that support the inferences a reasonable jury could draw that would show that the District's failure to accommodate was the proximate cause of his prosecution and detention.

**<u>Conclusion</u>**

For the foregoing reasons, the Court will deny the District's motion for reconsideration. Accordingly, the Court orders the parties to meet and confer to discuss the next steps in this litigation and to file a joint status report outlining a schedule for further proceedings by not later than August 15, 2023.  The Court also orders the parties to appear for a status conference on August 16, 2023 to discuss the status of the litigation and the proposed schedule.  A separate accompanying Order will issue on this date.

26

_____
/s/
JOHN D. BATES
United States District Judge

Dated:  July 21, 2023